# EXHIBIT D



# England and Wales High Court (Commercial Court) Decisions

---

**You are here:** BAILII >> Databases >> England and Wales High Court (Commercial Court) Decisions >> Fortress Value Recovery Fund I LLP & Ors v Blue Skye Special Opportunities Fund LP (A Firm) & Ors [2012] EWHC 1486 (Comm) (30 May 2012)
URL: *http://www.bailii.org/ew/cases/EWHC/Comm/2012/1486.html*
Cite as: [2012] EWHC 1486 (Comm)

---

[New search] [Printable RTF version] [Help]

---

**Neutral Citation Number: [2012] EWHC 1486 (Comm)**

Case No: 2011 FOLIO 1565

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

Royal Courts of Justice
Strand, London, WC2A 2LL

30/05/2012

B e f o r e :

**MR JUSTICE BLAIR**

_____

Between:

**(1) FORTRESS VALUE RECOVERY FUND I LLC (2) ZBS CAPITAL PARTNERS L.P. (3) CYPRESS WAY EUROPEAN ASSET INVESTORS II SARL**  **Claimants**

**- and -**

**(1) BLUE SKYE SPECIAL OPPORTUNITIES FUND L.P. (A Firm)**
**(2) MR SALVATORE CERCHIONE**
**(3) MR GIANLUCA D'AVANZO**
**(4) STEPSTONE ACQUISITION Sàrl**
**(5) BLUE SKYE GP LTD**
**(6) DBZ SPECIAL INVESTMENT (LUX) Sàrl**
**(Formerly BLUE SKYE (LUX) Sàrl)**
**(7) BENLOMOND CORPORATION Sàrl**
**(8) BLUE SKYE MANAGEMENT Sàrl**
**(9) BLUE SKYE CAPITAL Sàrl**
**(10) BLUE SKYE MANAGEMENT Sàrl SCS**  **Defendants**

**(11) GREENTEA S.A.**
**(12) BLUE SKYE FINANCIAL HOLDINGS Sàrl**
**(13) OMEGA SKYE PARTNERS LIMITED**
**PARTNERSHIP (A Firm)**
**(14) OMEGA PARTNERS Sàrl**
**(15) MR MATTIA MIRKO DANESE**
**(16) MR FRANCESCO PAOLO PADULA**
**(17) MR GIOVANNI CASLINI**
**(21)BSKYE INVESTORS Sàrl**

————————————

**Mr Ewan McQuater QC, Mr David Quest and Mr David Head (instructed by Slaughter and May) for the Claimant**
**Mr Tim Lord QC, Mr Orlando Gledhill, Ms Sarah Abram, Mr Edward Harrison and Mr Craig Morrison (instructed by Reynolds Porter Chamberlain LLP) for the Second, Third, Fifth, Seventh to fourteenth and Twenty-First Defendants**
**Mr Daniel Toledano QC and Mr Thomas Plewman (instructed by Stephenson Harwood) for the Fifteenth, Sixteenth and Seventeenth Defendants**
**Hearing dates: 25th and 26th April 2012**

————————————

**HTML VERSION OF JUDGMENT**

————————————

Crown Copyright ©

**MR JUSTICE BLAIR:**

1. This hearing is the return date of an injunction granted without notice on 26 January 2012 by Eder J, and continued on 10 February by Christopher Clarke J. Though the continuation of the injunction is not for the present opposed, there are a number of applications before the court for decision.

2. The underlying dispute is between investors relating to certain Italian assets including healthcare receivables and various distressed assets which are said by the defendants to be worth in the region of €200m. The assets are held pursuant to a complex investment holding structure. The opacity of the arrangements (something also commented on at the earlier hearing by Christopher Clarke J) is such that it is difficult to summarise the real commercial interests of the parties. The most valuable of the assets are the Italian healthcare receivables, which are held by one of the asset-holding companies at the bottom of the corporate structure, an Italian company called Beta Skye Srl.

3. In brief, Mr Salvatore Cerchione (the second defendant) and Mr Gianluca D'Avanzo (the third defendant) started to invest in the assets in 2005, at that time on behalf of a private hedge fund called DBZwirn. A new structure was set up in December 2008 based around a fund called the Blue Skye Special Opportunities Fund LP (that is, the first defendant, which I shall call the "Blue Skye Fund"). The Blue Skye Fund was managed by fifth defendant, Blue Skye GP Ltd. The defendants are all connected in one way or another with the Blue Skye investment group. Like the parties, I shall call these defendants as a group the "RPC defendants" (because they are represented by Reynolds Porter Chamberlain LLP).

4. By the December 2008 arrangements, the ultimate holding entity of the assets was the fourth defendant, a Luxembourg company called Stepstone Acquisition Sàrl ("Stepstone"). Stepstone held a 99.9% limited partnership interest in the Blue Skye Fund, which in turn held 100% of the sixth defendant (DBZ Special

Investment (Lux) Sàrl which was formerly known as Blue Skye (Lux) Sàrl), which in turn held all of the shares in the companies making up the Italian assets.

5. The claimant companies fitted in as follows. The third claimant ("Cypress Way") held a 48.95% shareholding in Stepstone. The second claimant ("ZBS") made available a loan to Stepstone secured on Stepstone's interest in the fund. (The loan was in the sum of about €98m, and is currently in default, the amount outstanding including capitalised interest according to the evidence being about €108m.) The first claimant (then called DBZwirn Special Opportunities Fund, LP) was the Security Trustee in respect of the loan made available by ZBS to Stepstone. All this was the subject of contractual documentation, some of which is relevant for the applications to be dealt with at this hearing.

6. In about June 2009, the first claimant, part of the Fortress Investment Group LLC, which is a New York based investment firm, came into the structure. Fortress was appointed adviser to funds previously managed by DBZwirn. As the RPC defendants put it, Fortress thereby "inherited" the interests of the second and third claimants, that is, the 48.95% Cypress shareholding in Stepstone, and the ZBS loan. I do not think it is in dispute that when the debt and equity investment is taken together, Fortress has the greatest interest in the Italian assets. The other substantial interests are those of DeA Capital Investment SA (which is part of the De Agostini group and which is not a party to these proceedings), and those of Mr Cerchione and Mr D'Avanzo themselves.

7. It is clear that relations between Fortress and the defendants soon deteriorated. There was a restructuring of the investments in 2011 which has given rise to this dispute. The Blue Skye Fund was dissolved, and control of the assets is now with the tenth defendant, Blue Skye Management Sàrl SCS. At the bottom of the holding structure, Blue Skye (Lux) Sàrl no longer holds the shares in the companies making up the Italian assets, its place being taken by a company called Blue Skye Financial Holdings Sàrl.

8. So far as the defendants are concerned, the restructuring was open and legitimate. So far as Fortress is concerned, the restructuring is contentious and unlawful. It led to the *ex parte* application by the claimants to Eder J. The injunction granted on 26 January 2012 in substance freezes the investment holding structure by restraining disposals, transfers, dealings, restructuring or reorganisation of the interests in the entities comprised in the structure pending determination of the dispute. The order, therefore, was made to preserve the structure. It is not an order freezing the defendants' assets generally, which may be of some significance when considering the claimants' disclosure application.

9. The matter came back before Christopher Clarke J on 10 February 2012. Though the defendants did not actively oppose the continuation of the injunction on that occasion, they did not consent to it. Then as now, an important part of the claimants' case concerns the effect of the issue of convertible loan notes in March 2011 by the tenth defendant, Blue Skye Management Sàrl SCS. The claimants say that this (taken together with a call option entered into in June 2011) permits the dilution of their interests in the assets to next to nothing (see [2012] EWHC 451 (Comm) at [15] to [26]). This is the substance of their complaint in these proceedings.

10. In continuing the injunction, the judge said at [5] that on the basis of the material before him and without hearing contrary argument, " … there is a good arguable case that the restructuring transactions whereby the assets of the [Blue Skye Fund] were stripped out and Stepstone's interest in the Fund was eliminated, amounted to a breach by Stepstone of the loan agreement, and to breaches of the security agreement and of the [Blue Skye Fund] Partnership Deed, and that the respondents procured those breaches, or conspired to commit unlawful acts which have caused damage to, or unlawfully interfered with the business of the applicants. It seems to me to be well arguable that those torts are most closely connected with England and that there is relief available under section 423 Insolvency Act 1986. It seems to me, also, that damages may well not be an adequate remedy and that there is sufficient risk to justify the continuance of the order sought". At that point, the claimants' case was not pleaded, and consequently the defendants had not filed a defence.

11. Meanwhile, in circumstances which are in dispute, insolvency proceedings in respect of Stepstone were getting under way in Luxembourg. Mr Mattia Danese and Mr Francesco Padula (the fifteenth and sixteenth defendants) were two of the three managers of Stepstone until it was put into liquidation by order of the Luxembourg Court of Appeal on 28 March 2012. They are also managers of the fourteenth defendant. Mr Danese and Mr Giovanni Caslini (the seventeenth defendant) were at various times managers of the sixth, seventh and twelfth defendants. Again, like the parties, I shall call these defendants as a group the "defendant managers". They are separately represented.

12. Though dishonesty was not expressly asserted when the injunction was obtained, the claimants have since pleaded a case against the defendants which is in summary that in the course of 2011, Mr Cerchione and Mr D'Avanzo, acting in concert with the other defendants (except the fourth defendant), as managers of the Blue Skye Fund, designed and implemented a dishonest scheme to reorganise the fund and its assets, the purpose and effect of which was to diminish or eliminate the claimants' rights and interests in relation to the assets, to take the control and benefit of the assets for themselves, and to enable them and their associated entities to extract fees and other value from the assets without reference to or oversight from the claimants.

13. The RPC defendants then filed a detailed defence. This is to the effect that there was no dishonest intent to promote the future interests of Mr Cerchione and Mr D'Avanzo to the prejudice of the claimants, who have not been harmed and nor will they be. Mr Cerchione and Mr D'Avanzo have not benefited improperly, it is asserted, and the acts complained of by the claimants were undertaken in the interests of all persons with interests in the investment structure, in particular in order to protect and enhance the value of the most important of the Italian assets, Beta Skye (which invests in the healthcare receivables). The purpose of issuing the convertible notes was to attract new investment to repay the ZBS loan, and the claimants were kept fully informed including through their nominee director on Stepstone. The defendants with interests in the investment structure (including Mr Cerchione and Mr D'Avanzo) have benefited from the reorganisation in proportion to their interests as investors in that structure and not to the prejudice of the claimants.

14. The three defendant managers have also now filed a detailed defence in which they deny participating in any dishonest scheme, and deny all of the claims against them. They say that they acted in good faith in the interests of the companies of which they were managers.

15. How things presently stand so far as the injunction is concerned is as follows. The claimants' application for the further continuation of the order "is not for now resisted by the RPC Defendants" (quoting from their skeleton argument) "on the basis that any continued order should be until further order, and not until judgment or further order (as the Claimants propose). The RPC Defendants may apply for the Order to be discharged, e.g. once their application to strike out and/or for summary judgment has been determined, at which time the Court will be able to determine whether the remaining Claimant(s) has or have a good arguable case against the RPC Defendants". As stated here, the RPC defendants intend to apply to strike out and/or for summary judgment in relation to a number of the claimants' claims. This is partly on the basis that the claims of Cypress Way and ZBS (or some of them) are "reflective" of Stepstone's losses, which (it is submitted) can only be recovered by the company, Stepstone.

16. The defendant managers do not oppose the application for a continued injunction.

17. The matters actively in issue at this hearing are consequently as follows:

   (1) The claimants' disclosure application from Mr Cerchione and Mr D'Avanzo.

   (2) The RPC defendants' application for further fortification of the cross-undertaking in the order (an application for an amendment to clarify the relevant part of the order is not pursued).

   (3) The defendants' application for the claimants to provide security for costs.

(4) The application by Mr Cerchione, Mr D'Avanzo, Blue Skye GP Ltd (the fifth defendant), Omega Skye Partners Limited Partnership (the thirteenth defendant) and Omega Partners Sàrl (the fourteenth defendant) for the stay of various claims said to be brought in breach of an arbitration clause.

(5) The claimants' application for permission to re-re-amend the Claim Form (which is not opposed in principle).

(6) Directions, in particular as to the RPC defendants' intended strike-out/summary judgment application.

(7) Costs, in particular an application by the defendant managers for their costs of two applications for the variation of the order in respect of its anti-suit injunction aspect (this refers to the Luxembourg insolvency proceedings).

In summary, the issues which were the subject of argument at the hearing were disclosure, fortification, security for costs, stay pending arbitration, and the defendant managers' application for their costs of earlier hearings, and I shall take them in that order.

The claimants' application for disclosure by Mr Cerchione and Mr D'Avanzo

18. The background to the application is as follows. In the *ex parte* order of 26 January 2012, Eder J ordered disclosure in relation to the holding structure and its history. At the first *inter partes* hearing on 1 February 2012, concerned about the burden on the defendants, he significantly narrowed the terms of the order, saying that the right approach as to disclosure was to proceed in stages. The order he made required Mr Cerchione and Mr D'Avanzo to swear an affidavit "setting out to the best of their ability the structure in which the [Italian Assets] are now held, and in particular whether the chart exhibited [to the Affidavit of Douglas Boyd Thomas in support of the application for the injunction] is correct or incorrect as at the date of the Respondent's affidavit and, if or insofar as such information is incorrect, stating the correct position". The chart shows the claimants' understanding of the holding structure, and is one of a number that are now before the court. The affidavits of Mr Cerchione and Mr D'Avanzo were served on 7 February 2012.

19. At the next hearing on 10 February 2010 the claimants sought further information, but although Christopher Clarke J required certain information already provided to be verified on affidavit, he did not make any further order. He was not however ruling out any further application for disclosure, and I reject the defendants' contention to that effect. I also reject the defendants' contention that the present application should have been made earlier, and should be rejected on that ground—the information was requested by letter prior to the issue of the application, and there has been no material delay.

20. By the claimants' application of 30 March 2012, the claimants seek three categories of disclosure from Mr Cerchione and Mr D'Avanzo. The third has been provided largely by way of the defence, and I need say no more about it. The others relate to (1) management fees and expenses, and (2) nature and value of current assets held.

21. The terms of the application are so far as relevant set out in the draft order attached to the application and are as follows (the term "respondent" coincides with the term "defendant").

6. The Second Respondent or the Third Respondent must, by 4pm on […] 2012, swear and serve on the Applicants' solicitors a further affidavit setting out and/or exhibiting the following information and/or documents:

6.1. All agreements and arrangements for the payment of or transfer by the Seventh, Tenth, Eleventh or Twelfth Respondent or any of their direct or indirect subsidiaries to the Second Respondent, the Third Respondent or any entities under their control or in which they are

interested of any fees, expenses, assets or other benefits, and exhibiting all such agreements and/or arrangements in so far as in writing.

6.2. All distributions paid to any of the Respondents in respect of their management or involvement or otherwise in connection with the management of the companies, partnerships, entities and instruments identified at paragraph 5 above and /or the Italian Assets (including but not limited to salaries and expenses paid) for the period from 31 December 2010 to date.

6.3. A list of each of the Italian Assets (including loans and/or other debts or financial instruments) held at the last valuation date, the value ascribed to each asset at that date, and an explanation as to the manner in which the make-up or valuation of the Italian Assets has changed since that date.

6.4. All information given to and other information relied upon by Butterfield Fulcrum to enable it to produce the Quarterly accounts referred to at paragraph 9 of the Second Respondent's First Affidavit dated 7 February 2012 ("Cerchione 1").

22. The claimants submit that (1) all of the information now sought would already have been provided if Mr Cerchione and Mr D'Avanzo had complied with their disclosure obligations under the Order of Eder J of 1 February 2012 which required them to serve an affidavit "...setting out to the best of their ability the structure in which the Assets...are now held...". In any event (2) they should now be directed to provide such information so that the Order can be policed and made effective.

23. Mr Cerchione and Mr D'Avanzo dispute both these points. They submit that they have complied with the Order, which does not freeze assets, but freezes an investment structure. There is therefore not the ordinary risk of specific assets being spirited away and the Particulars of Claim (they say) contain no allegation that any have been. None of the information now sought is necessary to police the order; further, the requests are disproportionate.

24. Mr Cerchione and Mr D'Avanzo also submit that the parties to the December 2008 transactions under which the claimants acquired their current interests, including the claimants themselves (which did not at that time have any connection to the Fortress group), deliberately limited the information and oversight rights given to each of the claimants. The reality is that, when the claimants came to be advised by Fortress in mid-2009, Fortress inherited transactions and investments which it had not itself negotiated and agreed. The claimants, it is said, then became dissatisfied with the information rights to which they had agreed and despite their limited rights demanded much more information than they were entitled to. The claimants have always had, it is said, a great deal of information about the investment structure: for instance, they have since 2008 had a representative (Tomas Lichy) on the board of Stepstone.

25. As to entitlement to information, the claimants submit to the contrary that the investment structure established in December 2008 provided (as it was put in oral argument) "relative visibility" in relation to the investments. Reference was made to a Deed of Limited Partnership dated 24 December 2008 in respect of the Blue Skye Special Opportunities Fund Limited Partnership. (This is the now dissolved first defendant.) This deed provided that Blue Skye GP Ltd (the fifth defendant) would provide to limited partners (including Stepstone) such information, including in relation to underlying assets, as they might reasonably request.

26. Under the deed there was also, the claimants submitted, relative visibility as to what Mr Cerchione and Mr D'Avanzo or their entities were charging for their management services. This was in essence 20% of the investment return, plus 2% annually of the Net Asset Value of the investments. However, the claimants do not know what is being charged under the new structure (a fact that is not in dispute).

27. The claimants are not parties to the Blue Skye Partnership Deed, but Stepstone is a party. The claimants point to the fact that by the Loan Agreement also dated 24 December 2008 in respect of the ZBS loan to Stepstone, the borrower (that is Stepstone) has to provide to the claimants financial information received

from Blue Skye GP Ltd and/or the Blue Skye Fund, as well as such information about the operation of the Blue Skye Fund and Blue Skye (Lux) Sàrl and the underlying assets as the claimants might reasonably request. In short, the claimants submit that whereas there was at least some visibility as to charges and assets under the old structure, and the means of obtaining it, they are in the dark as to the position under the new structure.

28. On this issue, whilst I accept the contention on behalf of Mr Cerchione and Mr D'Avanzo that the 2008 structure did limit the information and oversight rights given to each of the claimants, I also accept the claimants' submission that when one examines the contractual provisions, they provide for a considerable degree of disclosure. Further, when one recalls that the claimants are substantial investors in a fund managed by Mr Cerchione and Mr D'Avanzo, it is legitimate to ask how the information sought, or some of it, may reasonably be withheld, whether or not it is required under the terms of the injunction. To take the position as regards fees and expenses, although the defence served a few days before this hearing states that the 20% of the gain plus 2% of the NAV is no longer payable, there is (or was) no indication of what is now payable.

29. This approach was not readily tenable, and in the course of his oral submissions at the end of the first morning of the two day hearing, Mr Tim Lord QC, counsel for the RPC defendants, handed in a written "Statement of Management Fees and Expenses". The document must be confirmed on affidavit. The claimants' position was that they needed time to study the document, but that with commonsense on both sides, the position as regards fees and expenses should be capable of being resolved between the parties without a further ruling from the court. I agree that this approach should be adopted.

30. That leaves for decision the application so far as it applies to disclosure of the nature and value of current assets held. The terms of the order sought are those in paragraphs 6.3 and 6.4 of the draft order which I have set out above.

31. The claimants maintain that pursuant to the Loan Agreement and corresponding provisions of the Blue Skye Fund Partnership Deed, they were entitled to make reasonable requests for disclosure of information relating to the operation of the Blue Skye Fund, Blue Skye (Lux) and the underlying Italian Assets. There is no practical reason, they submit, why they should not be entitled to such information now.

32. In oral submissions, the response on behalf of Mr Cerchione and Mr D'Avanzo is that the latest accounts of the company which is now the immediate holding company in relation to the Italian assets, that is, Blue Skye Financial Holdings Sàrl, are currently being audited by PricewaterhouseCoopers, and will be available by the end of June, that is, by the end of next month after the hearing. These accounts, it was suggested, will provide such information about the assets as the claimants should reasonably have.

33. However, as was pointed out on behalf of the claimants, it is not known what level of detail, if any, these accounts will give about the underlying assets. I do not therefore regard the provision of accounts as meeting the claimants' demands at a practical level.

34. The claimants submit that the quarterly valuations which have been provided give no detail as to the investments constituting the Italian Assets, whether as to the type or nature of holdings, their present individual value, or the nature of value of any transfers or other relevant transactions. Although the valuations are prepared by an independent administrator, Butterfield Fulcrum, no explanation is given as to the basis of such valuations or as to the information available to that firm. As a factual matter, both these propositions are in my view correct.

35. The claimants also rely on the fact that the RPC defendants have indicated that notwithstanding their illiquid nature, the Italian assets "change regularly in the ordinary course of business". They submit that in the absence of any detail as to the nature and constitution of the assets, neither the claimants nor the court can be sure as to the extant "structure". Nor can they properly police the order, since they cannot tell whether any dealings or transfers fall within the ordinary course of business exception in paragraph 9 of the Order, including whether such transfers are made for full value. Information about the underlying

assets must be readily available to the defendants, or else quarterly reports and valuations could not be provided. Documentation relating to the nature and value of underlying assets will be disclosable in due course in any event because their value is an issue in the case.

36. In summary, it is submitted on behalf of Mr Cerchione and Mr D'Avanzo that the claimants are not entitled to this information because it is not concerned with the structure of the investments, is not necessary to police the order, is oppressive and disproportionate in its extent, and is commercially sensitive and confidential.

37. My conclusions are as follows. First, it is to be noted that the application is not based on the contractual rights to information mentioned above. It is part of the claimants' case that these contractual rights have been rendered useless by the restructuring. To make good the present application, the claimants must show that the information sought either falls within the disclosure ordered on 1 February 2012, or that it should be provided now so that the order can be policed and made effective. As to the last point, it is not in dispute that the court has power to order disclosure ancillary to an injunction to ensure that the injunction is properly policed and effective to achieve its purpose: see e.g. *Motorola Credit Corp v Uzan* [2002] All ER (Comm) 945, CA at [29].

38. Second, I reject the submission that the information sought falls within the disclosure ordered on 1 February 2012. The order was to the effect that Mr Cerchione and Mr D'Avanzo serve an affidavit setting out "...the structure in which the Assets (as defined in Schedule 2 of the claim form) are now held...". The information now sought goes to a different issue, namely the makeup of the assets, rather than the structure under which they are held.

39. The question, therefore, is whether the information is necessary to police the injunction. I can see that it might be difficult to make the injunction effective without some understanding as to the nature of the assets which are held, insofar as the claimants do not already have such an understanding. However, Mr Cerchione and Mr D'Avanzo submit (to quote their skeleton argument) that the requests are extraordinarily broad and are oppressive, disproportionate and contrary to the balance of convenience, because they would require an immense level of detail to be provided about each of the investments in the Italian assets. It appears that the claimants are seeking information about every investment held by each of the Italian asset businesses. Bearing in mind, they say, that the total value of the Italian assets is approximately €200 million, held through a number of companies in a range of assets including Italian healthcare and other public administration receivables, non-performing loans and real estate, it will readily be seen that the amount of information sought is huge.

40. In my view, this submission is largely justified, as can be seen by an examination of paragraphs 6.3 and 6.4 of the draft order. I do not accept that information sought in such wide terms is necessary to ensure that the injunction is properly policed and effective to achieve its purpose. As regards the submission that it is required in order to tell whether any dealings or transfers fall within the ordinary course of business exception in paragraph 9 of the Order, as already noted, this is not a freezing order of the usual kind. I think the defendants are right to say that the ordinary course of business exception has to be seen in the light of the fact that the order freezes the structure rather than the assets. It is correct that the order was itself made in wide terms, but that this was the intent is made in clear in (among other places) the claimants' skeleton argument in support of the application for the order. This says that the order sought was "intended to maintain the status quo of the structure itself, rather than seeking to restrict the ordinary day to day management of the underlying Italian Assets".

41. I accept that the degree of visibility envisaged in the original contractual scheme is something to be weighed in the discretionary balance in favour of some degree of disclosure as regards the assets. But even taking that into account in the claimants' favour, I consider that an order in the terms sought would be disproportionate. The claimants did not offer a more limited form of wording. Accordingly, I will not make the order sought, and need not in those circumstances consider the defendants' alternative case as to commercial sensitivity (they point out that significant redactions have been made to the accounts disclosed

by the first claimant). As regards future disclosure, which appears likely to remain an issue, the parties should try to reach agreement without the necessity for a resolution by the court.

Fortification

42. The RPC defendants apply for further fortification of the cross-undertaking in the order. Pursuant to the order of Eder J, the claimants' cross-undertaking as to damages is presently fortified by a deposit of €4 million held to the order of the court by Slaughter and May. The RPC defendants apply for an order that the amount of fortification be increased, the figure suggested in oral submissions being €25 million. The claimants resist the application.

43. The principles are not in dispute. A freezing order is a draconian remedy, usually made *ex parte*, and fortification is ordered to ensure that if it turns out that the order should not have been granted, and the defendant (or a third party) suffers loss as a result, the loss should be readily recoverable through the cross-undertaking in damages that the claimant has to give in order to obtain the order. Fortification may be ordered, even where the claimant has substantial assets, and is within the jurisdiction of the court. This is a general principle, and specifically recognised in the context of commercial cases by paragraph F15.4 of the Admiralty & Commercial Courts Guide. Although such loss, and certainly the quantification of the loss, will lie in the future, the court has to make an intelligent estimate of the likely amount (*Harley Street Capital Ltd v Tchigirinski* [2005] EWHC 2471 at [17], Michael Briggs QC). At the *ex parte* stage, the judge makes the best estimate possible on the available information. Where fortification or increased fortification is sought subsequently, it is for the applicant for fortification to show the risk of loss (*Sinclair Investment Holdings v Cushnie* [2004] EWHC 281 (Ch) at [24], Mann J).

44. The RPC defendants submit that the principle that the amount of fortification in this case should be based on the value of Mr Cerchione and Mr D'Avanzo's combined equity interests in the investment structure was established at the hearing before Eder J. But, it is said, the result was too low because of a misunderstanding in the claimants evidence of Luxembourg GAAP, since the relevant number in Stepstone's annual accounts, on which reliance was placed, refers to the original net asset value of the assets at the time of their acquisition (as Luxembourg GAAP require), not to their value as at the date of the accounts. When that error is taken into account, and other interests added in, a figure of €15m is arrived at. When the interest of DeA Capital Investment SA is taken into account, an appropriate level of fortification is, the RPC defendants submit, €25m.

45. The claimants submit that Eder J did not calculate the amount of fortification using any particular methodology, a submission that I accept. In any event, matters have moved on, and on the present application it is for the RPC defendants to show a sufficient risk of loss to justify further fortification. I also consider that there is force in the claimants' submission as to the lack of underlying material to support the valuation. As appears above, the defendants resist disclosure generally, and specifically in relation to the composition of the assets.

46. As regards the evidence, the RPC defendants rely on a witness statement from their solicitors. The claimants responded (correctly in my view) that this did not explain how the grant of the injunction has or might cause any loss to the value of the equity interests of Mr Cerchione and Mr D'Avanzo. The defendants sought to meet this by a further witness statement from their solicitors, as verified by Mr Cerchione following criticisms by the claimants of the indirect nature of the evidence.

47. What is said is as follows. The continuance of the order will in practice eliminate any prospect of obtaining any further investment in the structure. This is because potential investors will require legal advice as to the order, and its existence will in practice prevent them from giving serious consideration to an investment. The value of the equity interest held by existing equity holders in the structure is therefore likely to be affected by the impact of the order on opportunities for attracting new investment. If new investment does not come into the structure, that is likely to reduce growth in or impair the value of the assets, because the opportunity to make new investments or required financing for existing investments will be restricted. Reliance is also placed on what is said to be a significant and continuing reputational

impact of the order, in an industry based on relationships of trust and the confidence of investors to allow their money to be managed by third parties.

48. The claimants' response is that this is inadequate. The RPC defendants have had an opportunity since the *ex parte* hearing to put in substantial evidence of likely damage, but have not done so. The proposition that the prospect of further investment in the structure has been eliminated by the order is purely speculative. Further, there is no evidence as to why further investment is needed to preserve the value of the assets. The evidence consists, it is submitted, of speculative and highly generalised submissions.

49. My conclusion on this point is as follows. I agree with the claimants that the evidence of the RPC defendants is of a very general nature. The court is invited, in effect, to assume that the impact of the order will be to eliminate incoming investment, with adverse results as regards the value of the investments of Mr Cerchione and Mr D'Avanzo. I can see that this is a possibility, but do not consider that the court is justified in drawing such an assumption at this stage without some specific material in support. The position may change, but I do not consider that the RPC defendants have made out a good case for further fortification at the present time.

50. So far as additional fortification in respect of the interest of DeA Capital Investment SA, no evidence has been submitted to show that this investor shares the concerns of the RPC defendants. If and when DeA Capital Investment SA considers that its interest is sufficiently threatened by the order to require fortification on its own account, and can show good grounds, it can make its own application.

Security for costs

51. All the defendants apply for the claimants to provide security for costs. The applications are made under CPR r. 25.13(2)(c), on the basis that there is reason to believe that the claimants will be unable to pay their costs if ordered to do so, and under CPR r. 25.13(2)(a), on the basis that the claimants are resident outside of the jurisdiction (and outside of a European state under the relevant European instruments).

52. As to the latter, the first claimant is incorporated in Delaware and is managed in New York where it is said to be resident for these purposes, the second claimant is resident in the Cayman Islands, and the third claimant is a Luxembourg company which the claimants say is resident in Luxembourg (the RPC defendants say that it is resident in the Cayman Islands because it is majority owned by Cayman entities).

53. The approach of the court to an application under CPR r. 25.13(2)(c), on the basis that there is reason to believe that the claimants will be unable to pay their costs if ordered to do so, was not in dispute (see e.g. *Jirehouse v Beller* [2009] 1 WLR 751 at [21] et seq, Arden LJ). The defendants do not need to demonstrate on a balance of probabilities that the claimants will *not* be able to satisfy any costs order. However, there must be evidence that the company "*will be unable to pay*", which is more than mere doubt or concern about the future ability to pay (*Phaestos Ltd v Ho* [2012] EWHC 662 at [71], Akenhead J). The question is whether the defendant will be able to meet the costs order at the time when the order is made and requires to be met (*In re Unisoft Group Ltd (No 2)* [1993] BCLC 532 at 534, Sir Donald Nicholls V-C). The existence of a net asset balance at the time of the application for security is therefore not determinative. The issue involves consideration of the nature and liquidity of the assets (*Thistle Hotels Ltd v Gamma Four Ltd* [2004] EWHC 322, at [11] Sonia Proudman QC), since illiquid assets will not suffice.

54. The claimants' answer to the application on this ground is in substance that the first claimant is prepared to undertake to guarantee the costs liabilities of the other claimants, that the first claimant is a major international investment fund with extensive assets, and that there is no evidence that it is or might become insolvent, or that it has or might seek to put any assets out of the reach of its creditors or otherwise avoid its liabilities. The first claimant says that it is prepared to undertake to inform the defendants if its net assets fall below US$50 million or if it proposes to take any steps which would have that effect. In the circumstances, it is submitted, there is no basis for any order for security for costs.

55. The claimants have produced the audited accounts of the first claimant for the year ended 31 December 2010, and the draft accounts for the year ended 31 December 2011 (the latter were approved after the end of the hearing). The reported net assets as at 31 December 2010 are US$295 million, including US$34 million in cash and cash equivalents. The expected net assets for the year ended 31 December 2011 are US$159 million, including US$32 million in cash or cash equivalents.

56. The defendants, on the other hand, say that the first claimant is an investment vehicle whose business is to make and hold investments; the defendants do not know where those investments are made or held, what type of assets they are or how speculative they are. The business is fundamentally different from (for instance) that of an industrial company which owns identified fixed assets, such as land or factories. If, when costs orders are made, the first claimant only retains illiquid assets held in jurisdictions where enforcement is difficult or impossible, the parties will face the sort of secondary enforcement litigation which the security for costs rules are designed to avoid.

57. The following specific points arise on the factual position as regards the first claimant:

(1) It is not in dispute that the first claimant has been in wind-down since 2008, and cash is gradually being returned to investors. A letter dated 21 February 2008 from the then investment manager of the VRF Funds stated that it had decided to implement an orderly disposition of assets over a period of two to four years. In their evidence, the claimants say that an "orderly disposition" of the portfolios began in March 2008 and is continuing, and that the current position is that the process is expected to take another three to five years.

(2) The claimants submit that this is an orderly process, not an insolvent liquidation. The first claimant is solvent and has large net assets; there is no question of assets being distributed to members without liabilities first being paid or provision being made for them.

(3) The defendants submit however that the fact that the first claimant is in wind-down not only means that it may ultimately have disposed of its assets before the litigation is finally concluded, but also that such assets as it has are inherently unstable, since by definition they are being continuously returned to the investors in the fund.

(4) That there is potential volatility in the first claimant is, the defendants say, demonstrated by the drop in net asset value from an estimated US$250 million to approximately US$159 million between 31 November 2011 and 31 December 2011 (explained by an "unusually large unrealised write-down in the valuation of one of [its] investments").

(5) Further, the assets may be illiquid, and held by subsidiaries in many jurisdictions, something, the defendants say, which is not clarified by the accounts, making enforcement potentially very difficult.

(6) The claimants say that there are large cash deposits within the United States. However, the defendants point to the fact that cash has fallen significantly over the last couple of years. It started off at US$81.7 million at the beginning of 2010, it was US$34.7 million at the end of 2010, and it dropped to US$25 million by February 2012. The claimants say that it has now gone back up to US$34.7 million but the court only has evidence before it of balances of US$27 million.

58. The points of particular importance appear to me to be as follows. First, the financial statements show that presently the first claimant has a considerable net asset value, namely US$159 million, which is obviously much more than any possible costs liability. As against that, the fund is in the process of being wound down. As the defendants put it, it is not a company in the normal position trading in the normal way. The claimants submit that it is an orderly process, which I accept. But the question is whether the first claimant will be able to meet any costs liability when it falls due. The timescale of the wind down is not clear, and perhaps not known. It is equally unclear how long it may be before costs orders come to be made in this

litigation—the complexity of the issues are such that it may be some time. There is in the meantime the potential for substantial unforeseen volatility in the value of the fund, as seen at the end of 2011.

59. Then there is the question of the nature of the assets. As Mr Daniel Toledano QC for the defendant managers put it, net asset value is not in itself a helpful measure, because we know that the assets include, perhaps very largely, illiquid assets, and the authorities show that illiquid assets are inadequate. What is required are liquid assets that would be able to be utilised in respect of a costs order if and when a costs order has been made. I agree with that analysis.

60. The claimants maintained in argument that sufficient reserves would be maintained to meet its obligations, by which I understood them to be referring to cash reserves. However what they have offered the defendants is different. The first claimant says that it is prepared to undertake to inform the defendants if its net assets fall below US$50 million or if it proposes to take any steps which would have that effect. As the defendants point out, it is not an offer to undertake that the assets will not be reduced below US$50 million. It would put the onus on the defendants to make an application for security for costs when notified, at which stage the litigation might be far advanced. Further, it is not an offer to undertake that sufficient "cash or cash equivalents" will be held to meet the potential costs liability to the defendants. This may be (as the RPC defendants suggest) because cash balances are paid out to investors shortly after they are realised, as part of the winding up. But whatever the reason, this would leave the defendants, as they say, exposed to the risk that value was held in illiquid assets held in jurisdictions where enforcement is difficult or impossible.

61. Finally, notwithstanding the recent increase in cash assets, it is of some significance in my view that there is a downward trend in such assets, when viewed between 2010 and the present.

62. The position therefore is that the first claimant is in wind down, and has not offered any assurance that sufficient cash will be maintained to meet any potential costs liabilities to the defendants. Against that background, the question is whether the defendants have established that there is reason to believe that the first claimants will be unable to pay their costs if ordered to do so, and in my view they have.

63. So far as overall discretion is concerned, this is a case involving allegations of dishonesty against defendants including five individuals brought by claimants who are out of the jurisdiction and who have no assets within the jurisdiction. I am satisfied that having regard to all the circumstances of the case, it is just to require the first claimant to provide security.

64. I think it was common ground that the assets of the second and third claimants (the loan to and shareholding in Stepstone) are illiquid (as they clearly are). There must also be doubts as to the value of these assets, since Stepstone is in liquidation. Both must provide security for the defendants' costs. However, clearly the costs only need to be covered once, and on the assumption that the first claimant gives the proffered undertaking to guarantee the costs liabilities of the other claimants, it will suffice if the first claimant provides the security. Subject to any different agreement between the parties, security should be provided by payment into an account with Slaughter and May.

65. The defendants seek security up to the close of pleadings. So far as the amount is concerned, the RPC defendants seek £1,866,107.29, which figure includes £947,555.17 as the total costs incurred as of 26 March 2012, and £802,979.32 as an estimate of the additional costs that will be incurred prior to the close of pleadings. It also includes £115,572.80 as the costs separately incurred by the seventh and twelfth defendants, who are now also represented by RPC. So far as the defendant managers are concerned, they say (in their written submissions) that it is expected that their costs up until the end of the pleadings will be some £646,340.52 and they are seeking security in that amount.

66. The claimants say that even allowing for the complexity of the case and the length of the pleadings, that is a truly colossal amount, particularly when it is appreciated that the proceedings only began at the end of January this year. (They were not however prepared to state their own costs liabilities.) It has not been suggested that giving such security would stifle the claim.

67. The defendants justify the figures on the basis of the complexity of the case and the seriousness of the case involving as it does, allegations of dishonesty against them. It is submitted that the court should approach quantification of security on the basis that if in the event the defendants obtain a costs order, it is likely to be on an indemnity basis.

68. I do not consider that this is the right approach, though I do accept that the allegations of dishonesty, made as they are against fund managers, are grave ones, and have implications for the reputations of the individual defendants in particular. Though the amounts claimed are high, I do not accept the criticisms that were made of the defendants' schedules of costs in the claimants' written submissions. In oral argument, the primary point made by Mr Ewan McQuater QC for the claimants' was that a considerable proportion of the amount claimed was based on estimates, and that an award of security should allow for the likelihood of some reduction in any eventual assessment. I agree as to allowing for a reduction in any eventual assessment. Taking account of the nature of the case, I consider that security for costs should be ordered in favour of the RPC defendants up to the end of pleadings in the sum of £1,866,107.29, and in favour of the defendant managers until the end of pleadings in the sum of £646,340.52 each such sum to be reduced by 25%.

69. On that basis, the alternative applications under CPR r. 25.13(2)(a) on the ground that the claimants are resident outside of the jurisdiction are academic. Had I not ordered security under condition (c), I would have ordered it under condition (a) against the first and second claimants, but not the third claimant (the Luxembourg company). On the premise that the first claimant guarantees the costs liabilities of the other claimants, I think it was common ground that the amount of security would reflect the extra costs of enforcement in New York (*Nasser v The United Bank of Kuwait* [2002] 1 WLR 1868 (CA)). The RPC defendants' solicitor estimated the additional costs of enforcement at not less than US$150,000, and despite the claimants' criticism that it was plucked out of the air, and the evidence as to relative ease of enforcement in New York, in view of his extensive experience in the field I would have accepted that figure.

Stay under s. 9 Arbitration Act 1996

70. By an application of 26 March 2012, five of the defendants, that is, Mr Cerchione (the second defendant), Mr D'Avanzo (the third defendant), Blue Skye GP Ltd (the fifth defendant), Omega Skye Partners LP (the thirteenth defendant) and Omega Partners Sàrl (the fourteenth defendant) apply under s. 9 Arbitration Act 1996 and/or the court's inherent jurisdiction for a stay of various of the claimants' claims said to be brought in breach of an arbitration clause in a Deed of Limited Partnership dated 24 December 2008 in respect of the Blue Skye Special Opportunities Fund Limited Partnership, which is governed by English law.

71. The parties to the Partnership Deed are named on the first page, and are Blue Skye GP Ltd, Stepstone, Omega Partners Sàrl (then called IDeA AI Sàrl), and Omega Skye Partners LP.

72. The arbitration clause (clause 17.11) provides as follows:

> "**Governing law**
>
> This Agreement and the rights, obligations and relationships of the parties hereto under this Agreement shall be governed by and construed in accordance with the laws of England and Wales. Any dispute, controversy or claim arising out of or in connection with this Agreement or the formation, breach, termination or invalidity thereof, that the parties hereto are unable to resolve between themselves, shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce of Paris by three arbitrators appointed in accordance with the aforementioned rules. The place of arbitration shall be London, UK. All submissions and awards in relation to arbitration under this Agreement shall be in English, and all arbitration proceedings and pleadings shall be in English."

73. Section 9 Arbitration Act 1996 provides that, "A party to an arbitration agreement against whom legal proceedings are brought … in respect of a matter which under the agreement is to be referred to arbitration may … apply to the court in which the proceedings have been brought to stay the proceedings so far as they concern that matter". Other than in circumstances which are inapplicable in the present case, on application being made by a party to the arbitration agreement, a stay is mandatory.

74. The subject matter of the application is as follows. As well as claims brought by the claimants directly in their own capacity, their claims include claims brought indirectly to recover what is called the "Stepstone loss". The latter claims fall into two categories, namely (1) those of the first claimant (that is, Fortress), as the Security Trustee under a Security Assignment dated 24 December 2008; this assigns to the Security Trustee certain rights belonging to Stepstone; and (2) those of the second claimant (that is, ZBS) under the Luxembourg law *action oblique*, by which in certain circumstances a creditor (on this basis, ZBS, which made the loan to Stepstone) may exercise the rights of its debtor (Stepstone). The claims are disputed.

75. The application is for a stay of these claims. It does not apply to all the claims against the defendants making the application. The claimants make the comment that it is difficult to understand why the application is being made, since it is apt to result in inconvenience and extra cost in the final resolution of the substantive dispute. They also have concerns as to issues in the action and the arbitration overlapping. However they accept that the grant of a stay under s. 9 of the 1996 Act is a matter of entitlement and not discretion, and that these considerations are not in themselves an objection to the grant of a stay.

76. It is not in dispute that Stepstone's claims against Blue Skye GP Ltd (the fifth defendant), should be stayed in accordance with paragraphs 1 – 2 of the Draft Order attached to the application.

### *Omega Skye and Omega Partners*

77. Omega Skye Partners LP (the thirteenth defendant) and Omega Partners Sàrl (the fourteenth defendant) are parties to the Partnership Deed, being Limited Partners. So far as relevant, the claims advanced on Stepstone's behalf against them include conspiracy (Particulars of Claim, E1), unlawful interference (Particulars of Claim, E2), procuring a breach of the Blue Skye Fund Partnership Deed (Particulars of Claim, E7), dishonestly assisting breaches of duty by Mr Danese and Mr Padula (Particulars of Claim, E8, paragraph 162), dishonestly assisting breaches of duty by Blue Skye GP (Particulars of Claim, E8, paragraph 163), and tortious claims under Luxembourg law (Particulars of Claim, E10).

78. The claimants oppose the application for a stay on the basis that the claims have nothing at all to do with the Blue Skye Fund or their participation in it. They contend that the complaint against Omega Skye and Omega Partners relates to their separate role as shareholders in Stepstone. Their participation in the allegedly dishonest scheme, it is said, was to facilitate the seizing of control of the board of Stepstone by the defendants. The claims, it is submitted, are not claims "arising out of or in connection with" the Blue Skye Fund Partnership Deed. They are claims arising out of Omega Skye and Omega Partners' conduct as shareholders of Stepstone.

79. The defendants submit that this distinction between the roles of Omega Skye and Omega Partners as shareholders in Stepstone, and their roles as partners to the Partnership Deed, is an artificial one. The claims, including the claim for procuring a breach of the Partnership Deed, and also the other claims relating to the restructuring, are claims that are brought "in connection with" the Partnership Deed. The claimants' case is that the RPC defendants acted unlawfully in terminating the partnership constituted by the Partnership Deed and transferring assets from the Blue Skye Fund to Blue Skye SCS. The claims therefore arise "in connection with" the "termination" of the Partnership Deed.

80. I accept the defendants' submissions. A wide construction of the arbitration clause is mandated by *Fiona Trust & Holdings Corp v Privalov* [2007] UKHL 40 at [12] and [13]. Whether for the purposes of the dispute Omega Skye and Omega Partners are viewed as shareholders in Stepstone, or as partners, I am satisfied that the claims in question are claims "arising out of or in connection with" the Partnership Deed, or "the formation, breach, termination or invalidity" of the agreement. On that basis, the claims against

Omega Skye and Omega Partners (the thirteenth and fourteenth defendants), should be stayed in accordance with paragraphs 3 – 4 of the Draft Order attached to the application.

***Mr Cerchione and Mr D'Avanzo***

81. That leaves the application by Mr Cerchione and Mr D'Avanzo. The Stepstone claims against them are (I think it was accepted) broadly the same in nature as those against Omega Skye and Omega Partners which I have set out above (there is additionally a knowing receipt claim). However, the difference is that neither Mr Cerchione nor Mr D'Avanzo is a party to the Partnership Deed. The claimants say that this rules out an application on their part, since s. 9 Arbitration Act 1996 only gives standing to a "party to an arbitration agreement against whom legal proceedings are brought".

*The submissions on behalf of Mr Cerchione and Mr D'Avanzo*

82. The case of Mr Cerchione and Mr D'Avanzo in this respect is based on clause 17.14(a) of the Partnership Deed by which, "Any person (other than the Parties to this agreement) who is given any rights or benefits under this agreement (including pursuant to Clause 17.2 and the definition of "Independent Valuer") shall be entitled to enforce those rights or benefits against the parties in accordance with the Contracts (Rights of Third Parties) Act 1999". Although not named parties, they submit that they are to be treated as parties under s. 8(1) of the 1999 Act.

83. In considering this question, it is first necessary to set out the position of Mr Cerchione and Mr D'Avanzo under the Partnership Deed. They are named as "Key Managers". I do not think it was disputed that Mr Cerchione is a "Nominated Director" on account of his directorship of the General Partner, that is, Blue Skye GP the fifth defendant. Nor do I think it was disputed that Mr Cerchione and Mr D'Avanzo are on the claimants' case "Associates" of the General Partner. That is because by clause 1.1, the term "Associate" means "any person which in relation to the person concerned is ... (e) any person ... who exercises day to day control over the person concerned or over the ultimate direct or indirect holding entity (or entity which ultimately controls, directly or indirectly), of the person concerned". By clause 1.7, "The term "controlled by" [means] the possession, directly or indirectly, of the power to direct or procure the direction of the management and policies of a person, whether through the ownership of shares, by contract or otherwise".

84. Under clause 17.2 ("Exculpation and indemnities"), the Partnership Deed, to quote the RPC defendants' skeleton argument, extends an indemnity to "Associates" of Blue Skye GP and to officers and directors of Blue Skye GP. Three sub-clauses (the text of which is annexed to this judgment) are relied on in this regard:

(1) Clause 17.2.1 is an exclusion clause, providing that neither the General Partner (Blue Skye GP) nor any of its Associates "shall have any liability for any loss to the Partnership or the Partners arising in connection with the services to be performed hereunder or pursuant hereto...". Mr Cerchione and Mr D'Avanzo are Associates and Stepstone is a Partner. There follows a proviso in respect of fraud, etc.

(2) Clause 17.2.2 provides that the Blue Skye Special Opportunities Fund LP (the first defendant) "Agrees to indemnify and hold harmless out of Partnership Assets the General Partner and any Associate ... against any and all liabilities, actions, proceedings, claims, costs, demands, damages and expenses (including legal fees) incurred or threatened ..." in relation (in essence) to the activities of the Blue Skye Fund. Mr Cerchione and Mr D'Avanzo are Associates. There follows a proviso in respect of fraud, gross negligence, etc.

(3) Clause 17.2.3 excludes liability and extends an indemnity out of partnership assets to any "officer, director, shareholder, agent, partner or employee of the General Partner" (among whom is Mr Cerchione). There follows a proviso in respect of fraud, gross negligence, etc.

85. The defendants' case is that the effect of these provisions is that although Mr Cerchione and Mr D'Avanzo are not parties to the Partnership Deed, they fall within s. 1(3) of the Contracts (Rights of Third Parties) Act 1999 because they are "expressly identified in the contract" both by name and by the definition "Key Managers", and fall within s. 1(1) because the Partnership Deed expressly provides by clause 17.14 that they may enforce their rights under it. In claiming an indemnity, Mr Cerchione and Mr D'Avanzo are entitled, it is submitted, to enforce their rights directly under the Act. For this purpose, Mr Cerchione and Mr D'Avanzo are by s. 8(1) of the 1999 Act to be treated as parties to the arbitration agreement. The references in the arbitration clause (clause 17.11) to "parties hereto" therefore include Mr Cerchione and Mr D'Avanzo.

86. Because the Stepstone claims against Mr Cerchione and Mr D'Avanzo are covered by the indemnity provisions, it is submitted that disputes concerning their liability to Stepstone are disputes "arising out of or in connection with" the Partnership Deed. The overriding intention behind clause 17.11 is to ensure that all disputes under the Partnership Deed are resolved in accordance with the arbitration provision.

87. As Mr Lord QC put it on behalf of the defendants, Stepstone could not make these sorts of claim other than pursuant to the arbitration clause. The intention behind the clause would be frustrated if individuals could face legal action other than in accordance with the arbitration clause, in circumstances where, if liable, those individuals would be entitled to an indemnity under the Partnership Deed. This would lead to related proceedings in different forums and is among the results that the arbitration clause is intended to avoid.

*The submissions on behalf of the claimants*

88. As noted, the claimants submit that the fact that neither Mr Cerchione nor Mr D'Avanzo is a party to the Partnership Deed rules out an application on their part, since s. 9 Arbitration Act 1996 only gives standing to a "party to an arbitration agreement against whom legal proceedings are brought". The fact that the parties to the Partnership Deed have agreed that Mr Cerchione and Mr D'Avanzo will have the benefit of exclusions in some circumstances does not lead to the conclusion that claims against them are subject to arbitration. Because they are not parties to the Partnership Deed, claims by others against them are necessarily going to be non-contractual. Their position, it is submitted, is particularly strange because they do not rely on the exclusions in their defence, and make no claim on the indemnity.

89. As non-signatories to it, the only legal basis for treating them as parties would be under s. 8 of the 1999 Act, which deals with the application of the Arbitration Act 1996 in respect of third party rights. (I think that this is common ground.) Mr Cerchione and Mr D'Avanzo have a right under s. 1 of the 1999 Act to avail themselves of the exclusions against Stepstone (and therefore against those claimants claiming in right of Stepstone). However, nothing in the Partnership Deed expressly provides that this right is subject to the Arbitration Agreement, so as to engage s. 8(1). Nor is there any basis for implying such a condition, because the exclusions are by their nature defensive and do not confer a positive right of action. It makes no real sense to say that a contractual defence, as opposed to a contractual right of action, is "subject to arbitration".

90. As to the indemnity in clause 17.2.2 of the Partnership Deed, that is a right enforceable by Mr Cerchione and Mr D'Avanzo only against the Blue Skye Fund (the first defendant). Whether or not that right can, or must, be enforced by way of arbitration does not affect the right of Stepstone to pursue claims against them in the present proceedings. Moreover, as with the exclusions, the indemnity is not engaged because the relevant claims fall within the proviso, being "in respect of any matter resulting from [their] fraud, wilful misconduct, bad faith, reckless disregard".

*Discussion and conclusions*

91. The Partnership Deed is a commercial document, to be construed as such. Mr Cerchione and Mr D'Avanzo are not parties to the agreement, and since they are seeking a mandatory stay based on an arbitration

clause to which they are not parties, they have to bring themselves within the Contracts (Rights of Third Parties) Act 1999.

92. The Contracts (Rights of Third Parties) Act 1999 enacted a general exception to the common law doctrine of privity of contract, that is, the doctrine by which a contract cannot confer rights or impose obligations on non-parties. In financial transactions, it is common to find the Act expressly excluded, because of concern as to unforeseen consequences. However in the present case, as I have said, it is expressly incorporated by clause 17.14(a) of the Partnership Deed.

93. By s. 1 of the 1999 Act, a person who is not party to a contract (called a "third party") may enforce a term of the contract (a) if the contract expressly provides that he may, or (b) if the term purports to confer a benefit on him. But (b) does not apply if on a proper construction of the contract it appears that the parties did not intend the term to be enforceable by the third party.

94. The meaning of "third party" for these purposes is restricted by subsection (3), in that the third party must be expressly identified in the contract by name, as a member of a class or as answering a particular description. Mr Cerchione and Mr D'Avanzo are both identified in the contract by name.

95. The reference to "enforcing a term" in s.1 includes a third party's right to avail himself of an exclusion clause. This is the effect of s. 1(6), which provides that, "Where a term of a contract excludes or limits liability in relation to any matter, references in this Act to the third party enforcing the term shall be construed as references to his availing himself of the exclusion or limitation clause".

96. It appears that the interplay between these provisions and the statutory stay in favour of arbitration contained in s. 9 Arbitration Act 1996 did not emerge until the passage of the bill through Parliament (see *Nisshin Shipping Co Ltd v Cleaves & Co Ltd* [2004] 1 Lloyd's Rep 38 at 44). This led to the introduction of s. 8, which provides that:

> "(1) Where —
>
> (a) a right under section 1 to enforce a term ("the substantive term") is subject to a term providing for the submission of disputes to arbitration ("the arbitration agreement"), and
>
> (b) the arbitration agreement is an agreement in writing for the purposes of Part 1 of the Arbitration Act 1996,
>
> the third party shall be treated for the purposes of that Act as a party to the arbitration agreement as regards disputes between himself and the promisor relating to the enforcement of the substantive term by the third party."

Subsection (2) is concerned with the situation where the right is itself a right to arbitrate.

97. It was common ground that subsection (1) is the key provision for present purposes. According to the Explanatory Notes (cited in *Nisshin* at 44), the intent of subsection (1) is that where the substantive right is subject to an arbitration agreement, a third party who wishes to take action to enforce it is not only able, but bound, to do so through arbitration, with the consequence that a stay of proceedings can be ordered against him under s. 9 Arbitration Act 1996:

> "33. Section 8 ensures that, where appropriate, the provisions of the Arbitration Act 1996 apply in relation to third party rights under this Act. Without this section, the main provisions of the Arbitration Act 1996 would not apply because a third party is not a party to the arbitration agreement between the promisor and the promisee.
>
> 34. Subsection (1) deals with what is likely to be the most common situation. The third party's substantive right (for example, to payment by the promisor) is conferred subject to disputes

being referred to arbitration (see section 1(4)). This section is based on a "conditional benefit" approach. It ensures that a third party who wishes to take action to enforce his substantive right is not only able to enforce effectively his right to arbitrate, but is also "bound" to enforce his right by arbitration (so that, for example, a stay of proceedings can be ordered against him under section 9 of the Arbitration Act 1996). This approach is analogous to that applied to assignees who may be prevented from unconscionably taking a substantive benefit free of its procedural burden (see, for example, *DVA v Voest Alpine, The Jay Bola*) [1997] 2 Lloyd's Rep 279). "Disputes … relating to the enforcement of the substantive term by the third party" is intended to have a wide ambit and to include disputes between the third party (who wishes to enforce the term) and the promisor as to the validity, interpretation, existence or performance of the term; the third party's entitlement to enforce the term; the jurisdiction of the arbitral tribunal; or the recognition and enforcement of an arbitration award. But to avoid imposing a "pure" burden on the third party, it does not cover, for example, a separate dispute in relation to a tort claim by the promisor against the third party for damages."

98. The question is how these provisions apply in the present case. The only authority cited to me was the *Nisshin* case. In that case, applying s. 8(1) of the 1999 Act, Colman J held that a broker was entitled directly to advance its claim to commission in arbitration against owners, albeit not a party to the charterparties which contained the arbitration agreements. The broker's right under s. 1 to enforce the substantive term as to commission was subject to the arbitration clause. The conclusion was that the broker was entitled, indeed obliged, to refer the dispute to arbitration, and that the arbitrators had jurisdiction to determine it (p. 46).

99. In this case, as I have said, reliance was placed on the indemnity given to "Associates" (and thereby Mr Cerchione and Mr D'Avanzo) by Blue Skye Special Opportunities Fund LP, and to Mr Cerchione for an indemnity out of partnership assets. The first point taken by the claimants is that these rights fall outside clause 17.11 because they are not expressly or impliedly included within it. I reject that assertion. As a matter of construction, a claim for an indemnity pursuant to these provisions would (in my view) be a "claim arising out of or in connection with this Agreement". On that basis, if Mr Cerchione and Mr D'Avanzo had wished to enforce the indemnity under the Contracts (Rights of Third Parties) Act 1999, the claim would be subject to the arbitration agreement in accordance with the above principles.

100. However, that appears to me to be of limited relevance in the present circumstances. A defence has been served, and Mr Cerchione and Mr D'Avanzo do not seek an indemnity from Blue Skye. In fact, this entity has been dissolved, the claimants allege, in furtherance of the alleged dishonest scheme. No claim is made by Mr Cerchione for an indemnity out of partnership assets. (The ambit of the defence was not in dispute in this respect. I should state that it is a lengthy document, and I was invited to read the summary only, which is twenty eight pages.)

101. This distinguishes the present case from *Nisshin*, in which the broker was held to be entitled directly to advance its claim to commission in arbitration, albeit not a party to the arbitration agreements. In this case, Mr Cerchione and Mr D'Avanzo do not seek to enforce the substantive term, and there is no dispute between them and the promisor relating to the enforcement of the substantive term by them. Section 8(1) does not (in my view) result in them being treated as parties to the arbitration agreement by reference to the indemnity.

102. I turn to the argument as it revolved around the exclusion clause in clause 17.2 given to "any Associate" and thereby Mr Cerchione and Mr D'Avanzo. The position is similar to that as regards the indemnity. Mr Cerchione and Mr D'Avanzo do not rely on the exclusion clause in their defence. It was suggested in oral argument that consideration might be given to an amendment in this regard. I agree that in applying the statutory stay under s. 9 Arbitration Act 1996, it is the substance of the matter which is important rather than the formal nature of the proceedings. But I do not think that the prospect of a possible amendment can alter the outcome of the issue that I have to decide. Mr Cerchione and Mr D'Avanzo do not seek to avail themselves of the substantive term, and there is no dispute relating to the enforcement of the

substantive term by them. Section 8(1) does not (in my view) result in them being treated as parties to the arbitration agreement by reference to the exclusion clause.

103. There is a further issue as regards the exclusion clause. The claimants assert that the right of Mr Cerchione and Mr D'Avanzo to avail themselves of the exclusion clause as against Stepstone falls outside the arbitration clause. This is essentially because it is a contractual defence, as opposed to a contractual right of action which is subject to arbitration. In my view, this is correct. Whether proceedings are liable to be stayed in favour of arbitration must depend on the nature of the claim, not on the nature of an exclusion defence, because the issue has to be determined at the time the proceedings are issued (see *Sebastian Holdings Inc v Deutsche Bank AG* [2011] 1 Lloyd's Rep 106, at [62] to [63], Thomas LJ, in the context of jurisdiction clauses) and before the taking of any step in those proceedings to answer the substantive claim (s. 9(3) of the Arbitration Act 1996). In my view, the claimants are right to contend that Mr Cerchione and Mr D'Avanzo are entitled to rely on the exclusion clause (if applicable) regardless of the forum of the particular proceedings against them.

104. This conclusion is consistent with the decision in the *Nisshin* case. In that case, the brokers were seeking to enforce a positive right of action against the owners. It was held that they were entitled to rely on the arbitration clause under s. 8(1) of the 1999 Act because they should be treated as in effect an assignee of the charterers' right to enforce payment as against the owners, and that such assignment carried with it the benefit and burden of the arbitration clause. The present case, by contrast, is concerned with a contractual defence. I agree with the claimants that there is no analogy with assignment. A right of action can be assigned, but it is not possible to assign in any meaningful way an exclusion.

105. For these reasons, I do not consider that Mr Cerchione and Mr D'Avanzo are entitled to an order for a stay.

The defendant managers' application for costs of applications on 7 and 10 February

106. The defendant managers apply for costs relating to the applications brought by them on 7 and 10 February 2012 for amendment of the without notice Order made on 26 January 3012 so as to permit the Stepstone bankruptcy proceedings to continue and thereafter to remove all the anti-suit elements of the injunction which had been granted. It is said that the costs of those applications ought to have been dealt with at the return date on 10 February 2012, but were not because time ran out.

107. In summary, the defendant managers submit that an order to injunct even domestic liquidation proceedings will only be made on the basis of abuse of process. The general principle as to anti-suit injunctions against foreign proceedings is that they will only be granted if pursuing the foreign proceedings would be unconscionable in the eyes of English law (*Star Reefers Pool Inc v JFC Group Co Ltd* [2012] EWCA Civ 14 at [25] - [27]). The fact that the relevant part of the original Freezing Order was in substance an anti-suit injunction was, it is contended, not sufficiently made clear to Eder J in any of the witness statements, skeleton argument or oral argument before him at the without notice application. The evidence in support of the without notice application did not even attempt to show unconscionability. There was therefore no case for an anti-suit injunction in the form sought, and no basis for the attempts to retain any part of it thereafter. The defendant managers' applications were successful and ought therefore to carry an order for costs in the ordinary way.

108. Timing issues are also relied on. The first application was preceded by a letter of 3 February 2012 from their solicitors (Stephenson Harwood) asking Slaughter and May to agree to a variation, which invitation was rejected. The fact that evidence in support of the application had at that stage not yet been served is not the point – it was for the claimants to justify the original Freezing Order. Pursuant to that application, the claimants had received the skeleton argument on Monday 6 February 2012 setting out the relevant legal principles. In consequence, their attention was specifically drawn to the reasons why the anti-suit relief in the original Freezing Order was unjustified. But the claimants did not then, nor when given notice of the wider application, agree to the discharge of the anti-suit provisions in the original Freezing Order. An order for the costs of the applications made by the defendant managers on 7 and 10 February 2012 is therefore sought.

109. The claimants' response is that the 7 February 2012 variation was made by consent. The claimants were first requested to vary paragraph 12 by a letter from Stephenson Harwood at 4pm on Friday 3 February, threatening an application at 9am on Tuesday 7 February. The urgency was the result of a hearing in Luxembourg on Thursday 9 February, which the claimants had not previously been informed about. After considering the request over the weekend, the claimants' solicitors wrote to Stephenson Harwood at about 3.30pm on Monday 6 February indicating their agreement to the substance of the proposed variation. On 10 February the defendant managers applied to discharge paragraph 11 of the Order in its entirety. The claimants resisted that application and suggested a practical way forward by amending paragraph 12 of the Order. That suggestion was agreed and adopted at the 10 February hearing. Given that the applications were by consent or compromise, the correct order, the claimants submit, is no order as to costs or costs in the case.

110. As to the last point, the defendant managers submit that it is wrong to suggest that the variation to the original Freezing Order reflected some "give and take." Paragraph 11 of the original Freezing Order clearly included an anti-suit injunction. The Order as varied on 10 February 2012 does not, providing only that notice of the commencement of proceedings is given to the claimants.

111. My conclusion is as follows. I am conscious of the fact that the position of the defendant managers needs careful separate consideration, because they have become embroiled in heavy and expensive proceedings in which they are not the primary actors. Had there been any undue delay in discharging the anti-suit part of the injunction, I would have awarded them their costs in any event. However, I accept the claimants' submission that in the circumstances known to them at the time of the *ex parte* application, there was a legitimate concern that an insolvency process could be used to obstruct enforcement of their rights. Once they became aware of the existing insolvency proceedings in Luxembourg, they acted reasonably in response. As they say, the facts as regards how the liquidation fits into the picture have yet to be established. In the circumstances, I will order these costs to be in the case.

Conclusion

112. The matters that arise for the decision are dealt with above. I will hear the parties as to the appropriate form of order. I am grateful to them for their assistance.

Annex

17.2 **Exculpation and indemnities**

17.2.1 Neither the General Partner nor any of its Associates shall have any liability for any loss to the Partnership or the Partners arising in connection with the services to be performed hereunder or pursuant hereto, or under or pursuant to any management agreement, advisory agreement or other agreement under which it provides or agrees to provide services to or in respect of the Partnership or which otherwise arises in relation to the operation, business or activities of the Partnership save in respect of any matter resulting from its fraud, wilful misconduct, bad faith or reckless disregard for its obligations and duties in relation to the Partnership or its gross negligence or breach of any law, regulation or material term of this Agreement.

17.2.2 The Partnership agrees to indemnify and hold harmless out of Partnership Assets the General Partner and any Associate (the "**Indemnified Party**") against any and all liabilities, actions, proceedings, claims, costs, demands, damages and expenses (including legal fees) incurred or threatened by reason of the Indemnified Party being or having acted as a general partner or manager in respect of the Partnership or arising in respect of or in connection with any matter or other circumstance relating to or resulting from the exercise of its powers as a general partner or manager or from the provision of services to or in respect of the Partnership or which otherwise arise in relation to the operation, business or activities of the Partnership provided however that it shall not be so indemnified with respect to any matter resulting from its fraud, gross negligence, wilful misconduct, bad faith, reckless disregard for its obligations and duties in

relation to the Partnership or breach of any law, regulation or material term of this Agreement or, in the case of the General Partner, from any material breach of any provision of FSMA binding upon it.

17.2.3 No officer, director, shareholder, agent, partner or employee of the General Partner or any Associate nor any person (whether or not also an officer, director, shareholder, agent, partner or employee of the General Partner or any Associate) nominated by any of them to be a director of any company in which the Partnership holds an Investment (a "**Nominated Director**") shall have any liability for any loss to the Partnership or the Partners howsoever arising in connection with services performed or to be performed hereunder or pursuant hereto or under or pursuant to any management agreement, advisory agreement relating to the Partnership or in respect of services as a Nominated Director save in respect of any matter resulting from such person's fraud, gross negligence, wilful misconduct, bad faith or reckless disregard for any obligations and duties such person may have in relation to the Partnership or breach of any law, regulation or material term of this Agreement and each of them (the "**Indemnified Party**") shall be indemnified out of the Partnership Assets against any and all liabilities actions, proceedings, claims, costs, demands, damages and expenses (including reasonable legal fees) incurred arising out of or in connection with or relating to or resulting from the performance or otherwise by the Indemnified Party of services in relation to the Partnership, its operations, business or activities or the Indemnified Party having acted as a Nominated Director, provided however that such person shall not be so indemnified with respect to any matter resulting from such person's fraud, gross negligence, wilful misconduct or bad faith or reckless disregard for any obligations and duties such person may have in relation to the Partnership or breach of any law, regulation or material term of this Agreement. Without prejudice to the generality of the foregoing, the General Partner shall be entitled to give indemnities on behalf of the Partnership out of the Partnership Assets to any Nominated Director in terms similar to those set out in this Clause 18.

---

**BAILII:** Copyright Policy | Disclaimers | Privacy Policy | Feedback | Donate to BAILII
URL: *http://www.bailii.org/ew/cases/EWHC/Comm/2012/1486.html*