**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

MICHAEL J. ORTMANN, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

AURINIA PHARMACEUTICALS INC., PETER GREENLEAF, and JOSEPH MILLER,

Defendants.

Civil Action No.: TDC-22-1335

CLASS ACTION

**AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

JURY TRIAL DEMANDED

# TABLE OF CONTENTS


I. NATURE OF THE ACTION ..... 1

II. JURISDICTION AND VENUE ..... 2

III. PARTIES AND WITNESSES ..... 3

- A. Lead Plaintiff ..... 3
- B. Defendants ..... 3

IV. FACTS AND SUBSTANTIVE ALLEGATIONS ..... 4

- A. The Company and Its Business ..... 4
- B. LUPKYNIS's Commercial Launch and Resulting Adverse Sales Conditions ..... 6
- C. Greenleaf Provides False Aggressive Guidance ..... 10

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ..... 11

VI. END OF CLASS PERIOD DISCLOSURE ..... 20

VII. POST-CLASS PERIOD EVENTS ..... 21

VIII. ADDITIONAL SCIENTER ALLEGATIONS ..... 22

- A. Actual Knowledge ..... 22
- B. Admitted and Imputed Knowledge of Critical Facts ..... 24
- C. Temporal Proximity of Misrepresentation to Disclosure ..... 25
- D. Motive and Opportunity ..... 26
  - 1. Incentive Compensation ..... 26
  - 2. Cash Needs and the Potential Buyout ..... 27
  - 3. Insider Stock Sales ..... 27
- E. Corporate Scienter ..... 28

IX. LOSS CAUSATION ..... 28

X. CLASS ACTION ALLEGATIONS ..... 30

XI. PRESUMPTION OF RELIANCE ..... 31

XII. NO SAFE HARBOR ..... 33

COUNT I ..... 34

COUNT II ..... 37

PRAYER FOR RELIEF ..... 38

DEMAND FOR TRIAL BY JURY ..... 39

Lead Plaintiff Skye Capital Partners ("Lead Plaintiff" or "Skye Capital"), individually and on behalf of all others similarly situated, by and through undersigned counsel, brings this action against Aurinia Pharmaceuticals, Inc. ("Aurinia" or the "Company"), Peter Greenleaf ("Greenleaf"), and Joseph Miller ("Miller") (collectively, the "Defendants"). Lead Plaintiff alleges the following based upon personal knowledge as to Lead Plaintiff and Lead Plaintiff's own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Lead Plaintiff's counsel. The investigation included, but was not limited to, review and analysis of: (i) public filings of Aurinia with the U.S. Securities and Exchange Commission ("SEC"); (ii) conference calls Defendants held with analysts and investors; (iii) wire and press releases published by and regarding the Company; (iv) analyst and media reports concerning Aurinia; (v) other public information regarding the Company and its industry; and (vi) interviews with knowledgeable former Aurinia employees. Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity to conduct discovery.

## I. NATURE OF THE ACTION

1. This is a federal securities action brought on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Aurinia securities between May 7, 2021 and February 25, 2022, both dates inclusive (the "Class Period"). Lead Plaintiff seeks to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2. Aurinia is a biopharmaceutical company focused on developing and commercializing therapies to treat targeted patient populations that are suffering from serious

diseases with a high unmet medical need. Aurinia's sole commercial product is LUPKYNIS which is a treatment for adult patients with active lupus nephritis ("LN").

3. During the Class Period, Aurinia misled investors by touting the successful launch of LUPKYNIS, while concealing the known difficulties Aurinia was experiencing in marketing and selling LUPKYNIS. Those difficulties included, *inter alia*, physician reticence to prescribe LUPKYNIS, the lack of insurance coverage and/or extra requirements for the drug to be covered, and the unique demographic market that awaited the commercial sale of LUPKYNIS.

4. Shortly before the end of the Class Period, on February 16, 2022, defendant Greenleaf falsely proclaimed that "aggressive numbers will come from us" for the 2022 sales. Two weeks later upon the release of the fourth quarter and full year 2021 results, on February 28, 2022, Defendants disclosed just the opposite, reporting a year-over-year revenue decline and a lower-than-expected sales outlook for 2022.

5. On this news, Aurinia's stock plummeted 24.26%, from a closing price of to $16.24 per share on February 25, 2022, to close at $12.30 per share on February 28, 2022, on unusually heavy trading volume.

6. As a result of Defendants' wrongful acts and omissions, which led to a steep decline in the market value of Aurinia securities upon the revelation of the truth, Lead Plaintiff and other Class members have suffered significant damages.

## II. JURISDICTION AND VENUE

7. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

8. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 Exchange Act (15 U.S.C. § 78aa).

9. Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). In addition, Aurinia's principal United States ("U.S.") office and commercial hub is located in this District, and a substantial part of the events or omissions that give rise to the claims alleged in this action occurred in this District.

10. In connection with the acts alleged in this complaint, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mail, international and interstate data and wire transfers, international and interstate telephonic and digital communications, and the facilities of the national securities exchanges.

## III. PARTIES AND WITNESSES

### A. Lead Plaintiff

11. Lead Plaintiff Skye Capital is an investment company that makes investments in public and private entities. As set forth in the Declaration of Salvatore Cerchione and Amended Certification Pursuant to the Federal Securities Laws filed on July 12, 2022 (ECF No. 38-2), Lead Plaintiff acquired Aurinia's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

### B. Defendants

12. Defendant Aurinia is incorporated under the laws of Alberta, Canada, with principal executive offices located at #1203-4464 Markham Street, Victoria, British Columbia V8Z 7X8, Canada. Aurinia also has a principal U.S. office located at 77 Upper Rock Circle, Rockville, Maryland. The Company's common shares trade in an efficient market on the NASDAQ under the trading symbol "AUPH".

13. Defendant Greenleaf has served as Aurinia's President, Chief Executive Officer ("CEO"), and a member of the Company's board of directors (the "Board") since April 2019. During the Class Period, Greenleaf made materially false and misleading statements and failed to

disclose material facts to investors as alleged herein. As CEO, defendant Greenleaf signed Aurinia's quarterly and other periodic filings with the SEC.

14. Defendant Miller has served as Aurinia's Chief Financial Officer ("CFO") since April 2020. During the Class Period, Miller made materially false and misleading statements and failed to disclose material facts to investors as alleged herein. As CFO, defendant Miller signed Aurinia's quarterly and other periodic filings with the SEC.

15. Defendants Greenleaf and Miller are sometimes referred to herein as the "Individual Defendants."

16. The Individual Defendants possessed the power and authority to control the contents of Aurinia's SEC filings, press releases, and other market communications, and exercised that control during the Class Period.

17. The Individual Defendants were provided with copies, prior to or shortly after their issuance, of Aurinia's SEC filings and press releases alleged herein to be misleading and had the ability and opportunity to prevent their issuance or to cause them to be corrected.

18. The Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

## IV. FACTS AND SUBSTANTIVE ALLEGATIONS

### A. The Company and Its Business

19. Aurinia is a biopharmaceutical company focused on developing and commercializing therapies to treat targeted patient populations that are suffering from serious diseases with a high unmet medical need. Aurinia's sole commercial product is LUPKYNIS which is a treatment for adult patients with active LN.

20. LN is a flaring and remitting disease which can cycle from being in remission to being in active flare. As with other autoimmune conditions, physicians' goals are to induce/maintain a remission of the disease, decrease frequency of hospital or ambulatory care visits and limit long term disability. In LN specifically, physicians are trying to avoid further kidney damage, kidney failure, dialysis, kidney transplantation, and death.

21. LN disproportionately affects women and minority populations, and specifically "is four times higher for people of African descent and Asians and two times higher for Hispanics/Latinos and Native Americans" when compared to Caucasians. The Company estimates that the LN population in the U.S. to be about 80,000 to 120,000.

22. LUPKYNIS was approved by the U.S. Food and Drug Administration ("FDA") on January 22, 2021, and Aurinia immediately began commercial sales in the U.S. The price of LUPKYNIS during the Class Period was based on one unit of 60 capsules or "wallets" with each wallet priced at $3,950. Aurinia estimated the average annualized net revenue per patient to be approximately $65,000.

23. Aurinia sells LUPKYNIS primarily through specialty pharmacies and a specialty distributor which subsequently resells the Company's products to health care providers and patients.

24. To assist patients and healthcare providers, Aurinia developed and launched Aurinia Alliance, which the Company claimed to be "a patient support program featuring dedicated nurse case managers who provide personalized educational resources and assistance in navigating insurance and Aurinia medication costs throughout each patient's LUPKYNIS treatment journey."

25. The Company also receives income from its December 17, 2020 collaboration and license agreement with Otsuka Pharmaceutical Co., Ltd. ("Otsuka") for the development and

commercialization of LUPKYNIS in the European Union and Japan, as well as the United Kingdom, Russia, Switzerland, Norway, Belarus, Iceland, Liechtenstein and Ukraine. As part of the agreement, Aurinia received an upfront cash payment of $50 million in December 2020.

26. The Company announced the addition of two novel assets to its portfolio on August 17, 2021, AUR200 and AUR300, with AUR200 undergoing pre-clinical development during the Class Period.

27. Aurinia operates in one operating segment engaged in research, development and commercialization of therapeutic drugs in which revenues are derived from license, contract, and product revenues.

28. During the Class Period, Aurinia employed approximately 300 employees across the U.S., Canada, and the United Kingdom.

**B. LUPKYNIS's Commercial Launch and Resulting Adverse Sales Conditions**

29. In anticipation of FDA approval, during 2020, the Company fully staffed a commercial team, purportedly identified over 12,000 physician targets, and purportedly "[e]xecuted pre-approval information exchange with more than 50 payers covering two-thirds of commercially insured lives," among other things.

30. According to a January 2021 and a May 2021 presentation, the Company's plan was to establish a "robust infrastructure" to successfully commercialize LUPKYNIS.




31. Just one month after launching commercial sales, defendant Greenleaf stated: "After just 30 days, we are pleased by the uptake of LUPKYNIS by the healthcare community and believe we are on track to meet our internal expectations."

32. Defendants continued to tout the Company's positive commercial prospects and financial position throughout the Class Period, despite knowing those statements were false and misleading.

33. Specifically, despite Defendants' positive statements, at least three former Aurinia employees (the "CWs") confirmed that the Company knew that LUPKYNIS was not selling as anticipated and that sales goals for 2021 were unrealistic. Those former employees include: (i) CW1, who worked at Aurinia from June 2020 to June 2022 as a Regional Sales Manager responsible for the Midwest region (Wisconsin, a portion of Illinois, and "a little piece of Iowa"), overseeing six sales representatives and reporting to one of Aurinia's Area Vice President's ("VP")

of Sales[1]; (ii) CW2, who worked for the Company from August 2020 to April 2022 as the Director, Commercial Effectiveness, reporting to the VP of Customer Operations who reported to Colao; and (iii) CW3, worked at Aurinia as a Regional Sales Manager from July 2020 to October/November 2021 and was responsible for a team of seven Immunology Specialists (sales representatives) in a territory comprised of Delaware, Maryland, Virginia, and the District of Columbia, reporting to the Area VP of Sales.

34. More specifically, CW1 stated that the Company knew that the "uptake" of LUPKYNIS had been "slower than we wanted," and CW2 stated that the Company was never able to meet quarterly goals in 2021. CW3 likewise stated that there was a "slower uptake".

35. As 2021 progressed, numerous adverse impediments to sales arose which Defendants knew about but omitted from their positive public statements and/or misstated the seriousness of in public statements. First, LN is typically treated by nephrologists, but the Company mainly focused on engaging with rheumatologists.

36. Second, the social and economic backgrounds of LN patients' backgrounds made them hard patients to reach. CW3 stated that the LN market was a typically "underserved" market that was difficult to reach.

37. Third, CW1 and several other CWs stated that the Company knew that LN patients were non-compliant with their drug regimens which detracted from sales. CW4, who worked at Aurinia as an Immunology Specialist in the North Dallas/Fort Worth region from August 2020 to

[1] There were three Area VPs of Sales at Aurinia during the Class Period, each with Regional Sales Managers reporting to them. The Area VPs of Sales reported to the Company's VP of Sales, Fran Lynch ("Lynch"). During the Class Period, Lynch reported to Max Colao ("Colao"), who served as the Company's Chief Commercial Officer from March 2020 to January 2023, reporting to defendant Greenleaf. Colao often spoke on Aurinia's 2021 investor conference calls regarding the status of drug sales.

July 2022, commented that LN patients had "pill fatigue" from taking 30 to 40 other types of pills on a daily basis and would "skip a few days" of taking LUPKYNIS and then claim the drug did not work.

38. Fourth, according to CW4, practitioners believed LUPKYNIS was too expensive and did not view it as performing much better than other existing generic drugs. On top of that and of more significance, was the complexity of obtaining a prescription which was described as "tedious" and riddled with time-consuming issues with Start Forms. Indeed, some of CW4's Start Forms never became paid prescriptions because of details missing from Start Forms that resulted in the physicians essentially saying, "just forget this".

39. CW5, who served as an Immunology Sales Specialist at the Company from August 2020 to June 2022, with a sales territory consisting of Utah, Idaho, Montana, Wyoming and parts of Nevada, likewise commented that the amount of paperwork required tied up the staff of the prescribing physician, who might have to expend "a couple hours a day," which some doctors did not appreciate.

40. Fifth, the Company knew that insurance coverage limitations further deterred physicians from prescribing LUPKYNIS, according to CW4. For CW4's area, if a drug was not covered by Blue Cross, which was the case with LUPKYNIS for that region, it was very difficult to get a prescription. In fact, according to CW4, there were not any insurance companies that covered the drug in CW4's area, so all prescriptions were out of pocket or covered by Medicare. However, as for Medicare, a patient needed to have Medicare Part B (although not all Part B plans covered the drug), and Medicare Advantage did not cover LUPKYNIS.

41. Further, many insurance providers imposed additional steps required to be completed in order to have insurance cover the drug. CW5 stated that insurance companies would also require a patient to have tried other drugs first.

**C. Greenleaf Provides False Aggressive Guidance**

42. On February 16, 2022, Greenleaf publicly stated that the Company's 2022 guidance would be "aggressive." *See* ¶¶ 4, 63. Numerous former employees commented that the statement was contrary to internal data and information which Greenleaf knew about.

43. For example, CW1 said that "aggressive numbers" was as much a surprise "to us" (*i.e.*, Aurinia employees) as it had been to investors, adding that "our team was surprised" because they had known that "the uptake" of LUPKYNIS had been "slower than we wanted" and that sales numbers for 2021 had turned out to be "not even close" to what they wanted to achieve.

44. CW1 followed up by stating that Greenleaf's aggressive numbers statement "threw us off knowing the challenges" Aurinia had experienced with LUPKYNIS, as well as having access to "real time numbers." In fact, according to CW1, the salesforce had not been solicited for feedback as to what they thought was reasonable and achievable, "no one specifically asked," the 2022 forecast was basically a top-down process.

45. CW2 echoed the other CWs, stating that when Greenleaf made the February 16, 2022 statement, "a bunch of us wondered where'd he pull that from" because "we weren't trending" positively. CW2 also confirmed that the 2022 forecast was a top-down number that Colao was likely very involved in developing and that there was no feedback from the salesforce, they had to accept whatever number was assigned to them.

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

46. The Class Period begins on May 7, 2021, the day after Aurinia issued a press release titled "Aurinia Reports First Quarter 2021 Financial Results and Recent Operational Highlights," announcing the Company's financial results for the quarter ended March 31, 2021 (the "May 2021 Press Release"). The May 2021 Press Release quoted defendant Greenleaf, who stated, in relevant part:

> 2021 started with the FDA approval of LUPKYNIS, the first FDA-approved oral treatment for active lupus nephritis – a devastating complication of lupus . . . . Our pivotal decision and work to build a world-class commercial infrastructure prior to approval ultimately led to Aurinia being able to make LUPKYNIS immediately available to patients and physicians following approval. Since that time, the Aurinia team has been encouraged by the feedback we are receiving from physicians and patients and our confidence has only grown as we continue to understand the tremendous need and value of LUPKYNIS, and work to accelerate broader adoption across the underserved LN population.

47. Aurinia also hosted an earnings call with investors and analysts after the market closed on May 6, 2021 (the "Q1 2021 Earnings Call"). During the scripted portion of the Q1 2021 Earnings Call, defendant Greenleaf stated, in relevant part:

> So with respect to LUPKYNIS launch, as you all know by now, we were granted FDA approval around the end of January. And once we had the approval in hand, we got to work getting the therapy to patients. Max Colao is here today and he will provide [you] with more specifics in a few minutes. ***But in short, we are executing the plan and I have a great deal of confidence in the team and in the trends that we are currently seeing during the first quarter and into second quarter.***
>
> We ended the first quarter with two months of hard data, which included 257 patients start forms and a solid albeit early conversion rate. These trends continue and have grown into the early part of Q2. Things are off to a good start and just like any novel drug launch, the back half of the year is going to be that much more important. As mentioned by one of our sell side analyst notes, most launches only realize a small percentage, give or take less than 5% or so, of first year sales in their initial launch quarter. We had just 60 days. ***So when you look at this metric, we believe that we are right on trends and currently pointing in the right direction.***

* * *

> [O]n the financial front, we ended the first quarter with just over $360 million which will support us and our efforts well into 2023. So we have a strong balance sheet to support our ongoing activities.

48. These statements were false and misleading because Aurinia failed to disclose and/or misstated the significance of the known adverse conditions it was experiencing following the FDA approval and product launch. As discussed above, those adverse conditions included: (a) targeting the wrong types of physicians; (b) patients with a cultural distrust of medicine and loss of hope of successful treatment; (c) uncompliant patients; (d) physician reticence to prescribe due to, *inter alia*, cost and time-consuming paperwork; and (e) lack of insurance coverage and/or extra requirements in order for the drug to be covered by insurance. Accordingly, the Defendants had overstated LUPKYNIS's commercial prospects and overstated the Company's financial position.

49. On August 5, 2021, Aurinia issued a press release, titled "Aurinia Reports Second Quarter and Six Months 2021 Financial Results and Recent Operational Highlights," reporting the Company's second quarter and six months ended June 30, 2021 financial results (the "August 2021 Press Release"). The August 2021 Press Release stated, in relevant part:

> "***Aurinia continues to make progress toward transforming the treatment of lupus nephritis (LN) by improving access to treatment and providing disease education and care for the long underserved LN patient community***," said Peter Greenleaf, President and Chief Executive Officer of Aurinia. "Our second quarter results demonstrate our momentum as COVID-related restrictions are loosened in parts of the United States with a significant increase in both revenue and patient start forms. ***We are confident that with this year-to-date performance and a strong balance sheet, that we are well-poised for growth as we continue our work to expand the treatment of LN*** and seek new opportunities that could address the needs of patients with serious autoimmune disorders."
>
> Mr. Greenleaf further stated, "As we continue to expand patient access to LUPKYNIS across the United States, ***we anticipate that annual net revenue for LUPKYNIS will be in the range of $40 to $50 million for 2021, setting Aurinia up for a very strong 2022 as we recognize the benefit of patients continuing on therapy*** and hopefully achieving reductions in their proteinuria."

* * *

> Total revenue was $6.6 million and $29 thousand for the quarters ended June 30, 2021 and June 30, 2020, respectively. Total revenue was $7.5 million and $59 thousand for the six months ended June 30, 2021 and June 30, 2020, respectively. The increase for both periods was primarily the result of the commercial sales of LUPKYNIS following FDA approval in January 2021.

50. That same day, Aurinia hosted an earnings call with investors and analysts to discuss the Company's second quarter 2021 results (the "Q2 2021 Earnings Call"). During the scripted portion of the Q2 2021 Earnings Call, defendant Greenleaf stated, in relevant part:

> So, here we are, we're well into the summer and just over five months into the LUPKYNIS launch. ***I guess needless to say that we generated a lot of data points up to this point to supplement our prelaunch research and continue to learn more now that we actually have entered the real-world environment including lupus nephritis patient characteristics and healthcare professional attitudes and behaviors. With this ongoing understanding of the market and just under two quarters of commercial availability, our confidence with LUPKYNIS remains undiminished.***
>
> * * *
>
> ***Next, let me walk you through our revenue performance for the quarter and provide some context because there is a positive message here as well.*** In Q2, we generated $6.6 million in net sales. This number exceeded consensus expectations for the quarter ***and shows the type of ramp we have expected*** with the new drug and an indication that did not historically have an FDA-approved treatment. We believe this in combination with the prevailing wins [sic] of the COVID environment is a significant result.
>
> Okay, let's move on to some other positive trends. As of today, patient start forms are well north of 800 to-date and our conversion rate to patients on therapy continues to increase from what we last reported at the end of Q1. On the payer coverage front, LUPKYNIS is currently covered for over 110 million lives in the United States and we are continuing to pursue further coverage. To provide some added granularity behind that number, there are, as of today, at least 50 published LUPKYNIS clinical coverage policies.
>
> Importantly, the prior authorization requirements across these policies are very much in-line with the package insert and in fact, the restrictions are less onerous than what we had originally expected. All are reasons to be optimistic. We believe this trend will continue to grow for the remainder of 2021 and drive down our time to starting therapy and drive up our overall conversion rates.
>
> ***In addition, I can also report that the rate of prescription abandonment to date so far has been low*** and so far, albeit it is early on in the launch, our rate of

> compliance is also exceeding our initial launch expectation. In the face of these results, we have also experienced some challenges and acted on many key in-market learnings. The most prominent of these of course is the pandemic.

51. On August 5, 2021, Aurinia also filed its quarterly report for the period ending June 30, 2021 on Form 10-Q with the SEC (the "2Q21 10-Q"), signed by the Individual Defendants and affirming the information provided in the August 2021 Press Release and accompanying Q2 2021 Earnings Call. The 2Q21 10-Q referred to Aurinia's Annual Report on Form 10-K for the year ended December 31, 2020 (the "2020 10-K") for important risk factors and did not disclose any new risks or material changes, even though it had become clear that the purported "risks" were not something that may or could occur but were in fact occurring at the time of the issuance of the 2Q21 10-Q.

52. The statements referenced in ¶¶ 49-51 were materially false and misleading when made because Defendants knew, but omitted and/or misstated the significance of in public statements, that: (i) the uptake of LUPKYNIS was slower than expected due to numerous issues other than COVID, including, (a) targeting the wrong types of physicians, (b) patients with a cultural distrust of medicine and loss of hope of successful treatment, (c) uncompliant patients, (d) physician reticence to prescribe due to, *inter alia*, cost and time-consuming paperwork, and (e) lack of insurance coverage and/or extra requirements in order for the drug to be covered by insurance; (ii) accordingly, the Company had overstated LUPKYNIS's commercial prospects; (iii) as a result, Aurinia had overstated its financial position; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

53. On November 3, 2021, Aurinia issued a press release announcing its financial results for the quarter ended September 30, 2021, titled "Aurinia Reports Third Quarter and Nine Months 2021 Financial Results and Company Updates" (the "November 2021 Press Release"). The November 2021 Press Release stated, in relevant part:

> Aurinia achieved third quarter revenue of $14.7 million, with nine months ended September 30, 2021 revenue of $22.2 million and maintains its previously stated annual revenue estimate in the range of $40 to $50 million for 2021.
>
> "We are very pleased with Q3 results as we continue to execute on our LUPKYNIS commercialization strategies," said Peter Greenleaf, President and Chief Executive Officer of Aurinia. "Despite the challenge of the COVID-19 Delta variant and a slight seasonal slowdown, we saw steady increases in patient start forms and patients on treatment toward the end of the quarter and continue to see this upward momentum through October."
>
> * * *
>
> ***Third Quarter 2021 Highlights & Upcoming Milestones:***
>
> - Aurinia has secured 412 patient start forms (PSFs) in the third quarter and as of November 3, 2021, Aurinia has secured a total of more than 1,265 PSFs.
> - PSF conversion rates continue to increase with more than 68% of PSFs converted to patients on therapy. Q2 conversion rates were 50%. Time to convert continues to decrease since launch: 30- and 60-day conversion rates have improved each month.
> - As of early October, Aurinia has confirmed coverage for LUPKYNIS through published payer policies for 65% of total lives in the market. Through patients gaining access to LUPKYNIS, the company now has confirmed coverage in plans covering 87% of total lives.

54. Defendants also participated in an earnings conference call on the morning of November 3, 2021 (the "Q3 2021 Earnings Call"), reiterating the financial results from the November 2021 Press Release, among other things. During the scripted portion of the Q3 2021 Earnings Call, defendant Greenleaf stated, in relevant part:

> So let's start with our business performance related to the launch starting first with the quarter. In Q3, we generated $14.7 million in net sales, which exceeded analyst expectations and represents 122% increase over the prior quarter. Since the launch in late January, our total recognized revenue is $22.2 million. Based on our current metrics and anticipated year end results, we maintain our guidance in the range of $40 million to $50 million for 2021. In the third quarter, we added 412 patients, new patient star [sic] forms while COVID-19 challenges with the Delta variant and Southern states impacted per PSF prescribing early in the summer, it should be noted that we saw a steady increase in prescribing rates throughout September and continuing into October.

> As of this week, we have now logged a total of more than 1,265 patients star [sic] forms year-to-date and remain optimistic that this upward momentum will continue. We also continue to see improvements in movement from patient star [sic] forms to patients on therapy with a conversion rate in excess of 68% currently. This was up from approximately 50% in Q2. In addition, our time to convert is shrinking. Both 30 and 60 day conversion rates have continued to improve each month. On the payer coverage front, we continue to make progress, especially with regional and local plans.
>
> As of early October, we have confirmed LUPKYNIS coverage through published payer policies for 65% of total lives in the market. Through patients gaining access to LUPKYNIS, we have now confirmed coverage and plans covering 87% of total lives. While our goal is to ensure there are specific policies in place, healthcare professionals and patients are gaining access to LUPKYNIS through medical justifications and working in conjunction with Aurinia's personalized patient support resources. ***We continue to work to make access – the access process as seamless as possible for providers and patients, so that patients can quickly gain access and start our treatment.***
>
> ***Just over nine months post launch, we're not slowing down***. Our team continues to work tirelessly to educate professional in both professional and patient audience about LUPKYNIS and the urgent need to diagnose and treat lupus nephritis patients as quickly as possible. The most recent healthcare provider market research shows that LUPKYNIS awareness has increased significantly with both rheumatologists and nephrologists, and is on par with the competition, which by the way this competition has been on the market for over 10 years. LUPKYNIS is remarkable clinical results continue to differentiate our product and bolster this awareness and confidence in prescribing.

55. When questioned about potential seasonality, instead of admitting to the host of issues slowing sales, defendant Greenleaf merely stated:

> We've had north of 1,265 PSFs here to date. And if you just do the backwards math on that in the month of October alone, it's approximately 160 new patient start forms in the month of October alone. So I don't want anyone to take away that we've seen a slowing down at this business. We saw impact in – specifically in the Southeast as it was related to the Delta variant that was off target with what we've seen since the start of this launch. We still feel very confident in our prescription start form performance as it pertains to year-to-date and we don't know yet if the summer was something that's going to be a predictable seasonality. Sorry for the long-winded answer. Max, yes.

56. During the Q3 2021 Earnings Call, analyst Joseph Schwartz of SVB Leerink asked, "Are there segments of the market that you think are reluctant to use LUPKYNIS until they see

such data? And how large are these segments? Is there any way that you can provide us with any parameters to help us appreciate the importance of this data?" Defendant Greenleaf vaguely responded as follows, failing to actually answer the questions:

> Yes, Joe, I think, it's a great question. And I think the two biggest – in my mind, the two biggest swing factors that are hard to quantify for me today around the launch in the business, one has been the impact of COVID on our first year at a launch to quantify that for you would be difficult. I would say it definitely has, but to say whether it's 20% or 30%, we just don't know. The second – and by the way COVID decreasing and seeing lower virus rates, et cetera, we know we'll have a positive impact on our business, both with the physician access, patient access, access to care, patients staying on drug, we know that. The other thing we know that's hard to quantify is that obviously having three years worth of data both safety and tolerability data out to three years is better than having just one.
>
> And we know that it's going to help our business in lots of different ways. One, we're one of the only products that has data out this long in this patient population. So, that's an important thing to note. And with our drug in the class of CNIs, obviously we want to – while we're a new and differentiated new mechanism – a new drug, we want to continue to reinforce it, utilizing this drug over longer periods of time, doesn't compromise in any way the patient's kidney function, which we're hopeful that in three years we'll actually show that. We know that's going to have meaningful impact on both prescribing behavior and probably even more importantly how payers react to reimbursing the drug over longer periods of time when as you know our label today's safety and efficacy beyond one year has not been established. So hopefully that it's not a quant answer for you, and I apologize for that, but we think it's going to be really meaningful to both our patients, physicians and our efforts in getting the drug off the ground. And we will launch this data to the market in terms of what the outcomes are as if it were an extension of a pivotal trial, which it is.

57. Due to M&A rumors surrounding Aurinia for several months, a Jefferies analyst asked a direct question regarding possible acquisition that Greenleaf refused to comment on. However, when Cowen & Company analyst Ken Cacciatore asked for some color around whether the Company was thinking "about standalone versus thinking of or engaging with others", defendant Greenleaf responded, in relevant part:

> We have a business plan and we have a mission as a company. And that business plan is to get this drug to as many patients suffering from autoimmune disease and lupus nephritis as humanly possible.

> And we remain committed to doing that in a way that drives the most shareholder value, and we remain committed to exploring any and all avenues to complete that mission and do it in a way that is best for driving shareholder value. So I realized that that's a wide open answer, but I think if you read between the lines no one here at Aurinia has a boxed in way of thinking about how we both create value and expand access to this product more broadly, either in our hands or in someone else's or in partnership with someone, we remain open to all potential avenues.

58. For the first time, defendant Greenleaf revealed that patient compliance was an issue, stating the following in response to Justin Kim, an analyst with Oppenheimer and Company's question:

> Yes, as we've said, it's early, so it's really hard to deduce what the trend will be going forward. We are watching both physician behavior here and patient behavior. Remember we have – ***this patient population is a difficult one and can be pretty notoriously uncompliant***. ***So we are looking very closely, not only at physician prescribing behavior, but at persistency as it pertains to the patient and staying compliant and staying on drug. And I just think, you know, we're not trying in any way walk away from this question. I just think you need more than six to nine months worth of data to say anything about the persistency of your drug***. But over time, this is going to be one that we cannot speak about when you have a year's worth of data that's out there or more. And we, as we've said on previous calls, have every belief that we'll do that. ***So far things have looked good, but I don't want a false report that – compliance will be until I have a project – what I believe will be a projectable number and that's time.***

59. On November 3, 2021, Aurinia also filed its quarterly report for the period ending September 30, 2021 on Form 10-Q with the SEC (the "3Q21 10-Q"), signed by the Individual Defendants and affirming the information provided in the November 2021 Press Release and accompanying earnings conference call. The 3Q21 10-Q referred to Aurinia's 2020 10-K for important risk factors and did not disclose any new risks or material changes, even though it had become increasingly clear during the third quarter of 2021 that the purported "risks" were not something that may or could occur but were in fact occurring at the time of the issuance of the 3Q21 10-Q.

60. With the reporting of "mixed financial performance for Q3 2021" as earnings lagged expectations, and the disclosure that LN patients are "notoriously uncompliant," Aurinia's

stock price dropped 5% from a closing price of $32.00 per share on November 2, 2021 to a closing price of $30.39 per share on November 3, 2021, on heavier than normal trading volume.

61. Defendants' false and misleading statements and material omissions buoyed the stock price preventing a larger fall, particularly the statements by defendant Greenleaf regarding potential for an acquisition which one analyst commented on as follows in a November 22, 2021 article titled "Aurinia Buyout Chatter: CEO Says To 'Read Between The Lines'" available on *Seeking Alpha*:

> In my experience, companies usually do not say that when they actually plan to go it all alone. This is, in fact, a cute way of saying that yes, we're looking at partners or buyers, but no, we cannot disclose anything more. The CEO clearly told the analyst to "read between the lines." I'm guessing they are probably getting an offer or two.

The analyst also noted in response to Q3 EPS miss, "according to the CEO, this slowdown is 'seasonal.'"

62. Additionally, Defendants had received and rejected an offer to sell the Company, but investors were led to believe that an M&A transaction was imminent.

63. On February 16, 2022, Aurinia attended the Annual SVB Leerink Global Healthcare Conference. At the conference, when asked a question regarding the Company's year-over-year sales trajectory, defendant Greenleaf noted that "aggressive numbers will come from us," and further stated, "[w]e want to come and show numbers that we think we can achieve, but at the same time that I'm sure we have a lot of ambition as to how we want to grow the business[.]"

64. The statements referenced in ¶¶ 53-59 and 63 were materially false and misleading when made because Defendants knew, but omitted and/or minimized the significance, that: (i) the update of LUPKYNIS was slower than expected due to numerous issues other than COVID, including, (a) targeting the wrong types of physicians, (b) patients with a cultural distrust of medicine and loss of hope of successful treatment, (c) uncompliant patients, (d) physician reticence

to prescribe due to, *inter alia*, cost and time-consuming paperwork, and (e) lack of insurance coverage and/or extra requirements in order for the drug to be covered by insurance; (ii) Aurinia's 2022 sales outlook for LUPKYNIS would fall well short of expectations; (iii) accordingly, the Company had significantly overstated LUPKYNIS's commercial prospects; (iv) as a result, Aurinia had overstated its financial position and/or prospects for 2022; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

## VI. END OF CLASS PERIOD DISCLOSURE

65. On February 28, 2022, Aurinia issued a press release announcing the Company's financial results for the fourth quarter and year ended December 31, 2021, titled "Aurinia Reports Fourth Quarter and Full Year 2021 Financial Results and Company Update" (the "February 2022 Press Release"). The February 2022 Press Release disclosed, *inter alia*, 2022 revenue guidance far short of expectations, stating, in relevant part:

> For fiscal year 2022, the Company is providing net revenue guidance of ***$115 to $135 million from sales of LUPKYNIS.***
>
> * * *
>
> ***Financial Results for the Quarter and Year Ended December 31, 2021***
>
> Total net revenue was $23.4 million and $50.0 million for the quarters ended December 31, 2021 and December 31, 2020, respectively. ***Total net revenue was $45.6 million and $50.1 million for the years ended December 31, 2021 and December 31, 2020, respectively.*** The net revenue for the quarter ended and year ended December 31, 2021, primarily consisted of commercial sales of LUPKYNIS, following FDA approval in January of 2021. Total revenue for the quarter and year ended December 31, 2020, was primarily due to an upfront payment from Otsuka of $50.0 million resulting from entering into its collaboration agreement with Otsuka.

66. *The Motley Fool* noted in a report issued the same day titled "Why Aurinia Pharmaceuticals Stock Is Crashing Today" that:

> ***Aurinia's shares plunged in early morning action today in response to the release of its 2021 fourth-quarter and full-year earnings report.*** Although net revenue

> from the company's oral lupus nephritis medication, Lupkynis, jumped by 60% during the three-month period relative the third quarter of 2021, Aurinia's 2022 annual revenue guidance of between $115 million and $135 million fell well short of expectations. ***Wall Street, for its part, was expecting the midway point of the company's 2022 revenue forecast to come in at around $178 million.***
>
> Another key issue weighing on the drugmaker's shares today are recent comments by President and CEO Peter Greenleaf. During a fireside chat at the SVB Leerink 2022 Global Healthcare Conference earlier this month, Greenleaf said investors can expect "aggressive numbers" when the company rolls out its 2022 annual revenue guidance at the end of the month. ***This initial financial forecast, however, doesn't exactly jump off the page as aggressive. Wall Street, in fact, was calling for a figure that was 24% higher than Aurinia's top-end estimate.***

67. On this news, Aurinia's common share price plummeted $3.94 per share, or 24.26%, to close at $12.30 per share on February 28, 2022, on unusually heavy trading volume.

## VII. POST-CLASS PERIOD EVENTS

68. Aurinia's revenues declined sequentially between the fourth quarter 2021 and first quarter 2022, from $23.4 million, to $21.6 million. As reported by Edmund Ingham in a May 24, 2022 *Seeking Alpha* article titled "Aurinia Pharmaceuticals: Some Red Flags to Consider From Q1 2022 Earnings", "it is not an ideal metric, when you are selling Lupkynis as a potential blockbuster, to see sales shrinking quarter-on-quarter after only 1 year on the market."

69. On July 11, 2022, Aurinia and Colao "mutually agreed that Mr. Colao would cease his employment with Aurinia, effective July 22, 2022."

70. On April 24, 2023, MKT Capital Ltd. ("MKT Capital"), which owns 4.2% of the outstanding Company shares, published a letter to fellow shareholders calling for a "reconstituted board", noting that LUPKYNIS is only "being used for the treatment needs of 1,500 patients three years in" and that Greenleaf has been enriched through "outsized compensation" while "insulated from the Company's deteriorating share price largely due to their minimal ownership" with Greenleaf only owning greater than 1% "due to the outsized equity awards that he has received."

71. On May 10, 2023, Iljin SNT Co., Ltd. ("Iljin SNT"), which owns approximately 4.3% of Aurinia's outstanding shares, and 6.1% in aggregate with related companies, issued a letter stating, in relevant part:

> However, three years after the commercialization of the product, the company's sales growth is far below analysts' expectations, and the extent of its losses is not shrinking due to the company's continued significant expenditures, including the excessive amounts of compensation for the company executives. As a result, the stock price has remained depressed. In addition to the slow growth in sales failing to meet the market expectations, the limited ability to communicate with the market and the company's lack of effective patent strategies may have also contributed to the depressed stock price.

72. On May 11, 2023, MKT Capital commented on Iljin SNT's letter, writing that the "Board has consistently prioritized the interests of management" despite "concerns regarding the company's poor performance . . . and failure to commercialize LUPKYNIS[.]"

## VIII. ADDITIONAL SCIENTER ALLEGATIONS

### A. Actual Knowledge

73. Each of the Individual Defendants acted with scienter in that they knowingly or recklessly disregarded that the information disseminated to the public contained materially false and/or misleading information and omitted material adverse information. Throughout the Class Period, the Individual Defendants acted intentionally or in such a deliberately reckless manner as to constitute a fraud upon Lead Plaintiff and the Class. Such actions caused the price of Aurinia securities to be artificially inflated.

74. In their respective roles as CEO and CFO of Aurinia, the Individual Defendants were directly involved and participated in both the management and day-to-day operations of Aurinia at its highest levels. Accordingly, the Individual Defendants each had access to specific information regarding Aurinia's commercialization of and sales of LUPKYNIS generally and specifically. The Individual Defendants were able to, and did, control the information

disseminated to the investing public in the Company's various SEC filings, press releases, and other public statements during the Class Period. As a result, each had the opportunity to falsify the information provided to the public regarding Aurinia's business and performance.

75. Defendants knew, or were reckless in not knowing, and intentionally or recklessly failed to disclose, no later than the beginning of the Class Period that: (i) the uptake of LUPKYNIS was slower than expected due to numerous issues other than COVID, including, targeting the wrong types of physicians, patients with a cultural distrust of medicine and loss of hope of successful treatment, uncompliant patients, physician reticence to prescribe due to cost and time-consuming paperwork, and lack of insurance coverage and/or extra requirements in order for the drug to be covered by insurance; and, (ii) accordingly, the Company had overstated LUPKYNIS's commercial prospects; and (iii) as a result, Aurinia had overstated its financial position. Defendants knew, or were reckless in not knowing, not only the aforementioned, but its continuance during the Class Period, which meant that: (i) as a result, Aurinia's 2022 sales outlook for LUPKYNIS would fall well short of expectations; (ii) accordingly, the Company had significantly overstated LUPKYNIS's commercial prospects; (iii) Defendants had rejected an M&A offer; and, (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

76. Furthermore, in addition to publicly admitting knowledge as to sales facts, *inter alia*, the Individual Defendants had access to certain reports and were involved in Company meetings where they were updated on crucial information indicating that the statements made herein were materially false and/or omitted material adverse facts.

77. CW3 discussed the sales issues CW3's team was encountering with the Area VP of Sales and Lynch, usually in phone calls and texts. The issues were also discussed during Business

Review meetings that the Area VP of Sales held, and which were attended by the Regional Sales Managers.

78. CW4 had weekly sales calls with CW4's manager and the seven other reps who reported to CW4. Additionally, there were occasionally "area calls" hosted by the Area VP of Sales that Lynch sometimes attended where sale issues were discussed.

79. CW3 reported that in June or July of 2021, a call was held involving all of Aurinia's Regional Sales Managers and above, including Greenleaf, where Lynch addressed the issue of a lack of Start Form achievement. About ten days later, CW3 was informed that if CW3's salespeople were not making their numbers they would be fired.

**B. Admitted and Imputed Knowledge of Critical Facts**

80. During the Class Period, Aurinia was a small company with less than 300 employees. The false and misleading statements and omitted material adverse facts at issue herein relate to the Company's commercialization of its sole product. Consequently, Defendants' scienter concerning such core operations may be reasonably inferred based on such, in addition to the following considerations.

81. Because the Individual Defendants were the CEO and CFO of the Company during the Class Period, they had day-to-day operational control over and thorough knowledge of the Company's only product. Defendants Greenleaf and Miller also repeatedly admitted to having knowledge of Aurinia's progress with commercialization and sales of LUPKYNIS during the Class Period in connection with SEC filings and investor calls.

82. For example, during the Q2 2021 Earnings Call, defendant Greenleaf stated: "And today, we're going to walk you through the four major areas of focus for Aurinia and provide you with details on our execution and results achieved to-date." He continued with detail such as: "The team has conducted more than 30,000 calls on target clients to date." *See also* ¶ 50.

83. Defendant Miller added financial details on the same call, stating, for example: "Total revenue was $7.5 million and $59,000 for the six months ended June 30, 2021 in comparison to the prior-year period. Our revenues primarily consisted of product revenue, net of adjustments for LUPKYNIS following FDA approval in January of 2021."

84. Further, beyond the prepared remarks given by the Individual Defendants at earnings conference calls during the Class Period, each provided detailed descriptions of the Company's product, sales, customers, and forecasts in answering analyst questions, making clear their intimate familiarity with these topics.

85. For example, on the Q2 2021 Earnings Call, defendant Miller answered a question about physician interest in LUPKYNIS, stating: "And just to add a little bit of color to the extent of our effort around education over since launch, we've run more than 500 peer to peer programs and involve healthcare practitioners as well as KOLs."

86. And, on the Q3 2021 Earnings Call, for example, defendant Greenleaf answered a question regarding patient Start Forms, stating, in relevant part: "And you can see whether it's patient start forms from the time point of the launch to year-to-date, we continue to see strong growth there. On the conversion front, we've moved from an early stage at the front end of the launch in or around 30% to 40% to today just below 70% conversion." *See also*, ¶¶ 54-58.

87. Further, Defendant Greenleaf denied commercialization issues and/or side-stepped answering questions that would have required him to reveal the true state of affairs as noted above at ¶¶ 55-56.

**C. Temporal Proximity of Misrepresentation to Disclosure**

88. Defendant Greenleaf made the statements regarding "aggressive" 2022 guidance on Wednesday, February 16, 2022. Less than two weeks later, on Monday, February 28, 2022,

Defendants issued the subpar guidance for 2022. A strong inference of scienter is raised by the temporal proximately of the false misrepresentation and disclosure.

**D. Motive and Opportunity**

**1. Incentive Compensation**

89. The Individual Defendants were motivated to make false and misleading statements, and conceal material adverse facts regarding the commercialization of LUPKYNIS, in order to capitalize on their recent outsized compensation increases and performance-based incentive pay structure.

90. In 2020, defendant Greenleaf's pay package doubled to $10.78 million. It included $7.8 million in option awards and $1.5 million in stock awards, in addition to Greenleaf's base salary, cash bonus and other incentives. Defendant Miller, who was appointed CFO in April 2020, received a pay package of $3.715 million for 2020 which included $2.6 million in option awards. According to MKT Capital's April 24, 2023 letter to shareholders, Greenleaf's "total 2020 pay was 6.2 times the median of Aurinia's peers."

91. According to the Form 10-K/A filed by the Company with the SEC on April 30, 2021, executive bonuses "are dependent on the Company and the officer achieving annually determined goals and objectives" with "annual performance-based bonus opportunities". The annual performance bonuses are based on corporate goals (fully for Greenleaf and 75% for Miller) with the maximum achievement capped at 200%. For 2020, defendant Greenleaf's target was 70% and he received 150%. Miller's target was 40% and he received 150% as well.

92. For 2021, Greenleaf was given a base salary raise of 7.5% and defendant Miller received a base salary raise of 6.8%. According to MKT Capital, from 2019 through 2022, defendant Greenleaf reaped nearly $26 million in compensation.

### 2. Cash Needs and the Potential Buyout

93. The cash outlay for the commercialization of LUPKYNIS was substantial. By June 30, 2021, selling, general and administrative ("SG&A") expenses had risen over three times to $83.1 million for the six-months ended June 30, 2021 as compared to $26.5 million for the six months ended June 30, 2020. Net cash used in operating activities had almost doubled from $44.6 million for the six months ended June 30, 2020, to $91.5 million for the six months ended June 30, 2021. The Company's cash and cash equivalents had dropped to $121.6 million as of June 30, 2021, compared to $232.4 million as of June 30, 2020.

94. Rumors of a potential acquisition began circulating in the Fall of 2021. Therefore, the Defendants were motivated to continue the fraudulent deception in hopes of a large buyout price.

95. Defendants' second option for cash was a public offering, which also required a positive outlook to garner interest. On November 19, 2021, just over two weeks after issuing the false and misleading statements on November 3, 2021, described herein, the Company filed an automatic shelf registration statement with the SEC for the sale of shares up to $250 million. The SEC filing indicated that proceeds would be used to fund operations, including the clinical development and commercial production of LUPKYNIS, advancing its pipeline, clinical trials, business development, capital expenditures, and working capital.

96. Between November 19, 2021 and December 31, 2021, Aurinia sold 10.2 million common shares pursuant to the offering, resulting in net proceeds of $196.7 million.

### 3. Insider Stock Sales

97. During the third quarter 2021, Aurinia insiders increased sales of Company shares. The sales were so significant that on September 10, 2021, an article by Dulan Lokuwithana titled "Aurinia Pharma insider selling picks up" was posted on *Seeking Alpha*. That article noted that

Company insiders, including Michael Martin (Chief Business Officer), Neil Solomons (Chief Medical Officer), and Robert Huizinga (EVP Research), had trimmed their holdings "by 95k shares in seven transactions valued at ~$1.2M in total" which "contrasts net purchases of ~18.1K shares they made in the previous quarter." Those insiders continued to sell after the date of the article as well, additionally selling over 1 million shares by the end of 2021 for over $28.5 million.

### E. Corporate Scienter

98. The Individual Defendants were responsible for signing the financial statements, along with certain directors. The Individual Defendants acted with apparent authority to speak on behalf of the Company and their statements were made with the imprimatur of the Company that selected them to speak on its behalf. Moreover, as CEO and CFO, the Individual Defendants were highly involved in the preparation, review, finalization, and issuance of the Company's press releases and financial statements, and investors relied on their honesty and integrity.

99. Based on the foregoing, the Individual Defendants' actions and scienter are imputable to Aurinia at all times during the Class Period. Each of the Individual Defendants acted as an agent of Aurinia, both with respect to SEC filings they signed and also with respect to the SEC filings and earnings releases that they assisted in preparing and/or that they oversaw or participated in the accounting for. Therefore, the Individual Defendants' states of mind are imputable to Aurinia for all of the challenged statements in this Complaint, whether or not they personally signed those statements.

## IX. LOSS CAUSATION

100. During the Class Period, as detailed herein, Defendants engaged in a fraudulent scheme to deceive the market that artificially inflated the price of Aurinia securities and operated as a fraud or deceit on Class Period purchasers of Aurinia securities.

101. Defendants' materially false and/or misleading statements and omissions concealed, *inter alia*, Aurinia's slower than expected uptake of LUPKYNIS and overstated commercial and financial prospects. As detailed above, when the truth was revealed, the price of Aurinia's securities declined significantly as the prior artificial inflation was removed from the Company's stock price.

102. As a result of their purchases of Aurinia securities during the Class Period, at artificially inflated prices, Lead Plaintiff and the Class suffered damages under the federal securities laws.

103. The artificial inflation created by Defendants' misrepresentations and omissions was removed when on February 28, 2022, the Company disclosed guidance for 2022, far short of Wall Street expectations. This announcement caused Aurinia's share price to decline $3.94, or 24.26%, on heavier than usual trading volume, to close on February 28, 2022 at $12.30 per share.

104. The timing and magnitude of the price decline in Aurinia's stock on the date of the disclosure above negates any inference that the losses suffered by Lead Plaintiff and the Class were caused by changed market conditions, macroeconomic or industry facts, or Company-specific facts unrelated to Defendants' fraudulent conduct.

105. The damages suffered by Lead Plaintiff and the Class were the direct and proximate result of Defendants' materially false and misleading statements and omissions that artificially inflated the Company's stock price and the subsequent significant decline in the value of the Company's stock when the truth concerning Defendants' prior misrepresentations and fraudulent conduct were revealed.

## X. CLASS ACTION ALLEGATIONS

106. Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class of all persons and entities other than Defendants that purchased or otherwise acquired Aurinia securities between May 7, 2021 and February 25, 2022, both dates inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

107. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Aurinia securities were actively traded on the NASDAQ exchange. As of August 4, 2021, Aurinia had over 128 million common shares issued and outstanding. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Aurinia or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

108. Lead Plaintiff's claims are typical of the claims of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

109. Lead Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

110. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether the federal securities laws were violated by Defendants' acts as alleged herein;

b. whether statements made (or omissions) by Defendants to the investing public during the Class Period misrepresented (or omitted) material facts about the business, operations, and management of Aurinia;

c. whether Defendants acted knowingly or recklessly in issuing false and misleading statements (or omissions);

d. whether the prices of Aurinia securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

e. to what extent the members of the Class have sustained damages and the proper measure of damages.

111. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in managing this action as a class action.

## XI. PRESUMPTION OF RELIANCE

112. The market for Aurinia's securities was open, well-developed, and efficient at all relevant times. As a result of Defendants' materially false and/or misleading statements and material omissions, Aurinia stock traded at artificially inflated prices during the Class Period. Lead Plaintiff and the other members of the Class purchased or otherwise acquired the Company's

securities relying on the integrity of the market price of such securities and on publicly available market information relating to Aurinia, and have been damaged thereby.

113. During the Class Period, the artificial inflation of the value of Aurinia's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint, thereby causing the damages sustained by Lead Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about the Company's business, prospects, and operations, causing the price of the Company's stock to be artificially inflated at all relevant times. When the truth was disclosed, it drove down the value of the Company's securities, causing Lead Plaintiff and other Class members that had purchased the securities at artificially inflated prices to be damaged as a result.

114. Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a. Aurinia's shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient market, and was covered by analysts;

b. as a regulated issuer, Aurinia filed periodic public reports with the SEC and/or the NASDAQ;

c. Aurinia regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d. Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

e. the omissions and misrepresentations were material;

f. the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

g. Lead Plaintiff and members of the Class purchased, acquired, and/or sold Aurinia securities between the time Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

115. Based upon the foregoing, during the Class Period, the market for Aurinia's securities promptly digested information regarding the Company from all publicly available sources and impounded such information into the price of Aurinia's shares. Therefore, Lead Plaintiff and the Class are entitled to a presumption of reliance upon the integrity of the market.

116. Alternatively, Lead Plaintiff and the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## XII. NO SAFE HARBOR

117. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the statements alleged to be false and/or misleading herein. The statements complained of herein were historical statements or statements of then-existing facts and conditions at the time the statements were made and/or were material omissions.

118. To the extent that statements alleged to be false and/or misleading could be construed as forward-looking, the statutory safe harbor does not apply to such statements because they were not sufficiently identified as "forward-looking statements" when made, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements, and/or Defendants had actual

knowledge that the forward-looking statements were materially false or misleading at the time each such statement was made.

## COUNT I

**For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder (Against All Defendants)**

119. Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

120. This Count is asserted on behalf of all members of the Class against all Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

121. During the Class Period, Defendants carried out a plan, scheme, and course of conduct, which was intended to, and throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Aurinia securities; and (iii) cause Lead Plaintiff and other members of the Class to purchase or otherwise acquire Aurinia securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

122. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the

Company's securities during the Class Period in an effort to maintain artificially high market prices for Aurinia securities.

123. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the U.S. mails, engaged and participated in a continuous course of conduct to conceal and misrepresent adverse material information about the Company's business, operations, and financial results, as specified herein.

124. Pursuant to the above plan, scheme, and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases, and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Aurinia securities. Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented Aurinia's true condition.

125. The Company and the Individual Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each of the Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

126. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As senior officers of Aurinia, the Individual Defendants had knowledge of the details of Aurinia's internal affairs.

127. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Aurinia. As senior officers of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Aurinia's businesses, operations, financial condition, and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases, and public statements, the market price of Aurinia's securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Aurinia's business and financial condition which were concealed by Defendants, Lead Plaintiff and the Class purchased or otherwise acquired Aurinia securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

128. During the Class Period, Aurinia securities were traded on an active and efficient market. Lead Plaintiff and the Class, relying on the materially false and misleading statements described herein, which Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired Aurinia securities at prices artificially inflated by Defendants' wrongful conduct. Had Lead Plaintiff and the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Lead Plaintiff and the Class, the true value of Aurinia securities was substantially

lower than the prices paid by Lead Plaintiff and the Class. The market price of Aurinia's securities declined sharply upon public disclosure of the facts alleged herein to the injury of Lead Plaintiff and the Class.

129. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and SEC Rule 10b-5.

130. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the Class suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating material misrepresentations to the investing public.

## COUNT II

**Violations of Section 20(a) of the Exchange Act**
**(Against the Individual Defendants)**

131. Lead Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

132. During the Class Period, the Individual Defendants participated in the operation and management of Aurinia, and conducted and participated, directly and indirectly, in the conduct of Aurinia's business affairs. Because of their senior positions, they knew the adverse non-public information about Aurinia's misstatements and omissions.

133. As senior officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Aurinia's prospects, financial condition and results of operations, and to correct promptly any public statements issued by Aurinia which had become materially false or misleading.

134. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, and

public filings which Aurinia disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Aurinia to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Aurinia within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Aurinia's securities.

135. Each of the Individual Defendants, therefore, acted as a controlling person of Aurinia. By reason of their senior management positions, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Aurinia to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Aurinia and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiff and the other members of the Class complain.

136. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff prays for judgment against Defendants as follows:

1. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as the class representative and Lead Counsel as class counsel;

2. Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial;

3. Awarding Lead Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as Lead Plaintiff's reasonable attorneys' fees with interest, expert fees, and other costs; and

4. Awarding such equitable, injunctive, or other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Lead Plaintiff hereby demands a trial by jury.

DATED: May 22, 2023

Respectfully submitted,

**BROWN, GOLDSTEIN & LEVY**

By: */s/ Andrew Radding*
Andrew Radding (#00195)
120 E. Baltimore Street, Suite 2500
Baltimore, Maryland 21202
Telephone: (410) 982-1030
Facsimile: (410) 385-0869
Email: aradding@browngold.com

*Liaison Counsel for Lead Plaintiff Skye Capital Partners*

**BRAGAR EAGEL & SQUIRE, P.C.**
Lawrence P. Eagel (admitted *pro hac vice*)
Melissa A. Fortunato
Marion C. Passmore
810 Seventh Avenue, Suite 620
New York, NY 10019
Telephone: (212) 308-5858
Facsimile: (212) 214-0506
Email: eagel@bespc.com
fortunato@bespc.com
passmore@bespc.com

*Counsel for Lead Plaintiff Skye Capital Partners and Lead Counsel for the Class*