**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| MICHAEL J. ORTMANN, Individually and on Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>   v.<br><br>AURINIA PHARMACEUTICALS INC., PETER GREENLEAF, and JOSEPH MILLER,<br><br>        Defendants. | Civil Action No. 22-cv-1335-TDC<br><br>Hon. Theodore D. Chuang |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE <u>FEDERAL SECURITIES LAWS</u>**

**TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ................................................................................................. 1

II. BACKGROUND ................................................................................................. 3

  A.  Aurinia, the Individual Defendants, and LUPKYNIS. ........................................... 3

  B.  Aurinia Prepares for the Commercial Launch of LUPKYNIS and Cautions Investors about Attendant Risks. ...................................................................... 4

  C.  Aurinia Updates Investors on LUPKYNIS' Commercialization Progress. ........... 6

  D.  Aurinia Discloses Financial Results and Guidance. ............................................. 9

  E.  Plaintiff Files This Securities Class Action. ...................................................... 11

III. LEGAL STANDARDS ..................................................................................... 11

IV. ARGUMENT ..................................................................................................... 12

  A.  The AC Fails to Plead a Material Misrepresentation or Omission. ..................... 13

    1.  The AC is improperly puzzle pled. ............................................................ 13

    2.  The challenged statements are inactionable as a matter of law. .............. 15

    3.  The AC contains no facts to support Plaintiff's omissions theory ........... 20

      a.  The CW allegations are vague and unreliable. ............................. 21

      b.  The allegedly omitted information was repeatedly disclosed ........................................................................................ 23

  B.  The AC Fails to Plead a Strong Inference of Scienter. ....................................... 26

    1.  The CW allegations do not support scienter. ............................................ 27

    2.  Plaintiff's generic motive allegations do not support scienter. ............... 29

    3.  The remainder of Plaintiff's allegations do not support scienter. ............ 31

  C.  Plaintiff Fails to Plead a Claim Under Section 20(a). ........................................ 35

V.  CONCLUSION................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 2U, Inc. Sec. Class Action*,
2021 WL 3418841 (D. Md. Aug. 5, 2021) ................................................................29

*Abady v. Lipocine Inc.*,
2023 WL 2938210 (D. Utah Apr. 13, 2023).........................................................13, 14

*In re Acterna Corp. Sec. Litig.*,
378 F. Supp. 2d 561 (D. Md. 2005).........................................................................31

*Ash v. PowerSecure Int'l, Inc.*,
2015 WL 5444741 (E.D.N.C. Sept. 15, 2015).........................................................18

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..................................................................................................12

*In re AstraZeneca plc Sec. Litig.*,
2022 WL 4133258 (S.D.N.Y. Sept. 12, 2022).........................................................15

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..................................................................................................11

*Billhofer v. Flamel Techs., S.A.*,
2012 WL 3079186 (S.D.N.Y. July 30, 2012) .........................................................15

*Boykin v. K12, Inc.*,
54 F.4th 175 (4th Cir. 2022) ..............................................................................12, 19

*In re Cable & Wireless, PLC, Sec. Litig.*,
321 F. Supp. 2d 749 (E.D. Va. 2004) ................................................................16, 34

*In re Campbell Soup Co. Sec. Litig.*,
2020 WL 7022655 (D.N.J. Nov. 30, 2020) .............................................................33

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
556 F. Supp. 3d 100 (D. Conn. 2021)......................................................................34

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
399 F.3d 651 (6th Cir. 2005) ...................................................................................16

*Cozzarelli v. Inspire Pharms. Inc.*,
549 F.3d 618 (4th Cir. 2008) ...................................................................................26

*In re Cree, Inc. Sec. Litig.*,
333 F. Supp. 2d 461 (M.D.N.C. 2004) .....................................................................21

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*In re Emergent BioSolutions Inc. Sec. Litig.*,
  2023 WL 5671608 (D. Md. Sept. 1, 2023) ...............................................................31

*Emps.' Ret. Sys. of the City of Baton Rouge & Par. of E. Baton Rouge v. MacroGenics, Inc.*,
  61 F.4th 369 (4th Cir. 2023) ...................................................................16, 17, 19

*In re eSpeed, Inc. Sec. Litig.*,
  457 F. Supp. 2d 266 (S.D.N.Y. 2006)......................................................................31

*In re e.spire Commc'ns, Inc. Sec. Litig.*,
  127 F. Supp. 2d 734 (D. Md. 2001).........................................................................33

*Firemen's Ret. Sys. of St. Louis v. Telos Corp.*,
  2023 WL 1512207 (E.D. Va. Feb. 1, 2023).........................................................30, 31

*In re First Union Corp. Sec. Litig.*,
  128 F. Supp. 2d 871 (W.D.N.C. 2001) ............................................................. *passim*

*Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*,
  336 F. Supp. 3d 196 (S.D.N.Y. 2018)......................................................................22

*In re FuboTv Sec. Litig.*,
  2023 WL 2711826 (S.D.N.Y. Mar. 30, 2023) ..........................................................14

*Hillson Partners Ltd. P'ship v. Adage, Inc.*,
  42 F.3d 204 (4th Cir. 1994) ...................................................................................23

*In re Humphrey Hosp. Tr., Inc. Sec. Litig.*,
  219 F. Supp. 2d 675 (D. Md. 2002)....................................................................17, 19

*In re iRobot Corp. Sec. Litig.*,
  527 F. Supp. 3d 124 (D. Mass. 2021) ......................................................................22

*Iron Workers Loc. 16 Pension Fund v. Hilb Rogal & Hobbs Co.*,
  432 F. Supp. 2d 571 (E.D. Va. 2006) ......................................................................23

*Izadjoo v. Helix Energy Sols. Grp.*,
  237 F. Supp. 3d 492 (S.D. Tex. 2017) .....................................................................28

*Janus Cap. Grp. v. First Deriv. Traders*,
  564 U.S. 135 (2011)..............................................................................................13

*KBC Asset Mgmt. NV v. DXC Tech. Co.*,
  19 F.4th 601 (4th Cir. 2021) ......................................................................... *passim*

iii

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Leacock v. IonQ, Inc.*,
   2023 WL 6308045 (D. Md. Sept. 28, 2023) ........................................................22, 28

*Lerner v. Nw. Biotherapeutics*,
   273 F. Supp. 3d 573 (D. Md. 2017) ...................................................................30, 35

*In re Marriott Int'l, Inc.*,
   31 F.4th 898 (4th Cir. 2022) ..............................................................................21

*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*,
   543 F. Supp. 3d 96 (D. Md. 2021) ....................................................................12, 14

*Miao v. Fanhua, Inc.*,
   442 F. Supp. 3d 774 (S.D.N.Y. 2020)................................................................22, 32

*Nandkumar v. AstraZeneca PLC*,
   2023 WL 3477164 (2d Cir. May 16, 2023) .......................................................14

*Nguyen v. Endologix, Inc.*,
   962 F.3d 405 (9th Cir. 2020) .............................................................................23

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015)...........................................................................................19

*Phillips v. LCI Int'l, Inc.*,
   190 F.3d 609 (4th Cir. 1999) .............................................................................29, 30

*Primo v. Pac. Biosciences of Cal. Inc.*,
   940 F. Supp. 2d 1105 (N.D. Cal. 2013) ............................................................13

*Pub. Emps.' Ret. Ass'n of Colo. v. Deloitte & Touche LLP*,
   551 F.3d 305 (4th Cir. 2009) .............................................................................12

*Raab v. Gen. Physics Corp.*,
   4 F.3d 286 (4th Cir. 1993) .................................................................................16

*San Antonio Fire & Police Pension Fund v. Syneos Health Inc.*,
   75 F.4th 232 (4th Cir. 2023) ............................................................. *passim*

*Sinnathurai v. Novavax, Inc.*,
   2022 WL 17585715 (D. Md. Dec. 12, 2022).....................................................29

*Slayton v. Am. Express Co.*,
   604 F.3d 758 (2d Cir. 2010)...............................................................................33

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Smith v. Circuit City Stores, Inc.*,
    286 F. Supp. 2d 707 (E.D. Va. 2003) ....................................................................31

*Steamfitters Loc. 449 Pension Plan v. Skechers U.S.A., Inc.*,
    412 F. Supp. 3d 353 (S.D.N.Y. 2019).....................................................................16

*Tamar v. Mind C.T.I., Ltd.*,
    723 F. Supp. 2d 546 (S.D.N.Y. 2010).....................................................................30

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).........................................................................12, 27, 34

*In re Trex Co., Inc. Sec. Litig.*,
    212 F. Supp. 2d 596 (W.D. Va. 2002) ....................................................................30

*In re USC Sec. Litig.*,
    190 F. Supp. 2d 808 (D. Md. 2002) ........................................................................4

*In re Volkswagen AG Sec. Litig.*,
    2023 WL 2505539 (E.D. Va. Mar. 14, 2023) .........................................................16

*Wasson v. LogMeIn, Inc.*,
    496 F. Supp. 3d 612 (D. Mass. 2020) .....................................................................16

*Williams v. Globus Med., Inc.*,
    869 F.3d 235 (3d Cir. 2017)....................................................................................19

*Yates v. Mun. Mortg. & Equity, LLC*,
    744 F.3d 874 (4th Cir. 2014) ........................................................................ *passim*

**Statutes**

15 U.S.C.
    § 78u-4(b)(1)...........................................................................................................13
    § 78u-4(b)(1)(B)......................................................................................................12
    § 78u-4(b)(2)...........................................................................................................27
    § 78u-4(b)(2)(A) .....................................................................................................12
    § 78u-5(c).................................................................................................................17

Private Securities Litigation Reform Act of 1995 ................................................ *passim*

Securities Exchange Act of 1934
    Section 10(b)................................................................................................11, 21, 35
    Section 20(a) ...................................................................................................11, 35

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

**Other Authorities**

Federal Rule of Civil Procedure
  8....................................................................................................................................12
  9(b)...............................................................................................................................12
  12(b)(6) ...................................................................................................................12, 27

vi

## I.    INTRODUCTION

Aurinia Pharmaceuticals Inc. ("Aurinia" or the "Company") is a biopharmaceutical company that develops and delivers treatments for patients suffering from autoimmune disease. In January 2021, the FDA approved LUPKYNIS, Aurinia's oral therapy designed to supplement immunosuppressive therapy for adults with active lupus nephritis ("LN"), a rare autoimmune disease. But Aurinia's commercialization preparations for LUPKYNIS began well before FDA approval, and these preparations paid off: despite the typical obstacles associated with selling a new therapy targeting a rare disease, and the more unique ones posed by the COVID-19 pandemic, LUPKYNIS achieved steady patient growth and significant sales revenue increases every quarter, resulting in Aurinia successfully meeting its 2021 sales revenue guidance.

Ignoring the reality of this success story, the risks inherent in investing in life science companies, and the heightened pleading standards required to plead fraud under the federal securities laws, Plaintiff's Amended Complaint ("AC") alleges that Aurinia and its CEO and CFO sought—for reasons that remain unclear—to deceive investors for nearly a year about LUPKYNIS' commercial program and prospects.

But the AC pleads *none* of the hallmarks of securities fraud. Securities class actions involving life science companies like Aurinia usually allege that the company received negative information about its drug program or that manufacturing issues arose at the same time the company made positive statements about the drug's commercialization progress. Here, however, Aurinia *repeatedly disclosed* each and every headwind facing the LUPKYNIS program that the AC claims was hidden from investors. For example, Aurinia disclosed that, because LUPKYNIS was a new therapy, some physicians initially were hesitant to prescribe it, it would take time for all insurers to cover it, and some patients ultimately would not take it consistently throughout their treatment. Aurinia also disclosed that COVID-19 complicated every aspect of LUPKYNIS'

launch. In many parts of the country, COVID-19 restrictions made it impossible for Aurinia's sales teams to meet face-to-face with the prescribing physicians regarding LUPKYNIS' benefits. And the restrictions made it harder for LN patients—who were notoriously harder to reach and less compliant with drug regimens in the first place—to receive care from their physicians. Putting aside that Aurinia ultimately overcame these headwinds, investors *at all times* were fully aware of them throughout the class period.

Colorable securities class action complaints also often allege that a life science company manipulated drug program metrics or financial results that investors later discovered when the company missed guidance or when revenues declined. Nothing like that is alleged here—not a single fact, figure, or comma is alleged to be out of place when Aurinia disclosed LUPKYNIS' program metrics or Company financial results. Rather, Plaintiff challenges statements that are plainly inactionable as a matter of law. For example, Plaintiff challenges a statement concerning Aurinia's then-forthcoming 2022 sales guidance for LUPKYNIS that "aggressive numbers will come from us." This statement is quintessential puffery that is far too vague to be material to investors. It also is an opinion (and a patently believable one) that—as was explained to investors—projecting 150-200% more revenue in 2022 than 2021 *was aggressive*, especially considering Aurinia's many disclosed commercialization headwinds. And it is a forward-looking projection insulated from liability under the Private Securities Litigation Reform Act of 1995 ("PSLRA") because, as described above, Aurinia provided detailed, real-time warnings about the LUPKYNIS program. Many such statements permeate the AC and are similarly inactionable.

Also missing from the AC are particularized allegations from which the Court could strongly infer scienter, *i.e.*, that Defendants knowingly made false or misleading statements or did so with some nefarious motive. Nowhere does the AC allege ***contemporaneous facts***—*e.g.*,

documents, reports, meetings, discussions—at odds with Defendants' public statements. Rather, citing accounts from two former low-level Aurinia employees ("CWs"), Plaintiff claims the CEO and CFO knew their statements about LUPKINYIS' commercialization progress and sales guidance were false when made. But ***neither CW is alleged to have ever spoken or interacted directly with the CEO or CFO***, so neither can reliably speak to Defendants' state of mind. Even if they could, at most they say that some unidentified "sales issues" were discussed at some undefined point during the class period. That falls woefully short of pleading a "cogent" or "compelling" inference of scienter, as Plaintiff must to survive dismissal. The AC's motive allegations are even worse: Plaintiff does not allege that Aurinia's CEO or CFO personally benefited from the alleged fraud, for example, by selling their stock at artificially high prices. Instead, Plaintiff offers only generic business motives (*e.g.*, raising capital for business operations), which courts universally reject because they are common to all executives.

The AC's allegations and judicially noticeable facts all point one way: Defendants believed their statements at the time they were made, and constantly warned investors that various challenges could and ***in fact were*** making commercializing LUPKYNIS an uphill battle. Yet, despite those challenges, Aurinia set ambitious goals and achieved them. Nothing about this series of events supports any inference of fraud. Accordingly, the AC should be dismissed with prejudice.

## II.    BACKGROUND[1]

### A.    Aurinia, the Individual Defendants, and LUPKYNIS.

Aurinia is a biopharmaceutical company that develops and delivers treatments for patients suffering from autoimmune disease. At all relevant times, Peter Greenleaf has served as Aurinia's CEO and President, and Joseph Miller has served as its CFO. (¶¶ 13-14, 19.)

---

[1] "¶" refers to the AC. "Ex." refers to exhibits in the Joint Record ("J.R.") to be filed by the parties in accordance with the Case Management Order entered in this case (ECF No. 50), all of which

In January 2021, the FDA approved Aurinia's LUPKYNIS, the first FDA-approved oral therapy for adults with LN, an autoimmune disease that attacks the kidneys. (¶¶ 19-20, 22.) Although LN is rare (the total U.S. patient population is approximately 80,000 to 120,000), it is also very serious and, if poorly controlled, can lead to permanent and irreversible kidney damage, end-stage renal disease, and death. (¶¶ 20-21; Ex. 1 at J.R. 4.) Prior to FDA approval of LUPKYNIS, nearly half of the LN patients receiving off-label immunosuppressive therapy for their disease did not see meaningful results in the first year. (Ex. 2 at J.R. 42.) But clinical trial results showed that immunosuppressive therapy worked twice as fast and twice as effectively when patients also took LUPKYNIS. (Ex. 2 at J.R. 19.)

### B.   Aurinia Prepares for the Commercial Launch of LUPKYNIS and Cautions Investors about Attendant Risks.

Prior to receiving FDA approval for LUPKYNIS, Aurinia invested significant time and resources so that it would be prepared for a commercial launch if and when it received FDA approval. (¶¶ 29-30; Ex. 1 at J.R. 6-7; *see also id.* at 6 ("As we said and guided throughout 2020, it was our goal . . . to be ready to commercially launch the product if we were awarded that opportunity by end of the year of 2020").) Aurinia disclosed that during 2020, it had, among other things, (i) hired more than 150 employees tasked with helping nephrologists[2] and rheumatologists[3] identify patients who would benefit from taking LUPKYNIS; (ii) created the Aurinia Alliance, a patient support program with dedicated nurse case managers to help patients work with their insurance providers to determine access, payment, and coverage for LUPKYNIS; and (iii) worked

---

are incorporated by reference and/or judicially noticeable. *See In re USC Sec. Litig.*, 190 F. Supp. 2d 808, 812-13 (D. Md. 2002); *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 881 (4th Cir. 2014).

[2] Physicians who diagnose, treat, and manage kidney-related issues and diseases.

[3] Physicians who diagnose, treat, and manage autoimmune disorders, like lupus.

with insurance payers to create LUPKYNIS-specific policies. (¶ 30; Ex. 1 at J.R. 6-7; Ex. 2 at J.R. 41; Ex. 3 at J.R. 52, 62-63.)

But Aurinia warned that, even with such preparations, "some variables . . . could swing pretty wildly as we get out there. One is patients, there could be more than we think or there could be less. . . . And of course, COVID and the fact that launches take a little while to get a ramp-up are all going to factor on first year numbers." (Ex. 1 at J.R. 12.)

Aurinia also cautioned that, even with such preparations, commercialization presented many uncertainties that could impact its success, including:

- "*[W]e have and may continue to experience disruptions that severely impact our business [and] commercialization . . . [as a result of COVID-19]*," including: (i) "delays or difficulties in building out and maintaining commercial infrastructure"; (ii) "*limited ability to access accounts and healthcare professionals, in person or at all*, to provide medical information to promote LUPKYNIS"; and (iii) "*patient visits to physicians and new patient start* might have limited access to prescribers." [4]

- "A successful commercialization will depend on our ability to" (i) "achieve *market acceptance* of LUPKYNIS"; (ii) "*educate physicians and patients about the benefits* . . . of LUPKYNIS"; (iii) "*receive adequate levels of coverage and reimbursement* for LUPKYNIS"; and (iv) "*obtain acceptance of LUPKYNIS as safe and effective by patients and the medical community*."

- "*Our estimates of the number of patients who have received or might have been candidates to use LUPKYNIS may not accurately reflect the true market* for LUPKYNIS *or the extent to which it will actually be used by patients*. . . . Most of our revenue will come from a limited number of direct customers. The loss by us of any of these customers, or a material reduction in their purchases, could harm our business and prospects."

- "Levels of market acceptance for LUPKYNIS could be impacted by several factors, including" (i) "*availability and extent of reimbursement* from . . . third-party payors"; and (ii) "*the degree of cost-effectiveness*. . . . Efforts to educate the medical community and third-party payors on the benefits of LUPKYNIS may . . . never be successful."

- "*[R]eimbursement may be limited or unavailable in certain market segments* which could make it difficult for us to sell LUPKYNIS profitably. . . . *We cannot be certain that coverage will be available for LUPKYNIS and, if available, the level of reimbursement*. . . . If reimbursement is limited or not available, we might not be able to successfully commercialize

---

[4] Unless otherwise noted, emphasis is added and citations, quotation marks, and alterations are omitted.

LUPKYNIS. . . . ***There may be delays in obtaining reimbursement for newly approved products***. . . . Our inability to promptly obtain coverage . . . could have a material adverse effect on our operating results . . . and on our overall financial condition."

(Ex. 4 at J.R. 85-88; *see also* Ex. 8 at J.R. 780-81, Ex. 11 at J.R. 840-41, Ex. 14 at J.R. 896, Ex. 7 at J.R. 762, Ex.10 at J.R. 822, Ex. 9 at J.R. 787, Ex. 16 at J.R. 924, Ex. 18 at J.R. 951, Ex. 20 at J.R. 972 (all of which refer investors to the risk disclosures in the 2020 10-K).)

### C.    Aurinia Updates Investors on LUPKYNIS' Commercialization Progress.

Throughout the class period, Aurinia provided regular updates to investors on the key metrics impacting the adoption (and sales) of LUPKYNIS:

***Patient start forms ("PSFs") and conversion rates***. Each quarter, Aurinia reported on the number of new PSFs (the equivalent of a "prescription") and the conversion rate (the percentage of new PSFs that actually resulted in sales):

| Quarter | New PSFs | Conversion Rate |
|---|---|---|
| Q1 2021 (reported on May 6, 2021) | 257 | 40% |
| Q2 2021 (reported on August 5, 2021) | 415 | 50% |
| Q3 2021 (reported on November 3, 2021) | 412 | 68% |
| Q4 2021 (reported on February 28, 2022) | 477 | 70% |

(Ex. 8 at J.R. 778; Ex. 9 at J.R. 787; Ex. 11 at J.R. 838; Ex. 15 at J.R. 914; Ex. 19 at J.R. 963.) Defendants disclosed that, like with "any initial rare disease launch," Aurinia's conversion rate was lower at first because the "initial process for getting a patient on drug involves some paperwork and involves a prior [authorization] in most cases." (Ex. 12 at J.R. 853; *see also* Ex. 9 at J.R. 789 (noting that it takes "anywhere from 20 to as many as 50 days" for "a script to be fully vetted by a payer and then reimbursed").) But Defendants explained that, as more LUPKYNIS-specific insurance policies were created, the less time conversion took, which increased the conversion rate. (*See* Ex. 15 at J.R. 914 ("Time to convert continues to decrease since launch: 30- and 60-day conversion rates have improved each month."); Ex. 19 at J.R. 963 (similar).)

***Physician outreach and prescription statistics.*** Aurinia similarly updated investors about how receptive physicians were to prescribe LUPKYNIS. At almost every opportunity, analysts asked Defendants whether Aurinia was "seeing any differences . . . between [rheumatologists] and nephrologists." (Ex. 5 at J.R. 723; *see also* Ex. 9 at J.R. 794; Ex. 13 at J.R. 870; Ex. 16 at J.R. 928.) The Company consistently reported that it was targeting physicians across both specialties, and that prescriptions were equal across both specialties. (Ex. 5 at J.R. 723; Ex. 9 at J.R. 794-95; Ex. 13 at J.R. 870; Ex. 16 at J.R. 928; Ex. 18 at J.R. 958.) Aurinia also explained that the "COVID environment" was "a formidable challenge" for its sales teams (Ex. 9 at J.R. 789) because COVID-19 restrictions determined whether "a rep [could] even get in through the door and talk to a physician instead of trying to do it through a phone call." (Ex. 13 at J.R. 866.) As Aurinia explained, in-person interaction with the physicians was a critical factor in achieving sales: "What we see is depressed results in those areas that have been subject to significantly higher degree of restrictions versus the less restrictive environments." (Ex. 9 at J.R. 789.) For example, in May 2021, Aurinia reported that "territories in Florida and Texas [were] outperforming territories in Massachusetts, New Jersey and Michigan by multiples that range from 5 to 15x." (*Id.*)

***Patient access.*** Aurinia also disclosed that COVID-19 disproportionately impacted LN's "non-white patient population," which already was "notoriously uncompliant" and became even harder to reach and treat because they were "more impacted by COVID challenges." (Ex. 6 at J.R. 736; Ex. 16 at J.R. 933; *see also* Ex. 20 at J.R. 978 ("Remember, we're dealing with primarily a patient population that's an African-American, Hispanic and Asian female population in the U.S., and we can look [at] other disease states as analogs to understand that adherence and longer-term compliance are a challenge with that population in general."); Ex. 12 at J.R. 848 ("impact on lupus nephritis patients has been particularly problematic")). Aurinia further explained that, as a result,

7

"the addressable population of lupus nephritis patients was reduced by a material extent just as we were approved for use." (Ex. 12 at J.R. 848; *see also* Ex. 9 at J.R. 793 (explaining that LN treatment was "not happening or [was] . . . virtual" in "[m]any of the major medical institutions" and "lupus clinics").)

*Insurance coverage.* Aurinia also provided quarterly updates on insurance coverage of LUPKYNIS, disclosing that coverage increased steadily from 40% to 90% during the class period. (Ex. 9 at J.R. 789; Ex. 11 at J.R. 838; Ex. 15 at J.R. 914; Ex. 19 at J.R. 963.) Despite LUPKYNIS' expanding coverage, the Company warned investors that "[p]ayer coverage . . . with drug launches [is] always . . . the biggest challenge," (Ex. 13 at J.R. 865), and that "[o]f course, we've had payer denials," (Ex. 9 at J.R. 797.) "[L]ike any other rare disease launch, . . . going from prescription to . . . adjudication, approvals and finalizing the prescription takes some time." (Ex. 12 at J.R. 721.) Aurinia noted that was particularly true with "traditionally difficult payers" who, "when there's not a policy in place," require patients and physicians to go through "multiple steps" to obtain coverage. (Ex. 6 at J.R. 735-36.) Even some LUPKYNIS-specific policies imposed prerequisites to coverage, namely, that patients take the off-label standard of care first. (Ex. 9 at J.R. 797.) The Company explained that while these coverage hoops "require more paperwork and time to get the patient on to therapy," that process is not "different than any other drug launch in the specialty and the rare disease space." (Ex. 13 at J.R. 865-66; Ex. 9 at J.R. 797 ("[T]his is typical in any rare disease launch, you . . . go through a denial and appeal process on a set of prescriptions. That's just par for the course.").)

*Patient drug compliance.* Aurinia also updated investors on patient drug compliance, *i.e.*, drug adherence, persistence, and abandonment. Because the class period corresponds with LUPKYNIS' first year on the market, Defendants repeatedly told investors that it was too early to

see any meaningful trends as to any of these metrics. For example, Mr. Greenleaf said "it's so early in the game . . . . we have to see patients on drug for 6 months, a year, 1.5 years, 2 years before we really know what our ongoing persistency rate is going to be." (Ex. 12 at J.R. 853-54; *see also* Ex. 16 at J.R. 929 ("[T]he reason we haven't reported more on that to date is because it's just too early. If you think about the max number of doses a patient could have seen if they were approved for the drug in January, it would be in and around 9 months' worth of dose is up to this point. So I just don't have enough to really point to a trend there.").) And for that reason, he warned that "persistency . . . could all move around by the end of the year." (Ex. 12 at J.R. 857.)

Nevertheless, Defendants consistently reported that all early signs indicated "the rate of prescription abandonment . . . has been low," the "rate of compliance is . . . exceeding our initial launch expectation," and "things have looked good." (Ex. 12 at J.R. 848; Ex. 16 at J.R. 933; Ex. 20 at J.R. 973 ("[D]iscontinuations are aligned with what we tracked in our clinical trials, which is about 25% to 30%.").) But Mr. Greenleaf explained that "obviously, our expectations aren't that 100% of patients are going to stay on therapy"—"patients will fall off over time." (Ex. 16 at J.R. 929.)

### D.    Aurinia Discloses Financial Results and Guidance.

During the class period, Aurinia also disclosed quarterly financial results, including steady revenue growth from LUPKYNIS sales in 2021: Q1: $0.9 million; Q2: $6.6 million; Q3: $14.7 million; Q4: $23.4 million. (Ex. 8 at J.R. 779; Ex. 11 at J.R. 838-39; Ex. 15 at J.R. 914-15; Ex. 19 at J.R. 963-64.) Mr. Greenleaf explained that, like other "new drug[s]" during their first year on the market (Ex. 12 at J.R. 848), Aurinia expected most of the revenue from LUPKYNIS sales to come during "the back half of the year." (Ex. 9 at J.R. 787-88.) These back-heavy results, therefore, "show[ed] the type of ramp [Defendants] expected." (Ex. 12 at J.R. 848.)

On August 5, 2021, after two quarters of LUPKYNIS sales, the Company issued 2021 year-end revenue guidance of $40-50 million for LUPKYNIS sales. (Ex. 11 at J.R. 838.) Aurinia disclosed that the guidance was "[b]ased upon a number of factors, including the current growth rates, expected conversion rate improvements, payer reimbursement, attrition rates and our compliance estimates." (Ex. 12 at J.R. 849.) These factors proved prescient, as Aurinia squarely hit its 2021 revenue guidance, achieving $45.6 million in revenue.[5] (Ex. 19 at J.R. 963-64.)

On February 16, 2022, Aurinia attended the Annual SVB Leerink Global Healthcare Conference ("Leerink Conference"). An analyst asked Mr. Greenleaf about the Company's "trajectory in the second year" and "any main factors . . . that you think will come into play." (Ex. 18 at J.R. 958.) In response, Mr. Greenleaf said that "COVID obviously has been a real impact. . . . It's probably the greatest unknown in terms of what could change and what the upside could be. I think it's pretty clear that it's a factor that's been weighing on our business for two years." (*Id.*) Mr. Greenleaf also warned that the Company's ability to "add[] . . . . [and] retain[] patients" would affect the Company's results and guidance. (*Id.*) Acknowledging these traditional (*i.e.*, patient growth) and non-traditional (*i.e.*, COVID-19) challenges, Mr. Greenleaf said "I think you're going to see aggressive numbers come from us." (*Id.*; ¶ 63.)

A few weeks later, Aurinia issued 2022 revenue guidance of $115-135 million for LUPKYNIS sales, ***which was 150-200% higher than its 2021 sales revenue***. (Ex. 19 at J.R. 963.) Referencing his comment at the Leerink Conference, Mr. Greenleaf said "I think 150 to 200-plus percent growth year-on-year is aggressive in light of the challenges everyone is facing in the start

---

[5] The AC alleges a "year-over-year revenue decline" from 2020 to 2021. (¶ 4.) This apples-to-oranges comparison is highly misleading. As Aurinia disclosed, almost all of the 2020 revenue—***before LUPKYNIS was on the market***—came from a one-time, $50 million "upfront payment from Otsuka," the Company's licensing partner. (Ex. 19 at J.R. 964.) By contrast, the 2021 revenue ($45 million) "consisted of commercial sales of LUPKYNIS." (*Id.*)

of the year with the Omicron variant, its impact on offices, our individual companies and our reps, the patients themselves, et cetera . . . And I think that kind of growth . . . more than doubling up our business year-on-year is aggressive." (Ex. 20 at J.R. 979.)

Despite this, certain analysts issued reports criticizing Aurinia's 2022 LUPKYNIS sales guidance, and Aurinia's stock declined approximately 24%, which led to this lawsuit. (¶ 67.)

### E.      Plaintiff Files This Securities Class Action.

On May 22, 2023, Plaintiff filed the AC, alleging that Aurinia and Messrs. Greenleaf and Miller made false and misleading statements between May 7, 2021, and February 25, 2022 (the proposed class period), in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. Specifically, Plaintiff claims that various statements about the progress of LUPKYNIS' commercialization, including Mr. Greenleaf's statement that the 2022 LUPKYNIS sales guidance would be "aggressive," were false and misleading because the Company failed to disclose five purportedly adverse sales impediments: (i) the Company targeted the wrong type of physicians; (ii) LN patients were harder to reach because of their cultural background; (iii) some number of LUPKYNIS patients were not drug-compliant; (iv) some number of physicians were hesitant to prescribe LUPKYNIS; and (v) some number of insurers did not cover LUPKYNIS. (¶¶ 29-41, 48, 52, 64.)

## III.    LEGAL STANDARDS

To state a claim under Section 10(b), Plaintiff must plead: (1) a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) loss causation, and (6) economic loss. *KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601, 607 (4th Cir. 2021). To successfully plead these elements, Plaintiff must clear three sizeable hurdles:

***First***, Plaintiff must satisfy Federal Rule of Civil Procedure ("Rule") 8 and allege enough facts to state a plausible claim for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 569-70 (2007);

11

*see also* Fed. R. Civ. P. 8. The Court should not accept "mere conclusory statements" as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

**Second**, Plaintiff must satisfy Rule 9(b)'s heightened pleading standard and state with **particularity** the time, place, and content of the challenged statements, identity of the speaker, and what he obtained from or how he benefited by his misrepresentation. *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 543 F. Supp. 3d 96, 109 (D. Md. 2021); *see also* Fed. R. Civ. P. 9(b).

**Third**, Plaintiff must satisfy the PSLRA's stringent pleading standards for falsity and scienter to "protect[] defendants' reputations from baseless accusations" and to "discourage[] fishing expeditions brought in the dim hope of discovering a fraud." *Pub. Emps.' Ret. Ass'n of Colo. v. Deloitte & Touche LLP*, 551 F.3d 305, 311 (4th Cir. 2009); *see also Boykin v. K12, Inc.*, 54 F.4th 175, 183 (4th Cir. 2022) ("The Supreme Court has emphasized that the PSLRA responded to concerns that meritless securities lawsuits had resulted in extortionate settlements."). To plead falsity under the PSLRA, Plaintiff must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B). To plead scienter, Plaintiff must plead "with particularity facts giving rise to a strong inference" that Defendants acted with "intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319, 321 (2007); *see also* 15 U.S.C. § 78u-4(b)(2)(A).

Failure to satisfy these pleading requirements for any element of Plaintiff's claim warrants dismissal of the action. *See* Fed. R. Civ. P. 12(b)(6).

## IV.    ARGUMENT

The AC fails to state a claim for two independent reasons: (1) it does not plead a materially false or misleading statement; and (2) it lacks any well-pled facts from which the Court could draw a strong inference of scienter.

A.      **The AC Fails to Plead a Material Misrepresentation or Omission.**

Plaintiff's falsity allegations fail for three reasons: (1) the AC is an improper puzzle pleading; (2) all of the challenged statements are inactionable; and (3) the AC contains no facts to support Plaintiff's omissions theory.[6]

1.      **The AC is improperly puzzle pled.**

The AC fails at the outset because it does not "specify" (i) "each statement alleged to have been misleading" and (ii) "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1); *see In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 887 (W.D.N.C. 2001). Courts call such complaints "puzzle pleadings" because they leave "it up to defendants and the court to try to figure out exactly what the misleading statements are, and to match the statements up with the reasons they are false or misleading." *Primo v. Pac. Biosciences of Cal. Inc.*, 940 F. Supp. 2d 1105, 1111-12 (N.D. Cal. 2013); *see Abady v. Lipocine Inc.*, 2023 WL 2938210, at *12-13 (D. Utah Apr. 13, 2023) (finding that a puzzle-pleading "is sufficient, by itself, to warrant dismissal").

Here, it is impossible to determine which statements Plaintiff is challenging. Section V of the AC—comprised largely of block quotes from Aurinia's press releases, SEC filings, and earnings call transcripts—purports to identify the challenged statements. (¶¶ 46-63.) But it is unclear whether Plaintiff intends to challenge every statement within these block quotes or whether some of the text is provided only as context. This forces Defendants and the Court to "guess what particular statements" Plaintiff is challenging. *Primo*, 940 F. Supp. 2d at1112. This alone renders

---

[6] The AC does not allege that Mr. Miller was the "maker" of the challenged statements, nor that he had "ultimate authority" over any of them. *Janus Cap. Grp. v. First Deriv. Traders*, 564 U.S. 135, 142 (2011). Therefore, Mr. Miller cannot be held liable for any of the challenged statements and he should be dismissed from the action. *See id.* at 137 ("We conclude that JCM cannot be held liable because it did not make the statements in the prospectuses.").

the AC a puzzle pleading. Further, while some of the paragraphs in Section V include text that Plaintiff bolded and italicized (*e.g.*, ¶¶ 47, 49-50, 54, 58), many paragraphs do not (*e.g.*, ¶¶ 46, 51, 53, 55, 56, 57, 59, 61, 63). One could presume that the bolded and italicized language identifies the specific portions Plaintiff alleges are false, but that presumption collapses when considering that the "aggressive numbers" statement at the core of the AC is neither bolded nor italicized. (¶ 63.) *See Marriott*, 543 F. Supp. 3d at 120 ("Any additional claim that [the non bolded/italicized] part of this statement is false fails because it cannot satisfy the PSLRA's specificity requirement to identify the allegedly false or misleading statement."); *In re FuboTv Sec. Litig.*, 2023 WL 2711826, at *12 (S.D.N.Y. Mar. 30, 2023) (dismissing majority of complaint because it included "lengthy paragraphs" full of "long block quotes . . . from Fubo's SEC filings and investor calls" and because Plaintiff failed "to point to the specific 'materially false and misleading statements' made by the Defendants").

Further, it is impossible to determine why the challenged statements were false. After each block quote that purportedly includes a misstatement, Plaintiff recites the same "boilerplate paragraph," *Nandkumar v. AstraZeneca PLC*, 2023 WL 3477164, at *2 (2d Cir. May 16, 2023), of five alleged omissions that purportedly renders all (or some) of that text false. (¶¶ 48, 52, 64.) "[T]he AC does not with any particularity attempt to connect . . . the challenged statements with the alleged omitted material facts." *FuboTV*, 2023 WL 2711826, at *12.

Moreover, several of the alleged omissions are completely untethered to the challenged statements and "lead[] to some patently false allegations." *First Union*, 128 F. Supp. 2d at 887; *see also Lipocine Inc.*, 2023 WL 2938210, at *12 (finding puzzle pleading violated "the PSLRA's [specificity] requirement" where "many of the purported reasons [why the statements were false] appear to have nothing to do with the statements"). For example, Plaintiff claims the statement

14

"*the rate of prescription abandonment to date so far has been low*" (¶ 50) was false because the Company was "targeting the wrong types of physicians" and the physicians were "reticen[t] to prescribe due to, inter alia, cost and time-consuming paperwork" (¶ 52). That makes no sense— alleged omissions regarding Aurinia's efforts to secure *new* LUPKYNIS patients cannot render statements about *existing* LUPKYNIS patients' abandonment rate false. Nor can Plaintiff's alleged omission regarding "uncompliant patients" (¶ 64) render statements about Aurinia's efforts to provide patients with access to LUPKYNIS "so that patients can quickly gain access and *start our treatment*" (¶ 54) false. This alone requires dismissal under the PSLRA.

### 2.        The challenged statements are inactionable as a matter of law.

In addition to the foundational problems above, the challenged statements are inactionable because they are demonstrably true, puffery, protected forward-looking statements, or opinions.

***Demonstrably true.*** The challenged paragraphs are littered with statements recounting the FDA's approval of LUPKYNIS (¶¶ 46-47); disclosing the Company's historical revenues (¶¶ 47, 49-50, 53-54); and detailing key commercialization metrics for LUPKYNIS such as PSFs, conversion rates, time to conversion, the number of drug-specific policies, the number of covered lives, and the rate of compliance (¶¶ 47, 50, 53-55). (*See also* Appendix A (cataloging challenged statements and reasons each is inactionable).)[7] Plaintiff does not allege that *any* of these historical dates or figures were misstated. As such, these statements must be dismissed because "accurate statements of historical facts are not actionable under the securities law." *Billhofer v. Flamel Techs., S.A.*, 2012 WL 3079186, at *13 (S.D.N.Y. July 30, 2012); *see also In re AstraZeneca plc Sec. Litig.*, 2022 WL 4133258, at *7 (S.D.N.Y. Sept. 12, 2022) ("[A]ccurate statements describing

---

[7] Appendix A is attached to the Declaration of David Mills filed concurrently herewith.

the launch and historical progression of the Phase II/III clinical trials . . . are not actionable [because] they merely recite historical fact.").

**Puffery.** Many of the statements Plaintiff emphasizes within the large block quotes of challenged paragraphs are "loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available." *In re Cable & Wireless, PLC, Sec. Litig.*, 321 F. Supp. 2d 749, 766-67 (E.D. Va. 2004). For example:

- "[W]e believe that *we are right on trends* and currently *pointing in the right direction*." (¶ 47.)

- "Aurinia *continues to make progress* toward transforming the treatment of lupus nephritis (LN) . . . " (¶ 49.)

- "[W]e are *well-poised for growth* . . ." (¶ 49.)

- "So far *things have looked good* . . ." (¶ 58.)

- "*[A]ggressive numbers* will come from us . . ." (¶ 63.)

(*See also* ¶¶ 46, 50, 53-57; Appendix A.) Such statements are textbook examples of puffery that courts routinely find inactionable. *See, e.g.*, *Emps.' Ret. Sys. of the City of Baton Rouge & Par. of E. Baton Rouge v. MacroGenics, Inc.*, 61 F.4th 369, 386 (4th Cir. 2023) ("*trending for OS has been positive*" inactionable puffery); *Wasson v. LogMeIn, Inc.*, 496 F. Supp. 3d 612, 633 (D. Mass. 2020) ("made very good progress" inactionable); *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 289 (4th Cir. 1993) ("*poised to carry the growth*" inactionable); *In re Volkswagen AG Sec. Litig.*, 2023 WL 2505539, at *13 (E.D. Va. Mar. 14, 2023) ("*healthy growth*" inactionable); *Steamfitters Loc. 449 Pension Plan v. Skechers U.S.A., Inc.*, 412 F. Supp. 3d 353, 363 (S.D.N.Y. 2019) ("*things are still looking pretty good*" inactionable); *see also City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 670-71 (6th Cir. 2005) ("*aggressive* product development" and "*aggressive* marketing" inactionable).

***Forward-looking statements.*** Plaintiff also purports to challenge Aurinia's 2021 revenue guidance for LUPKYNIS (¶¶ 49, 53-54), its intent to provide "aggressive" LUPKYNIS revenue guidance for 2022 (¶ 63), and its expectations regarding future commercialization trends and safety data (¶¶ 50, 56, 58). These are quintessential forward-looking statements that fall within the protections of the PSLRA safe harbor so long as they are ***either*** (i) "accompanied by meaningful cautionary language" ***or*** (ii) Plaintiff "fail[s] to plead that the speaker had actual knowledge of the statements' falsity at the time the statements were made." *MacroGenics*, 61 F.4th at 389; *see* 15 U.S.C. § 78u-5(c). Here, the statements are protected under both prongs.

Meaningful cautionary language. The forward-looking statements were made in two Aurinia press releases (¶¶ 49, 53), two earnings calls (¶¶ 50, 54, 56, 58), and at the Leerink Conference (¶ 63). Both press releases, the earnings calls, and the Leerink Conference contained a forward-looking statement disclaimer and directed investors to Aurinia's 2020 10-K for a list of factors that could cause results to differ materially from those projected in the forward-looking statement. (*See* Ex. 11 at J.R. 840-41; Ex. 15 at J.R. 917-18; Ex. 12 at J.R. 847; Ex. 16 at J.R. 924); Ex. 18 at J.R. 951.) *See In re Humphrey Hosp. Tr., Inc. Sec. Litig.*, 219 F. Supp. 2d 675, 684 (D. Md. 2002) ("SEC filings incorporated by reference are adequate to invoke the Safe Harbor provision for forward-looking statements."). And Aurinia's 2020 10-K included detailed cautionary language about the factors that could impact its ability to successfully commercialize LUPKYNIS and meet its revenue guidance, including (among others):

- "***As a result of the COVID-19 pandemic, we have and may continue*** to experience disruptions that severely impact our business . . . including . . . ***limited ability to access accounts and healthcare professionals***, in person or at all, to provide medical information to promote; and . . . ***patient visits to physicians and new patient start might have limited access to prescribers***."

- "***Our ability to generate revenues and meet expectations will be contingent on the successful commercialization of LUPKYNIS***. A successful commercialization will depend on our ability to, amongst other things: . . . ***educate physicians and patients about the benefits,***

*administration and use of LUPKYNIS*; . . . receive *adequate levels of coverage and reimbursement for LUPKYNIS* from commercial health plans and governmental health programs; . . . *obtain acceptance of LUPKYNIS as safe and effective by patients and the medical community*."

- "The commercial success of LUPKYNIS is dependent upon achieving and maintaining market acceptance among physicians, patients, and the medical community. . . . Levels of market acceptance for LUPKYNIS could be impacted by several factors, many of which are not within our control, including but not limited to: . . . *availability and extent of reimbursement from managed care plans and other third-party payors*."

- "*If LUPKYNIS does not achieve an adequate level of acceptance by physicians, patients, and the medical community, we may not generate sufficient revenue, and we may not become or remain profitable*. Efforts to educate the medical community and third-party payors on the benefits of LUPKYNIS may require significant resources and may never be successful."

(Ex. 4 at J.R. 85-88.) Such detailed disclosures—which "warned investors of the very risk[s] that [Plaintiff alleges were] later realized"—are "sufficiently meaningful" to fall within the protection of the safe harbor. *Ash v. PowerSecure Int'l, Inc.*, 2015 WL 5444741, at *8 (E.D.N.C. Sept. 15, 2015).

To the extent Plaintiff alleges that it was misleading for Aurinia to rely on the 2020 10-K risk disclosures in its Q2'21 and Q3'21 10-Qs because the "risks" were purportedly no longer "something that may or could occur but were in fact occurring" when the 10-Qs were issued (¶¶ 51, 59), these allegations are manifestly inadequate. Plaintiff makes no attempt to identify *which risks* among the *23 pages* of risk disclosures were purportedly "occurring" when the 10-Qs were issued, when they first began occurring, or how "it had become clear" they were occurring. (*Id.*; Ex. 4 at J.R. 85-108.) Not to mention that Aurinia *did disclose* that certain risks already were impacting the Company. (*See, e.g.*, Ex. 4 at J.R. 85 ("As a result of the COVID-19 pandemic, *we have and may continue to* experience disruptions that severely impact our business . . .").) In short, Plaintiff's allegations do not change the fact that the challenged statements are protected under the cautionary language prong of the safe harbor.

18

No actual knowledge. The statements also are protected under the "actual knowledge" prong of the safe harbor. Conclusory allegations of knowledge (which are all that is alleged here), "without more particularized facts to show what Defendants knew, when and how they knew it, and how their knowledge rendered particular statements false or misleading, fail to meet the stiff pleading requirements of the PSLRA." *Humphrey Hosp.*, 219 F. Supp. 2d at 684. Further, Aurinia ultimately hit its 2021 sales guidance for LUPKYNIS, meaning any "claim that the projections were impossible to achieve is undermined by the fact that the company ultimately . . . achieved the challenged projections." *Williams v. Globus Med., Inc.*, 869 F.3d 235, 245 (3d Cir. 2017).

***Opinions.*** Several of the challenged statements are not statements of fact, but opinions. (¶ 47 ("*[W]e believe* that we are right on trends"); ¶ 50 ("*We believe* this trend will continue"); ¶ 55 ("*We still feel very confident* in our prescription start form performance"); (¶ 63 ("*[A]ggressive numbers* will come from us"); *see also* ¶¶ 46, 54-58.) "The prefatory '*I believe*' or '*I think*,' for example, conveys that a speaker is sharing a personal belief, not warranting facts." *Boykin*, 54 F.4th at 183.

Such opinion statements generally are not actionable. *MacroGenics*, 61 F.4th at 388. There are only three circumstances in which an opinion may be actionable: (1) "if the speaker did not hold the belief she professed"; (2) "if the supporting fact she supplied [for the stated opinion] were untrue"; or (3) the Plaintiff identifies "particular (and material) facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 185-86, 194 (2015). No such circumstances are present here.

*First*, as discussed above (§ IV.A.2 (forward-looking statements)) and below (§ IV.B (scienter)), the AC does not plead a single fact about either Individual Defendant's state of mind *at any point*, and thus fails to plead that Defendants did not truly hold their opinions. For example, with respect to Mr. Greenleaf's "aggressive numbers" statement at the Leerink Conference, the AC does not allege any facts that Mr. Greenleaf knew the 2022 LUPKYNIS sales guidance would *not* be aggressive. In fact, Mr. Greenleaf said that he thought that "150 to 200-plus percent growth year-on-year *is aggressive* in light of the challenges everyone is facing." (Ex. 20 at J.R. 979.)[8]

*Second*, Plaintiff does not allege that the facts supporting the challenged opinions were false. For example, Mr. Greenleaf said that "most launches only realize a small percentage, give or take less than 5% or so, of first year sales in their initial launch quarter. We had just 60 days. *So when you look at this metric, we believe that we are right on trends and currently pointing in the right direction.*" (¶ 47.) Plaintiff does not allege "this metric"—the basis for Mr. Greenleaf's opinion—was in any way false.

*Third*, as discussed in more detail below, all of the allegedly omitted information supporting Defendants' opinions was disclosed. (*See* § IV.A.3.b.)

### 3.   The AC contains no facts to support Plaintiff's omissions theory.

Unable to plead any affirmative misrepresentation, Plaintiff relies solely on an omission-based theory of falsity. Plaintiff alleges that *every* challenged statement was false or misleading because Defendants failed to disclose five "adverse impediments to sales": (i) the Company was "targeting the wrong types of physicians"; (ii) LN patients were harder to reach because of their "cultural distrust of medicine"; (iii) there were "uncompliant [LUPKYNIS] patients"; (iv)

---

[8] CW1 and CW2's purported "surprise" about the 2022 guidance figure due to allegedly slower LUPKYNIS sales numbers in 2021 (¶¶ 43-45) not only runs counter to 2021's actual results, but says nothing about what Mr. Greenleaf knew or believed, particularly given that CW1 and CW2 are not alleged to have had any direct interaction with him.

physicians were hesitant to prescribe LUPKYNIS because of "cost and time-consuming paperwork"; and (v) physicians were hesitant to prescribe LUPKYNIS because of a "lack of insurance coverage and/or extra requirements in order for the drug to be covered by insurance." (¶¶ 48, 52, 64.) To support this omission-based theory of fraud, Plaintiff (i) relies solely on the accounts of five low-level CWs with no alleged insight into Aurinia's overall commercialization efforts (¶¶ 35-41); and (ii) blatantly disregards the Company's myriad disclosures about these very same topics.[9]

### a.      The CW allegations are vague and unreliable.

In order for the Court to credit the CW allegations, the AC must contain sufficient facts to "support the probability that the [CWs] have first-hand knowledge of the [matters] at issue." *In re Cree, Inc. Sec. Litig.*, 333 F. Supp. 2d 461, 473 (M.D.N.C. 2004). The AC contains no such facts.

***First***, none of the CWs are alleged to have held positions that would provide insight into the Company's operations as a whole. Plaintiff alleges that CW 2 was a Director of Commercial Effectiveness, but provides no details about what that job entailed or what insight CW 2 may have had (if any) into Aurinia's overall sales operations. (¶ 33.) CW 1 and CW 3 were Regional Sales Managers, each responsible for a small sales territory (four states or less) within one of the three larger regions overseen by Area VPs. (¶ 33 & n.1.) And CW 4 and CW 5 were sales representatives responsible for even smaller territories. (¶¶ 37, 39.) There is no allegation that any CW had access to Company-wide sales or commercialization details, and because of their low-level positions, there is no basis to infer they did. *See KBC*, 19 F.4th at 609 (explaining that CW "allegations will

---

[9] Section 10(b) does not require the disclosure of all material information. *See In re Marriott Int'l, Inc.*, 31 F.4th 898, 901-02 (4th Cir. 2022). Rather, "disclosure is required only when necessary to make statements made, in the light of the circumstances under which they were made, not misleading." *Id.* Here, however, all the relevant facts were already disclosed, foreclosing Plaintiff's omission-based theory of fraud.

only be afforded the weight they are due given their indicia of reliability"); *Leacock v. IonQ, Inc.*, 2023 WL 6308045, at \*14 (D. Md. Sept. 28, 2023) ( (rejecting CW allegations about "the company's progress on and the size of the 32-qubit machine" because that CW "was not involved in the research, design, or development of IonQ's quantum computers"). As such, any CW allegation purporting to address Aurinia's **overall** commercialization progress is simply not reliable.[10] *See Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 799 n.19 (S.D.N.Y. 2020) (collecting cases where CWs were not credited because they had limited insight into the defendant company); *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 223 (S.D.N.Y. 2018) (disregarding CWs that worked within one unit and did not have insight into other corporate units).

**Second**, the CW allegations are far too "vague and conclusory" to support their reliability. *Yates*, 744 F.3d at 887. For example, CW 1 and CW 3 allege that "the uptake" of LUPKYNIS was "slower than we wanted," and that their "sales numbers" were "not even close" to "what they wanted to achieve." (¶¶ 34, 43.) Neither CW, however, provides any specific figures to put these allegations into context. How much slower? Slower compared to stated goals or their own personal expectations? Slower when? The AC provides none of these necessary details to understand the significance (if any) of the CW allegations. *See In re iRobot Corp. Sec. Litig.*, 527 F. Supp. 3d 124, 134 (D. Mass. 2021) (rejecting CW allegations that did not include "specific or quantifiable facts—no metric, projection, analysis, assumption, summary or other data"); *see also IonQ*, 2023

---

[10] The lack of Company-wide information is particularly critical here, as Aurinia reported that sales numbers varied wildly based on location due to COVID-19 restrictions. (Ex. 9 at J.R. 789) (explaining that "Florida and Texas are outperforming territories in Massachusetts, New Jersey and Michigan by multiples that range from 5 to 15x" because the latter states had stricter COVID-19 restrictions).

WL 6308045, at *16 (finding CW's "conclusion" was "not pled with the PSLRA's required particularity" because the CW did "not identify how he knows what he claims to know").

Other allegations amount to mere anecdotes. For example, CW 4 purportedly stated that "LN patients had 'pill fatigue' . . . and would 'skip a few days' of taking LUPKYNIS and then claim the drug did not work." (¶ 37.) But CW 4 does not identify how many patients purportedly had "pill fatigue," nor whether any of those patients actually stopped treatment as a result. Similarly, CW 5 purportedly claimed that "some doctors did not appreciate" "the amount of paperwork required." (¶ 39.) Again, the complete lack of any specific details renders the CW allegations meaningless. *See Nguyen v. Endologix, Inc.*, 962 F.3d 405, 416 (9th Cir. 2020) (rejecting CW allegations because they failed to "identify . . . the number of European patients that experienced device migration, [and] how much Nellix was migrating in these patients").

### b.    The allegedly omitted information was repeatedly disclosed.

Even if the Court were to consider the CW allegations (and it should not), the allegedly omitted "facts" could not have rendered any challenged statement false or misleading because they were fully and "repeatedly disclosed" to investors both before and during the class period. *See Iron Workers Loc. 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 583 (E.D. Va. 2006) (finding no falsity where allegedly omitted information was disclosed). Securities laws "require disclosure of information that is not otherwise in the public domain, not information that has already been publicly—indeed, officially—disclosed." *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204, 212 (4th Cir. 1994).

***"Targeting the wrong types of physicians."*** Plaintiff alleges that Aurinia failed to disclose that it was "targeting the wrong types of physicians." (¶ 48.) According to Plaintiff, "the Company mainly focused on engaging with rheumatologists" even though "LN is typically treated by nephrologists." (¶ 35.) This allegation manages to be both unsupported and incorrect. Unsupported

because the AC does not plead any facts indicating that the Company was targeting nephrologists over rheumatologists or explaining why nephrologists were "the wrong type[] of physician[]." (¶ 48.) And incorrect because the Company repeatedly disclosed that it was "targeting *both specialties*" (Ex. 5 at J.R. 723) and "prescriptions [were] coming from rheumatologists *as actively* as . . . from nephrologists," (Ex. 13 at J.R. 870; *see also* Ex. 9 at J.R. 794 (May 6, 2021: "It really . . . splits down the middle between rheumatologists and nephrologists, 50% on each side."); Ex. 12 at J.R. 849 (August 5, 2021: "We are seeing . . . increased responses from both rheumatologists and nephrologists."); Ex. 17 at J.R. 944 (January 2022: "[R]heumatolog[ists] . . . own probably 50% of the overall prescriptions for lupus nephritis."); Ex. 18 at J.R. 958 (February 2022: "There have been almost evenly split prescriptions between rheumatologists and nephrologists.").)

*"Patients with a cultural distrust of medicine and loss of hope for successful treatment."* Plaintiff's allegation that Aurinia did not disclose that "the social and economic backgrounds of LN patients[] . . . made them hard patients to reach" (¶ 36) fails because Defendants disclosed that LUPKYNIS' "non-white patient population" (Ex. 6 at J.R. 736) was (1) "notoriously uncompliant" (Ex. 16 at J.R. 933); (2) "more impacted by COVID challenges" (Ex. 6 at J.R. 736); (3) and experienced "significant hurdles in seeing their physicians and in access to medical testing" (Ex. 9 at J.R. 789); *see also* (Ex. 4 at J.R. 86 (warning that, because of COVID-19, LN "patient visits to physicians and new patient start might have limited access to prescribers").)

*"Uncompliant patients."* Relying on CW4, Plaintiff claims that Aurinia failed to disclose that LUPKYNIS "patients were non-compliant with their drug regimens" because an unknown number of patients in Dallas at some point did not take LUPKYNIS for "a few days." (¶ 37.) Putting aside the ridiculousness of Plaintiff extrapolating CW4's anecdote to the LUPKYNIS program as a whole, Defendants repeatedly disclosed to investors that some number of LN patients

24

taking LUPKYNIS were not and would not be drug-compliant or persistent, and that some would discontinue treatment all together. (*See* Ex. 4 at J.R. 85-88 (February 2021: warning that Aurinia's results will depend on "the extent to which [LUPKYNIS] will actually be used by patients" and the "acceptance of LUPKYNIS as safe and effective by patients"); Ex. 12 at J.R. 848 (August 2021: "[T]he rate of prescription abandonment . . . has been low."); *Id.* at J.R. 853, 857 (August 2021: "[P]ersistency . . . could all move around by the end of the year" and "there's some of the start forms that are canceled. But . . . the cancellation rate that we've been seeing is relatively low, especially when we compare ourselves with benchmarks."); *Id.* at J.R. 853 (August 2021: "[O]ur abandonment number is low."); Ex. 16 at J.R. 929, 933 (November 2021: describing patient population as "notoriously uncompliant" and stating that their "expectations aren't that 100% of patients are going to stay on therapy," and that "patients will fall off over time[.]").)

*"Physician Reticence to prescribe due to, inter alia, cost and time-consuming paperwork."* Plaintiff claims Defendants did not disclose that physicians were hesitant to prescribe LUPKYNIS "due to . . . cost and time-consuming paperwork." (¶¶ 48, 52, 64.) Once again, this allegation fails because Defendants constantly warned investors that (i) "market acceptance for LUPKYNIS could be impacted by . . . *cost-effectiveness*" (Ex. 4 at J.R. 87); (ii) "[w]e do hear from some physicians out there . . . a hesitancy to wait to utilize the product" (Ex. 9 at J.R. 798); and (iii) with "any initial rare disease launch," the "initial process for getting a patient on drug involves some *paperwork* and involves a prior [authorization] in most cases and that alone is an initial hurdle you need to get over" (Ex. 12 at J.R. 853; *see also* Ex. 13 at J.R. 865-66 ("[I]n a lot of cases, the drug is being approved as a medical exception, and that can require *more paperwork* and time to get the patient on to therapy. . . . [T]he patient and physician have to opt into our system

25

so that we can help the process along. ***That's paperwork***. And then once the payer receives the paperwork, that paperwork kicks back and forth.")).

***"Lack of insurance coverage and/or extra requirements in order for the drug to be covered by insurance."*** Contrary to Plaintiff's allegation that Defendants failed to disclose that "insurance coverage limitations" and coverage prerequisites "deterred physicians from prescribing LUPKYNIS" (¶ 40), the Company expressly warned investors of the many potential and actual payer-related pitfalls during the class period. Specifically, Defendants warned that (i) "[o]f course, we've had payer denials," (Ex. 9 at J.R. 797); (ii) "there are ***multiple steps*** that most payers will put on a patient and a physician when there's not a policy in place," (Ex. 6 at J.R. 736), including taking "MMF and steroids" first, (Ex. 9 at J.R. 797); (iii) "***reimbursement may be limited*** or unavailable in certain market segments," (Ex. 4 at J.R. 88); (iv) "[w]e cannot be certain that coverage will be available," (*id.*); and (v) "[o]ur inability to promptly obtain coverage . . . could have a material adverse effect on our operating results," (*id.*). Moreover, in every quarter during the class period, the Company disclosed how many insurance companies had issued LUPKYNIS-specific policies, and how many lives those policies covered. (*See supra* at § II.C.)

\* \* \*

Amendment cannot render inactionable statements actionable, nor can it salvage an omission-based theory premised on facts that repeatedly were disclosed. Accordingly, the AC should be dismissed with prejudice for failure to plead falsity.

**B.      The AC Fails to Plead a Strong Inference of Scienter.**

A second, independent basis for dismissal is Plaintiff's failure to plead a strong inference of scienter. Satisfying the PSLRA's strong inference standard—which "unequivocally raised the bar for pleading scienter"—is "no small burden." *Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 624 (4th Cir. 2008). Plaintiff must plead "with particularity facts giving rise to a strong inference"

that Defendants acted with "intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319, 321. To satisfy this standard, Plaintiff must allege ***contemporaneous*** facts demonstrating "either intentional or severely reckless conduct." *KBC*, 19 F.4th at 607-08. In this context, "[r]ecklessness is an act so ***highly unreasonable*** and such an ***extreme departure*** from the standard of ordinary care as to present a danger of misleading the plaintiff." *Id.* These requirements must be met "with respect to each act or omission alleged to violate" the statute, 15 U.S.C. § 78u-4(b)(2), and for each "individual defendant," *Yates*, 744 F.3d at 885. Finally, Plaintiff's allegations must be "cogent," and the inference of scienter must be "at least as compelling as any opposing inference." *Tellabs*, 551 U.S. at 323-24. In this regard, the Court "***must consider plausible, nonculpable explanations***" for Defendants' conduct. *Id.* Thus, unlike a standard Rule 12(b)(6) analysis, the Court does ***not*** draw all inferences in Plaintiff's favor when assessing scienter under the PSLRA, and "may not stack inference upon inference to satisfy the [] pleading standard." *San Antonio Fire & Police Pension Fund v. Syneos Health Inc.*, 75 F.4th 232, 243 (4th Cir. 2023).

Plaintiff's scienter allegations fall well short of these exacting standards. The AC does not allege a single contemporaneous fact—not one statement, document, email, or meeting—that conflicted with Defendants' public statements or otherwise demonstrates that any Defendant intended to deceive investors about LUPKYNIS' commercial prospects. Indeed, despite interviews with at least five former Aurinia employees, the AC does not contain a single CW allegation that could support an inference of scienter. And the remainder of Plaintiff's scienter allegations consist of generic, garden-variety motives and theories, unsupported by the necessary facts to support any inference—much less a strong inference—of scienter.

### 1.    The CW allegations do not support scienter.

Although CW allegations can, in some instances, support an inference of scienter, "such allegations will only be afforded the weight they are due given their indicia of reliability, and any

omissions and ambiguities count against an inference of scienter." *KBC*, 19 F.4th at 609. Additionally, CW allegations fail "to establish a strong inference of scienter where [P]laintiffs d[o] not allege that [the CWs] spoke with the executives and the [CWs] were several levels removed from the company's executive team." *Id.*

Here, Plaintiff relies on CW 3 (a Regional Sales Manager, four levels below Mr. Greenleaf) and CW 4 (a sales representative, five levels below Mr. Greenleaf) to allege that "sales issues" and a "lack of Start Form achievement" were discussed during calls and meetings. (¶¶ 76-79.) The alleged details about such calls and meetings, however, are suspiciously vague. For example, there are no details about what the purported "sales issues" entailed, when they occurred, who they were impacting, how prevalent they were, whether they were the result of deviations from Company protocols, or what steps were suggested (or taken) to remediate such issues. (¶¶ 77-78.) *See IonQ*, 2023 WL 6308045, at *17 (rejecting CW allegations from "unspecified days"); *Izadjoo v. Helix Energy Sols. Grp.*, 237 F. Supp. 3d 492, 513 (S.D. Tex. 2017) (explaining that CW allegations about "some issues" "fall[] short of the PSLRA's particularity requirement" because "it is unclear whether [those] 'issues' were . . . severe enough"). Nor is there any allegation that either Individual Defendant was present for the discussion about "sales issues." *See KBC*, 19 F.4th at 609 ("This general lack of direct contact with Defendants weakens the inference of scienter, as [they] may have been unaware of the problems, the causes of the problems, or the extent of the problems"); *IonQ*, 2023 WL 6308045, at *14 (rejecting CW allegations because there were "no allegations from which the Court may infer that [the CW] spoke with" an individual defendant).

As for the discussion about the purported "lack of Start Form achievement," CW 3 claims this discussion occurred in "June or July 2021" and that Mr. Greenleaf attended this call. (¶ 79.) The AC, however, provides no details about what specifically was discussed with regard to the

"lack of Start Form achievement," what this phrase even means, whether it was a Company-wide issue or specific to certain regions, or what Mr. Greenleaf said (if anything) in response to this discussion. Without such details, there is no basis to infer that any information conveyed in this discussion was inconsistent with Mr. Greenleaf's public statements. *See KBC*, 19 F.4th at 609 ("[T]o the limited extent the employees allege that they did notify [individual defendants] of their concerns, Plaintiffs' allegations are vague and conclusory, and lack particularized facts demonstrating Defendants intentionally or recklessly misled investors").[11]

### 2.    Plaintiff's generic motive allegations do not support scienter.

Plaintiff also alleges several generic motives, none of which support any inference of scienter. (¶¶ 89-97.) "[I]n order to demonstrate motive, a plaintiff must show concrete benefits that could be realized by one or more of the false statements and wrongful non-disclosures alleged." *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 621 (4th Cir. 1999). Failure to plead a "plausible motive . . . . weighs heavily against [Plaintiff] in the scienter analysis." *Syneos*, 75 F.4th at 242.

***Incentive compensation.*** Plaintiff claims the Individual Defendants were motivated to commit fraud by their incentive compensation. (¶¶ 89-92.) But most of these allegations focus on compensation packages from 2019 and 2020 (¶¶ 90-92)—well before the start of the class period—and thus were secured before any alleged fraud even occurred. *See Phillips*, 190 F.3d at 622 ("Allegations that merely charge that executives aim to prolong the benefits they hold are, standing alone, insufficient to demonstrate the necessary strong inference of scienter."). As for Mr. Greenleaf's pay raise in 2021 (¶ 92), Plaintiff does not allege it was contingent upon or tied to

---

[11] This case could not be more different than *In re 2U, Inc. Sec. Class Action*, 2021 WL 3418841 (D. Md. Aug. 5, 2021) (Chuang, J.), where the CWs had direct contact with and managed relevant information reviewed by the defendants (*id.* at *12, 17), or *Sinnathurai v. Novavax, Inc.*, 2022 WL 17585715 (D. Md. Dec. 12, 2022) (Chuang, J.), where the defendants directly answered employee questions relevant to the allegedly undisclosed issues (*id.* at *22). Nothing similar is alleged here.

Aurinia's stock price, but even so, this would still be insufficient to plead scienter. *See Phillips*, 190 F.3d at 622 (rejecting claims that "corporate officers were motivated to defraud the public because an inflated stock price would increase their compensation"). Moreover, all of Plaintiff's incentive-related allegations (receiving compensation, getting a raise, or earning a bonus) are common to all executives, and therefore cannot support a strong inference of scienter. *See In re Trex Co., Inc. Sec. Litig.*, 212 F. Supp. 2d 596, 607 (W.D. Va. 2002) ("Every corporate officer wants . . . a bigger bonus," but such allegations "lead to no more than a strained and tenuous inference of motive, and therefore must fail.").

*Acquisition rumors.* Plaintiff alleges that the Individual Defendants were motivated to "continue the fraudulent deception in hopes of a large buyout price." (¶ 94.) Plaintiff, however, fails to plead any facts explaining how an acquisition would personally benefit the Individual Defendants. And the Fourth Circuit has repeatedly held that scienter cannot be inferred from the motive to engage in business transactions because they are common to every business. *See, e.g.*, *Phillips*, 190 F.3d at 623 ("Because the stockholders' allegations pertain to motivations common to every corporate merger, those allegations cannot demonstrate scienter."); *Tamar v. Mind C.T.I., Ltd.*, 723 F. Supp. 2d 546, 555 (S.D.N.Y. 2010) (noting motive to "pursue strategic acquisitions . . . insufficient to establish scienter").[12]

*Stock sales.* Plaintiff alleges that a handful of Company insiders who are *not defendants* in this case sold stock. (¶ 97.) Such allegations are both "curious and unavailing," as such individuals are not alleged to have made any fraudulent statements and thus, "whether [they] had a motive to commit fraud is irrelevant." *First Union*, 128 F. Supp. 2d at 898; *see also Firemen's*

---

[12] Likewise, Plaintiff's allegations about "motivations to raise capital . . . are common to every company and thus add little to an inference of fraud." *Lerner v. Nw. Biotherapeutics*, 273 F. Supp. 3d 573, 595 (D. Md. 2017). (¶¶ 93, 95.)

*Ret. Sys. of St. Louis v. Telos Corp.*, 2023 WL 1512207, at *10 (E.D. Va. Feb. 1, 2023) (finding that "no inference of scienter can be drawn as to any Defendant from . . . sales by non-defendants"). More importantly, ***Plaintiff does not (because it cannot) allege that either Individual Defendant sold any Aurinia stock during the class period***. This strongly cuts against any inference of scienter. *See In re Acterna Corp. Sec. Litig.*, 378 F. Supp. 2d 561, 567-77 (D. Md. 2005) (holding that a lack of stock sales by defendants creates a "negative inference" regarding scienter); *Smith v. Circuit City Stores, Inc.*, 286 F. Supp. 2d 707, 716 (E.D. Va. 2003) ("Plaintiffs' failure to allege that the Defendants sold stock insulates them from any inference of scienter."); *First Union*, 128 F. Supp. 2d at 899 (noting a "lack of sales by several defendants undermines plaintiffs' claim that defendants delayed notifying the public so that they could sell their stock at a huge profit"); *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 289 (S.D.N.Y. 2006) (lack of stock sales "undermines plaintiffs' motive allegations").[13]

### 3.     The remainder of Plaintiff's allegations do not support scienter.

Lacking any particularized, contemporaneous facts or any cognizable motive for fraud, Plaintiff is left to rely on allegations that potentially can (when adequately pled, unlike here) support an inference of scienter, but cannot evince a strong inference of scienter on their own. *Syneos*, 75 F.4th at 242 (explaining that "circumstantial evidence of fraud must be correspondingly greater" where plaintiff does not plead a plausible motive).

***Individual Defendants' roles.*** According to Plaintiff, the Individual Defendants must have known their statements were false because of their "respective roles" as CEO and CFO. (¶¶ 74, 81.) The Fourth Circuit has firmly rejected this position. *Yates*, 744 F. 3d at 890 ("[W]e reject

---

[13] The lack of such allegations easily distinguishes this case from *In re Emergent BioSolutions Inc. Sec. Litig.*, 2023 WL 5671608 (D. Md. Sept. 1, 2023), where there were significant and suspiciously timed stock sales, in addition to a damning Congressional report and CW allegations that are far more particularized than those pled here. *Id.* at *22, 25-26, 29.

31

plaintiffs' contention that the individual defendants must have acted intentionally or recklessly . . . merely because . . . they were senior executives."); *see Miao*, 442 F. Supp. 3d at 806 (noting allegations "founded on nothing more than a defendant's corporate position[] are entitled to no weight").

    ***Access to information.*** Next, Plaintiff claims that the Individual Defendants must have known that their statements were false because they "had access to specific information regarding Aurinia's commercialization of and sales of LUPKYNIS generally and specifically." (¶ 74; *see also* ¶¶ 44, 76.) But the mere fact that Defendants had access to information, without more, is insufficient to establish scienter. *Syneos*, 75 F.4th at 242 ("[W]e cannot impute factual knowledge to individuals merely based on their professional position or because such knowledge relates to the business's core operations."). Rather, Plaintiff must plead "detailed allegations establishing the defendants' actual exposure" to the fraud. *Yates*, 744 F. 3d at 890-91. The AC is several large leaps away from making this showing: it does not allege what the information showed, whether the Individual Defendants reviewed that information, or whether the information contradicted their public statements. *See id.* at 890 ("[W]ithout additional detailed allegations establishing the defendants' actual exposure to the accounting problem, the complaint falls short of the PSLRA's particularity requirements.")

    ***Alleged admissions.*** Similarly, Plaintiff claims that the Individual Defendants knew their statements were false because they "repeatedly admitted to having knowledge of Aurinia's progress with commercialization and sales of LUPKYNIS" and spoke knowledgeably about the "Company's product, sales, customers, and forecasts" when responding to analysts' questions. (¶¶ 81-87.) This allegation fails for the same reason as the access to information allegations— Plaintiff does not identify a single contemporaneous fact that contradicted Defendants' statements.

*See In re Campbell Soup Co. Sec. Litig.*, 2020 WL 7022655, at *7 n.4 (D.N.J. Nov. 30, 2020 (rejecting argument that "statements to analysts made in direct response to analyst questions bolster scienter" where plaintiffs "fail[ed] to show that Defendants knew facts contradicting their statements in response to analyst questions").

***Temporal proximity.*** Plaintiff alleges that Mr. Greenleaf must have known his "aggressive numbers" statement at the Leerink Conference was false because it was made roughly two weeks before the Company issued its 2022 sales guidance for LUPKYNIS. (¶ 88.) As a threshold matter, because this is a forward-looking statement ("aggressive numbers ***will come*** from us"), Plaintiff can only plead scienter with allegations of actual knowledge. *See Slayton v. Am. Express Co.*, 604 F.3d 758, 773 (2d Cir. 2010) ("[B]ecause the safe harbor specifies an actual knowledge standard for forward-looking statements, the scienter requirement for forward-looking statements is stricter than for statements of current fact."). (*See supra* § IV.A.2 (addressing Plaintiff's failure to plead actual knowledge).) Circumstantial allegations related to temporal proximity therefore are not enough. Moreover, the Fourth Circuit has held that temporal proximity, alone, is insufficient to plead a strong inference of scienter. *KBC*, 19 F.4th at 612 ("While such temporal proximity is relevant to the scienter inquiry, we . . . declin[e] to draw a strong inference of scienter based ***solely*** on [it].").

***Post class-period shareholder complaints.*** Plaintiff also alleges that in April and May 2023—more than a year after the end of the class period—two Aurinia shareholders published letters listing their grievances with management. (¶¶ 70-72.) As an initial matter, ***post-class-period events do not have any "probative value in assessing whether any Defendant acted with scienter at the time any statement or omission was actually made.*** First Union*, 128 F. Supp. 2d at 896. In any case, neither letter suggests fraudulent conduct. (¶¶ 70-72.) *In re e.spire Commc'ns, Inc.*

*Sec. Litig.*, 127 F. Supp. 2d 734, 748 (D. Md. 2001) ("Corporate mismanagement . . . is generally not sufficient to establish securities fraud."); *see also In re Cable & Wireless*, 321 F. Supp. 2d at 770 ("[M]ere corporate mismanagement is not actionable under the securities laws . . . . Congress did not intend for the securities laws to be used by investors to play 'Monday morning quarterback' on the legitimate business decisions, however bad, of company officers and executives.").

***Post class-period executive departure.*** Plaintiff lastly alleges that Mr. Colao and the Company "mutually agreed that Mr. Colao would cease his employment with Aurinia, effective July 22, 2022"—*i.e.*, five months after the end of the class period. (¶ 69.) Setting aside that a post class-period resignation is irrelevant to the scienter analysis, it is well understood that executives leave for all sorts of reasons. Accordingly, to support any inference of scienter, Plaintiff must plead particularized facts demonstrating that the timing or circumstances of the departure was suspicious. *See Syneos*, 75 F.4th at 244 (declining to "read anything nefarious" into executive departures where "Plaintiffs have failed to raise an inference of scienter through any other means"). *Cf. Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 556 F. Supp. 3d 100, 136 (D. Conn. 2021) (finding executive's departure suspicious because he resigned "shortly after the company launched the internal investigation into sales practices" and because he had "direct involvement in the unethical and illegal sales practices"). No such facts are pled here.[14]

*   *   *

Viewed holistically, and considering "plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff," *Tellabs*, 551 U.S. at 324, the far more compelling inference is that Defendants were cautiously optimistic about LUPKYNIS'

---

[14] Because Plaintiff fails to plead scienter as to the Individual Defendants, it also fails to plead scienter as to Aurinia. *See Yates*, 744 F.3d at 885.

34

prospects. At the same time, however, Defendants fully disclosed the facts upon which that cautious optimism was based, as well as the headwinds stemming both from COVID-19 and those attendant with launching a new and novel rare-disease drug, including the ***same exact*** risks that the AC alleges were omitted. Moreover, Defendants' optimism regarding LUPKYNIS proved to be well-founded, as there was steady patient and revenue growth during the class period, with the Company squarely meeting its year-end sales guidance for LUPKYNIS in 2021.

In the face of this non-culpable evidence, Plaintiff would have the Court believe that Defendants—for reasons the AC does not even attempt to articulate beyond boilerplate motives common to all executives—would put their reputations at risk and engage in a sweeping fraud for nearly a year. Far from "cogent" or "compelling," Plaintiff's theory of fraud is nonsensical. *See Lerner*, 273 F. Supp. 3d at 593 ("[W]hen the facts as a whole more plausibly suggest that the defendant acted innocently—or even negligently—rather than with intent or severe recklessness, the action must be dismissed.").

### C.    Plaintiff Fails to Plead a Claim Under Section 20(a).

Because Plaintiff fails to plead a primary Section 10(b) violation, its Section 20(a) claim necessarily fails. *See KBC*, 19 F.4th at 614 n.4.

## V.    CONCLUSION

For these reasons, the AC should be dismissed with prejudice.

Dated: October 20, 2023                  **COOLEY LLP**


                                         By: */s/ David E. Mills*
                                         David E. Mills
                                         1299 Pennsylvania Avenue, NW,
                                         Suite 700
                                         Washington, DC 20004-2400
                                         Tel: (202) 842-7800
                                         dmills@cooley.com


35

Koji Fukumura (admitted *pro hac vice*)
Ryan Blair (admitted *pro hac vice*)
Heather Speers (admitted *pro hac vice*)
10265 Science Center Drive
San Diego, CA 92121-1117
Tel: (858) 550-6000
rblair@cooley.com
kfukumura@cooley.com
hspeers@cooley.com

Zach Williams (admitted *pro hac vice*)
1144 15th Street, Suite 2300
Denver, CO 80202-2686
Tel: (720) 566-4000
zwilliams@cooley.com

*Counsel for Defendants Aurinia Pharmaceuticals Inc., Peter Greenleaf, and Joseph Miller*

36