# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| MICHAEL J. ORTMANN, Individually and on Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br>v.<br><br>AURINIA PHARMACEUTICALS INC., PETER GREENLEAF, and JOSEPH MILLER,<br><br>        Defendants. | Civil Action No.: 22-cv-1335-BAH<br><br>CLASS ACTION<br><br>Hon. Brendan Abell Hurson |

## LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

I.     PRELIMINARY STATEMENT ..................................................................................1

II.    STATEMENT OF FACTS.......................................................................................2

       A.  Aurinia's LUPKYNIS Drug Enters the Commercial Market .....................................2

       B.  Defendants Mislead Investors, Touting LUPKYNIS' Purportedly Successful
           Launch While Omitting Negative Adverse Conditions Affecting Sales....................3

       C.  Aurinia's Hidden Issues Result in Negative Performance and Stock Declines.........6

III.   THE MOTION SHOULD BE DENIED BECAUSE IT IMPERMISSIBLY
       RELIES ON DOCUMENTS NOT REFERENCED OR INCORPORATED INTO
       THE COMPLAINT AND EXCEEDS PAGE LIMITS ......................................................7

IV.    THE MOTION SHOULD ALSO BE DENIED BECAUSE THE COMPLAINT
       STATES A CLAIM FOR SECURITIES FRAUD............................................................9

       A.  Applicable Legal Standards ...............................................................................9

       B.  The Complaint Pleads Material Omissions...........................................................10

           1.   Defendants' Misleading Representations that the
                Commercialization of LUPKYNIS Was a Success Are Actionable .......11

           2.   Defendants Fail to Discredit Plaintiff's Omission Theory.....................16

                a.   The CW Attacks Fail..................................................................17

                b.   The Omitted Information Was Not Disclosed.............................19

           3.   Defendants' Other Falsity Arguments Lack Merit ................................21

       C.  The Complaint Adequately Alleges Scienter .........................................................26

           1.   Plaintiff's Scienter Allegations Must Be Viewed Holistically................26

           2.   Considered Holistically, the Allegations in the  Complaint
                Establish a Strong Inference of Defendants' Scienter............................28

           3.   The Law Does Not Require Direct Evidence of Scienter.......................28

                a.   The Defendants Knew Critical Facts and Had Access to
                     Information Undermining the Truth of Their Statements...........29

                b.   Selling LUPKYNIS Was the Core Operation of Aurinia,
                     and Defendants Admitted to Having Intimate Knowledge of
                     Sales ..........................................................................................31

                c.   Other Facts Support a Strong Inference of Scienter ..................33

           4.   The Opposing Inference of Non-Fraudulent Intent is Not
                Compelling.............................................................................................35

V.     CONCLUSION .....................................................................................................35

**TABLE OF AUTHORITIES**

<u>CASES</u>

*Abady v. Lipocine Inc.*,
No. 2:19-cv-00906, 2023 WL 2938210 (D. Utah Apr. 13, 2023)..........................................22

*Abramson v. NewLink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020) ................................................................................................24

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002) .................................................................................................34

*Arnlund v. Deloitte & Touche LLP*,
199 F. Supp. 2d 461 (E.D. Va. 2002) ....................................................................27, 29, 33

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...............................................................................................................9

*Backe v. Novatel Wireless, Inc.*,
642 F. Supp. 2d 1169 (S.D. Cal. 2009).................................................................................14

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)...............................................................................................................9

*Boston Ret. Sys. v. Uber Techs., Inc.*,
No. 19-cv-06361-RS, 2020 WL 4569846 (N.D. Cal. Aug. 7, 2020)...............................16, 22

*Brambaugh v. Wave Sys. Corp.*,
416 F. Supp. 2d 239 (D. Mass. 2006) .............................................................................15, 34

*Burt v. Maasberg*,
No. ELH-12-0464, 2013 WL 131460 (D. Md. Mar. 31, 2013)..............................................11

*Burt v. Maasberg*,
No. ELH-12-0464, 2014 WL 129183 (D. Md. Mar. 28, 2014) ...............................................8

*Caiola v. Citibank, N.A.*,
295 F.3d 312 (2d Cir. 2002) ................................................................................................10

*Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*,
496 F. Supp. 3d 952 (E.D. Va. 2020) ..............................................................13, 20, 22, 35

*Carlucci v. Han*,
907 F. Supp. 2d 709 (E.D. Va. 2012) ..................................................................................29

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
399 F.3d 651 (6th Cir. 2005) ...............................................................................................22

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't Inc.*,
477 F. Supp. 3d 123 (S.D.N.Y. 2020) .................................................................................19

*Direct Benefits, LLC, v. TAC Fin. Inc.*,
No. GLR-13-1185, 2014 WL 671616 (D. Md. Feb. 20, 2014)........................................10, 25

*Dunn v. Borta*,
   369 F.3d 421 (4th Cir. 2004) ........................................................................................23

*Epstein v. World Acceptance Corp.*,
   203 F. Supp. 3d 655 (D.S.C. 2016) ...............................................................................35

*Frank v. Dana Corp.*,
   646 F.3d 954 (6th Cir. 2011) ........................................................................................27

*Gen. Motors, Inc. v. Richard Francis, et al.*,
   No. 19-12371, ECF No. 61 (E.D. Mich. Jan. 7, 2020) ...................................................9

*Hedick v. Kraft Heinz Co.*,
   No. 19-cv-1339, 2021 WL 3566602 (N.D. Ill. Aug. 11, 2021) ...........................8, 18, 24

*Herman & Maclean v. Huddleston*,
   459 U.S. 375 (1983) ......................................................................................................29

*In re 2U, Inc., Sec. Class Action*,
   Nos. TDC-19-3455, TDC-20-1006, 2021 WL 3418841 (D. Md. Aug. 5, 2021) ........... *passim*

*In re Celera Corp. Sec. Litig.*,
   No. 5:10-cv-02604 EJD, 2013 WL 4726097 (N.D. Cal. Sept. 3, 2013) ..........................24

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
   No. 17 Civ. 1580 (LGS), 2018 WL 2382600 (S.D.N.Y. May 24, 2018) ..........................23

*In re Cree, Inc. Sec. Litig.*,
   333 F. Supp. 2d 461 (M.D.N.C. 2004) ..........................................................................18

*In re Emergent Biosolutions Inc. Sec. Litig.*,
   No. DLB-21-955, 2023 WL 5671608 (D. Md. Sept. 1, 2023) ........................... *passim*

*In re Finisar Corp. Sec. Litig.*,
   646 F. App'x 506 (9th Cir. 2016) ..................................................................................14

*In re GE Sec. Litig.*,
   857 F. Supp. 2d 367 (S.D.N.Y. 2012) ............................................................................33

*In re Genworth Fin. Inc. Sec. Litig.*,
   103 F. Supp. 3d 759 (E.D. Va. 2015) ..................................................................... *passim*

*In re Hi-Crush Partners L.P. Sec. Litig.*,
   No. 12 Civ 8557(CM), 2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) ..............................31

*In re Human Genome Scis. Inc. Sec. Litig.*,
   933 F. Supp. 2d 751 (D. Md. 2013) ................................................................................9

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
   251 F. Supp. 3d 596 (S.D.N.Y. 2017) ............................................................................11

*In re IronNet, Inc. Sec. Litig.*,
   No. 1:22-cv-449 (RDA/JFA), 2023 WL 5110932 (E.D.V.A. Aug. 9, 2023) ............16, 21, 25

*In re James River Grp. Holdings, Ltd.*,
   No. 3:21cv444(DJN), 2023 WL 5538218 (E.D. Va. Aug. 28, 2023) ..........................23, 26

*In re Marriott Int'l, Inc. Customer Data Security Breach Litig.*,
543 F. Supp. 3d 96 (D. Md. 2021) ...............................................................................22

*In re Massey Energy Co. Sec. Litig.*,
883 F. Supp. 2d 597 (S.D. W. Va. 2012) ................................................................21, 32

*In re MicroStrategy, Inc. Sec. Litig.*,
115 F. Supp. 2d 620 (E.D. Va. 2000) .....................................................................29, 35

*In re Quality Sys.*,
865 F.3d 1130 (9th Cir. 2017) ............................................................................14, 18, 23

*In re Res. Am. Sec. Litig.*,
No. CIV. 98-5446, 2000 WL 1053861 (E.D. Pa. July 26, 2000) ...........................34

*In re SCANA Corp. Sec. Litig.*,
No. 3:17-2616-MBS, 2019 WL 1427443 (D.S.C. Mar. 29, 2019) ........................23

*In re Scottish Re Grp. Sec. Litig.*,
524 F. Supp. 2d 370 (S.D.N.Y. 2007) .......................................................................16

*In re Signet Jewelers Ltd. Sec. Litig.*,
No. 16 Civ. 6728 (CM), 2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018) ...........17, 23

*In re StockerYale Sec. Litig.*,
453 F. Supp. 2d 345 (D.N.H. 2006) ..........................................................................15

*In re Twitter, Inc. Sec. Litig.*,
No. 16-cv-05314-JST, 2020 WL 4187915 (N.D. Cal. Apr. 17, 2020) ...................33

*In re UTStarcom, Inc. Sec. Litig.*,
617 F. Supp. 2d 964 (N.D. Cal. 2009) ......................................................................14

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009) ................................................................................27, 33

*Iwa Forest Indus. Pension Plan v. Textron Inc.*,
14 F.4th 141 (2d Cir. 2021) .......................................................................................19

*Jiangchen v. Rentech, Inc.*,
No. CV 17-1490-GW(FFMx), 2017 WL 10363990 (C.D. Cal. Nov. 20, 2017) ......9

*KBC Asset Mgmt. NV v. 3D Sys. Corp.*,
No. 0:15-cv-02393-MGL, 2016 WL 3981236 (D.S.C. July 25, 2016)...................32

*KBC Asset Mgmt. NV v. DXC Tech. Co.*,
19 F. 4th 601 (4th Cir. 2021) .........................................................................18, 30, 31

*Khoja v. Orexigen Therap., Inc.*,
899 F.3d 988 (9th Cir. 2018) ..............................................................................8, 11, 12, 16

*Kiken v. Lumber Liquidators Holdings, Inc.*,
155 F. Supp. 3d 593 (E.D. Va. 2015) ........................................................................12

*Klein v. Altria Grp., Inc.*,
525 F. Supp. 3d 638 (E.D. Va. 2021) .......................................................12, 13, 20, 21

iv

*Knurr v. Orbital ATK Inc.*,
  294 F. Supp. 3d 498 (E.D. Va. 2018) ...........................................................................27

*Leacock v. IonQ, Inc.*,
  No. DLB-22-1306, 2023 WL 6308045 (D. Md. Sept. 28, 2023) ...........................................18

*Lefkoe v. Jos. A. Bank Clothiers*,
  No. WMN-06-1892, 2007 WL 6890353 (D. Md. Sept. 10, 2007) ...........................................18

*Lefkoe v. Jos. A. Bank Clothiers*,
  No. WMN-06-1892, 2008 WL 7275126 (D. Md. May 13, 2008) ...........................................33

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
  416 F.3d 940 (9th Cir. 2005) ..........................................................................................25

*Lloyd v. CVB Fin. Corp.*,
  811 F.3d 1200 (9th Cir. 2016) ........................................................................................15

*Lormand v. US Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) ..........................................................................................27

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
  437 F.3d 588 (7th Cir. 2006) .....................................................................................17, 24

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
  513 F.3d 702 (7th Cir. 2008) ..........................................................................................32

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) .......................................................................................................10

*McIntyre v. Pedder*,
  No. 3:12-cv-00213-MOC-DCK, 2015 WL 5039431 (W.D.N.C. Aug. 26, 2015)...................22

*Mulderrig v. Amyris, Inc.*,
  492 F. Supp. 3d 999 (N.D. Cal. 2020) ...............................................................23, 24, 25, 34

*Nandkumar v. AstraZeneca PLC*,
  No. 22-2704-cv, 2023 WL 3477164 (2d Cir. May 16, 2023)..................................................22

*No. 84 Emp'r Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
  320 F.3d 920 (9th Cir. 2003) ..........................................................................................33

*Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*,
  780 F. App'x 480 (9th Cir. 2019) .....................................................................................14

*Ollila v. Babcock & Wilson Enterprises, Inc.*,
  No. 3:17-cv-109, 2018 WL 792069 (W.D.N.C. Feb. 8, 2018) ........................................14, 23

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015).................................................................................................23, 24

*Oneida Sav. Bank v. Uni-Ter Underwriting Mgmt. Corp.*,
  No. 5:13-cv-746 (MAD/ATB), 2014 WL 4678046 (N.D.N.Y. Sept. 18, 2014).....................34

*Phillips v. LCI Int'l, Inc.*,
  190 F.3d 609 (4th Cir. 1999) ............................................................................................8

v

*Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*,
  No. 3:19-cv-04744-WHA, 2020 WL 2559939 (N.D.C.A. May 20, 2020)............................23

*Republican Party of N.C. v. Martin*,
  980 F.2d 943 (4th Cir. 1992)...............................................................................................10, 21

*Robb v. Fitbit Inc.*,
  No. 16-cv-00151-SI, 2017 WL 219673 (N.D. Cal. Jan. 19, 2017).........................................18

*Roberti v. OSI Sys.*,
  No. CV 13-9174-MWF (VBKx), 2015 WL 1985562 (C.D. Cal. Feb. 27, 2015)...................24

*Roberts v. Zuora*,
  No. 19-cv-03422-SI, 2020 WL 2042244 (N.D.C.A. Apr. 28, 2020) .....................................23

*S. Ferry LP, #2 v. Killinger*,
  687 F. Supp. 2d 1248 (W.D. Wash. 2009)............................................................................32

*S. Ferry LP, #2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008)................................................................................................31

*Setzer v. Omega Healthcare Inv'rs, Inc.*,
  968 F.3d 204 (2d Cir. 2020) ................................................................................................14

*Singer v. Reali*,
  883 F.3d 425 (4th Cir. 2018)...................................................................................... passim

*Sinnathurai v. Novavax, Inc.*,
  645 F. Supp. 3d 495 (D. Md. 2022)............................................................................ passim

*Siracusano v. Matrixx Initiatives, Inc.*,
  585 F.3d 1167 (9th Cir. 2009) .............................................................................................16

*Sloman v. Pressteck, Inc.*,
  No. 06-cv-377-JD, 2007 WL 2740047 (D.N.H. Sept. 18, 2007)...........................................16

*Tchatchou v. India Globalization Cap. Inc.*,
  No. PWG-18-3396, 2021 WL 307415 (D. Md. Jan. 29, 2021)..............................................34

*Teachers' Ret. Sys. of La. v. Hunter*,
  477 F.3d 162 (4th Cir. 2007)................................................................................................35

*Tellabs Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)............................................................................................26, 27, 29, 33

*Turka v. S.C. Pub. Serv. Auth.*,
  No. 2:19-1102-RMG, 2020 WL 901965 (D.S.C. Feb. 25, 2020) .........................................16

*Turocy v. El Pollo Loco Holdings, Inc.*,
  No. SACV 15-1343-DOC (KESx), 2017 WL 3328543 (C.D. Cal. Aug. 4, 2017)................15

*Va. Bankshares, Inc. v. Sandberg*,
  501 U.S. 1083 (1991)...........................................................................................................25

*Vaitkuviene v. Syneos Health, Inc.*,
  No. 5:18-CV-29-H-KS, 2020 WL 5742714 (E.D.N.C. Aug. 7, 2020)....................................9

vi

*Vaitkuviene v. Syneos Health, Inc.*,
    No. 5:18-CV-29-H-KS, 2021 WL 385652 (E.D.N.C. Aug. 30, 2021)......................................9

*Van Dongen v. CNinsure, Inc.*,
    951 F. Supp. 2d 457 (S.D.N.Y. 2013) ...............................................................................34

*Wikimedia Found. v. Nat'l Sec. Agency*,
    857 F.3d 193 (4th Cir. 2017)...............................................................................................9

*Zaghian v. Farrell*,
    675 F. App'x 718 (9th Cir. 2017)........................................................................................26

*Zak v. Chelsea Therapeutics Int'l, Ltd.*,
    780 F.3d 597 (4th Cir. 2015) .........................................................................................8, 12

## STATUTES

15 U.S.C. § 78u-5(c)(1)(A)(i) ....................................................................................................24

Lead Plaintiff Skye Capital Partners ("Plaintiff" or "Skye Capital"), respectfully submits this Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Amended Class Action Complaint ("Motion" or "Mot.") (ECF No. 71) and supporting memorandum ("Mem.").

## I.    PRELIMINARY STATEMENT

Aurinia and the Individual Defendants[1] created a false narrative regarding the actual and expected success of Aurinia's newly approved drug, and only commercial product, LUPKYNIS, artificially inflating the price of Aurinia's stock during the proposed Class Period. Defendants touted LUPKYNIS' successes, while concealing from investors real, known problems the Company was experiencing when marketing and selling LUPKYNIS. The boilerplate risk factors included in Aurinia's public disclosures were vague and general, failing to disclose the material adverse facts and conditions Defendants knew about at the time. Defendants instead led investors to believe that any difficulties were caused by COVID-19, when in fact Defendants knew there were at least five other reasons, discussed below, for the difficulties. Defendants cannot escape scrutiny by arguing that no one should look behind the curtain because LUPKYNIS was a new drug, and there are always risks.

Aurinia's alleged success story promoted by Defendants (Mem. 1) is not one of success for investors who were misled by Defendants' failure to disclose material facts. Lead Plaintiff Sky Capital alone lost $6,067,912 as a result of Defendants' fraud. (ECF No. 22-4.) Defendants' argument that Plaintiff cannot prove fraud because they do not have direct evidence of Defendants' intent to deceive the investing public also fails. As described in detail below, the evidence of scienter is often circumstantial, and allegations must be taken collectively. The Complaint relies

---

[1] The Individual Defendants are Aurnia's CEO, Peter Greenleaf ("Greenleaf") and CFO, Joseph Miller ("Miller"). All references to "¶ ___" are to the Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint" or "AC"). ECF No. 54. Unless otherwise indicated, capitalized terms shall have the same meaning as given in the AC, internal citations and quotations are omitted, and emphasis is added.

1

in part on five former employees who explain that Defendants knew, but failed to disclose, the adverse facts concerning the difficulties Aurinia was experiencing in selling LUPKYNIS. And recklessness alone is enough to plead a strong inference of scienter. The Complaint satisfies that standard.

Defendants' attempt to create a different narrative through documents submitted as exhibits should be rejected. While the Court can consider certain documents referenced or incorporated into the AC, many of the documents are not within that category, and Defendants' reliance goes beyond the information for which the Court can take judicial notice. More importantly, Defendants have grossly exceeded the Court's order on page limitations which alone is a reason to deny the Motion. Finally, by submitting the extraneous documents, Defendants have essentially converted the Motion into one for summary judgment, and pursuant to Rule 12(d), where "matters outside the pleadings are presented to and not excluded by the court, the motion **must** be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Plaintiff has not been given that opportunity, and for this reason as well, Defendants' Motion should be denied.

## II.    STATEMENT OF FACTS

### A.    Aurinia's LUPKYNIS Drug Enters the Commercial Market

Aurinia is a small Canadian biopharmaceutical company. ¶¶2, 4, 12, 28. The Company's sole commercial product during the Class Period was LUPKYNIS, a treatment for adult patients with active lupus nephritis ("LN"). ¶¶2, 4. LN is a flaring and remitting autoimmune disease, cycling from remission to active flare. ¶20. The U.S. LN population was estimated by Defendants to be about 80,000 to 120,000 with the population including disproportionately higher numbers of women and minority populations. ¶21.

LUPKYNIS was approved by the FDA on January 21, 2021, and Aurinia immediately

2

began selling the drug commercially. ¶22. The drug was sold in "wallets" containing 60 capsules at a price of $3,950, amounting to annualized net revenue per patient of $65,000. *Id.*

The cash outlay for the commercialization of LUPKYNIS was substantial. ¶¶22, 93. Indeed, by June 30, 2021, SGA expenses alone had risen over three times to $83.1 million for the six-months ended June 30, 2021 as compared to $26.5 million for the six-months ended June 30, 2020. ¶93. Net cash used in operating activities had almost doubled from $44.6 million to $91.5 million for the same periods and the Company's cash and cash equivalents had dropped to $121.6 million as of June 30, 2021, compared to $232.4 million as of June 30, 2020. *Id.*

As described below, Defendants concealed the difficulties confronting the Company at the time by touting LUPKYNIS' successes, current and projected. In doing do, Defendants hid the known negative trends and conditions adversely affecting current and projected sales of LUPKYNIS, securing their continued long-term and lucrative employment at the Company and enabling other insiders to sell Aurinia stock at inflated prices. *E.g.*, ¶¶48, 52, 64, 70-72, 89-97.

**B.      Defendants Mislead Investors, Touting LUPKYNIS' Purportedly Successful Launch While Omitting Negative Adverse Conditions Affecting Sales**

Presentations in January and May of 2021 stated that the Company's plan was to establish a "robust infrastructure" to commercialize LUPKYNIS, and just one month after launch, Greenleaf claimed that Defendants were "pleased by the uptake of LUPKYNIS by the healthcare community" and that they believed they were "on track to meet [] internal expectations." ¶¶30-31. Defendants continued to tout the Company's positive commercial prospects and financial position throughout the Class Period, despite knowing the substantial undisclosed adverse issues arising and preventing the positive results promised to investors. ¶¶32-64.

On May 6, 2021 after the market closed, Greenleaf stated that looking at LUPKYNIS' recent launch, "we believe that we are right on trends and currently pointing in the right direction."

¶47. On August 5, 2021, Greenleaf stated that, "[a]s we continue to expand patient access . . . , we anticipate that annual net revenue for LUPKYNIS will be in the range of $40 to $50 million for 2021, setting Aurinia up for a very strong 2022 as we recognize the benefit of patients continuing therapy". ¶49. Defendants continued to maintain 2021 guidance during the third quarter report on November 3, 2021, with Greenleaf denying any slowing of sales and sidestepping answering whether there were market segments reluctant to use LUPKYNIS, among other things. ¶¶53-58. While Defendants acknowledged obvious and generic impediments to sales, such as the facts that COVID-19 made it harder to access physicians and that an inability to obtain insurance coverage could negatively affect sales (*e.g.*, Mem. 5), the positive statements described above omitted known prevalent issues arising with the sales and marketing of LUPKYNIS (¶¶3, 33-45).

According to former Aurinia employees ("CWs"), there were at least five undisclosed sales issues that were readily known to Defendants preventing the level of touted growth in sales on the timeline put forth by Defendants. ¶¶33-45, 48, 52, 64. CW1 who worked at Aurinia from June 2020 to June 2022 as a Regional Sales Manager responsible for Wisconsin, Illinois, Iowa, overseeing six sales representatives, stated that the known issues resulted in sales being "slower that we wanted." ¶¶33, 34. CW3, who was also a Regional Sales Manager from July 2020 to October/November 2021 and responsible for a team of seven sales representatives in Delaware, Maryland, Virginia, and the D.C., said the same thing. *Id.* CW2, who was employed from August 2020 to April 2022 as the Director, Commercial Effectiveness, explained that Aurinia was never able to meet quarterly goals in 2021. *Id.*

As 2021 progressed, the sales issues became more salient. First, LN is typically treated by nephrologists, but the Company mainly focused on engaging with rheumatologists. ¶35. Second, as noted by CW3, the LN patients were typically an "underserved" market and the social and

4

economic backgrounds of LN patients made them hard to reach. ¶36. Third, LN patients were non-compliant with their drug regiments, detracting from sales. ¶37. As explained by CW4 (Immunology Specialist in Texas from August 2020 to July 2022), LN patients often had "pill fatigue" from taking 30 to 40 types of pills on a daily basis and would "skip a few days" of taking LUPKYNIS and then claim the drug did not work. *Id.* The non-compliance issue was disclosed, but not until November 3, 2021 (¶58), which contributed in part to a 5% stock drop (¶60).

Fourth, according to CW4, LUPKYNIS was not well received by physicians as they found it to be too expensive and did not view it as much better than existing generic drugs. ¶38. On top of the lack of positive reception, when physicians did prescribe LUPKYNIS they encountered "tedious" and time-consuming issues with Aurinia's Start Forms, resulting in practitioners essentially saying "just forget this." *Id.* CW5, an Immunology Specialist from August 2020 to June 2022 for Utah, Idaho, Montana, Wyoming and Nevada, confirmed CW4's paperwork comments, stating that it could take "a couple hours a day" which doctors did not appreciate. ¶39.

Fifth, the insurance coverage limitations were causing far more drastic issues than the Company's boilerplate disclosures pertaining to insurance coverage let on. ¶40. For example, for CW4's region, if a drug was not covered by BlueCross, which was the case with LUPKYNIS for that region, it was very difficult to get a prescription. *Id.* Indeed, no insurance companies covered the drug in CW4's region. *Id.* Even if covered, many insurance companies required additional steps be completed for coverage, including requiring that a patient try other drugs first. *Id.*

Despite these undisclosed hurdles, and contrary to internal data and information, Greenleaf publicly stated on February 16, 2022, that Aurinia's 2022 guidance would be "aggressive." ¶¶4, 42, 63. The statement came as a surprise to employees because management knew that sales numbers for 2021 were "not even close" to what they wanted to achieve. ¶43. CW1 added that

Greenleaf's statement "threw us off knowing the challenges" Aurinia had experienced with LUPKYNIS, as well as having access to "real time numbers", and that "no one specifically asked" the sales team for feedback on what was reasonable or achievable. ¶44. CW2 commented that "a bunch of us wondered where'd he pull that from" because "we weren't trending" positively. *Id.*

### C.    Aurinia's Hidden Issues Result in Negative Performance and Stock Declines

The sales issues and resulting effects could not remain hidden from investors. On November 3, 2021, Defendants were forced to report "mixed financial performance for Q3 2021" and disclose that LN patients were "notoriously uncompliant," resulting in a 5% drop on November 3, 2021. ¶¶53-60. Instead of telling investors the truth, Defendants chose to continue to mislead the market, omitting yet again the other significant sales impediments discussed above. ¶¶53-59.

Defendants' continued silence and false and misleading statements buoyed the stock price, preventing a larger decline, particularly a statement by Greenleaf regarding the potential for an acquisition (¶57), which one analyst wrote about in an article titled "Aurinia Buyout Chatter: CEO Says To 'Read Between The Lines'" on November 22, 2021, which also noted that "according to the CEO, this slowdown is 'seasonal'" (¶61). Defendants had received and rejected an offer to sell the Company, but investors were led to believe that an M&A transaction was imminent. ¶62.

On February 28, 2022, approximately two weeks after Greenleaf's promise of "aggressive numbers" (¶63), the Company reported its fourth quarter and year end results for 2021, disclosing revenue guidance far short of expectations. ¶65. As reported by the *Motley Fool*, "***Aurinia's shares plunged in early morning action today . . . .*** Aurinia's 2022 annual revenue guidance of between $115 million and $135 million fell well short of expectations. ***Wall Street, for its part, was expecting the midway point of the company's 2022 revenue forecast to come in at around $178 million.***" The article added:

> Another key issue weighing on the drugmaker's shares today are recent comments by . . . Greenleaf. During a fireside chat . . . earlier this month, Greenleaf said investors can expect "aggressive numbers" when the company rolls out its 2022 annual revenue guidance at the end of the month. ***This initial financial forecast, however, doesn't exactly jump off the page as aggressive. Wall Street, in fact, was calling for a figure that was 24% higher than Aurinia's top-end estimate.***

¶66. On this news, Aurinia's share price plummeted $3.94 per share, over 24%, to close at $12.30 per share on February 28, 2022, on unusually heavy trading volume. ¶67.

The effects of the undisclosed sales issues continued after the Class Period, with revenues declining sequentially between fourth quarter 2021 and first quarter 2022, and continuing thereafter. ¶¶68, 71, 72.

Defendants were motivated to hide the true state of affairs during the Class Period so they could continue receiving significant incentive compensation and propping up the cash poor Company in hopes of a buyout. ¶¶89-97. Defendants knew the truth regarding the sales issues and impending stagnation in growth from multiple meetings and related discussions. ¶¶77-79. Defendants were intimately involved with the sales of the Company's sole source of revenue and repeatedly admitted to having knowledge of LUPKYNIS' commercialization. ¶¶74-76, 80-87.

III.    **THE MOTION SHOULD BE DENIED BECAUSE IT IMPERMISSIBLY RELIES ON DOCUMENTS NOT REFERENCED OR INCORPORATED INTO THE COMPLAINT AND EXCEEDS PAGE LIMITS**

Defendants seek judicial notice of 20 exhibits and an eight-page appendix, and often cite to those documents in order to create an impermissible self-serving counter narrative. *E.g.*, Mem. 3-11 (Section cites to AC a mere 6 times and extraneous documents over 60 times). Many of the documents should not be considered, and the Motion denied, given that the Appendix leads to a gross excess of the Court ordered page limits. Moreover, if these matters are considered, the Motion must be treated as a summary judgment motion and Plaintiff given an opportunity for discovery.

"Consideration of a document attached to a motion to dismiss ordinarily is permitted only" when the document is "***integral to and explicitly relied on in the complain***t." *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606-07 (4th Cir. 2015). This is because the "unscrupulous use of extrinsic documents to resolve competing theories against the complaint risks premature dismissals of plausible claims that may turn out to be valid after discovery." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018).[2] Pursuant to these parameters, the Court should not consider Exhibits 1, 2, 3, 5, 6, 13, 17, 20, or any exhibit submitted for the truth of the matter asserted.[3] *See*, *e.g.*, *Sinnathurai v. Novavax, Inc.*, 645 F. Supp. 3d 495, 512 (D. Md. 2022) (refusing consideration of exhibits not integral to the complaint); *Hedick v. Kraft Heinz Co.*, 2021 WL 3566602, at *7 (N.D. Ill. Aug. 11, 2021) (declining to "take Defendants' view of these allegations, because neither the PSLRA, nor Rule 9(b), nor Rule 8(a), nor Rule 12(b)(6) requires the Court to read these allegations individually and out of context").

Even more egregious is Defendants' use of Appendix A which is plainly an end-run around the Court ordered 35-page limit. For example, in arguing that challenged statements are true (Mem. 15), Defendants use the Appendix as a way to exceed page limits.  Instead of explaining why each is inactionable in the permitted page limitations, Defendants refer to the Appendix for the "reasons why each [statement] is inactionable." Mem. 15. Federal courts have not hesitated to strike

---

[2] Judicial notice is a second "narrow" exception which allows courts to consider facts that are generally known or that "can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned." Fed. R. Evid. 201. Whether a fact can be judicially noticed depends on how a court uses it; for instance, a court cannot consider the fact as evidence to contradict the facts in the complaint. *Zak*, 780 F.3d at 607. Thus, documents may be judicially noticed for their existence, but not their truth. *Burt v. Maasberg*, 2014 WL 129183, at *10 (D. Md. Mar. 28, 2014) (considering public filings submitted to the SEC to determine what the documents stated, but not to prove truth); *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999); *Zak*, 780 F.3d at 607-08 (trial court erred in relying on SEC documents that were not referred to in the complaint).

[3] *See*, Exs. 1-3, 5-6 (pre-Class Period Company call/presentations transcripts and press release) and Exs. 13, 17, 20 (additional Company call/presentation transcripts not relied on in AC). *See also, e.g.*, Mem. 4 (use of Exhibit to assert truth that LUPKYNIS worked better than other drugs).

attachments to a motion to dismiss where the attachment contains legal arguments that belong in the brief and where the document, together with the brief, exceeds the page limits. *See, e.g.*, *Gen. Motors, Inc. v. Richard Francis, et al.*, No. 19-12371, ECF No. 61 (E.D. Mich. Jan. 7, 2020) (striking an exhibit styled "Charts Listing Grounds for Dismissal of All Claims" as an end-run around the page limit expounding defendant's legal position when defendant claimed the exhibit was merely an "aid to the court").[4] The Appendix should not be considered, and/or Defendants' Motion should be denied for this reason alone.

## IV.   THE MOTION SHOULD ALSO BE DENIED BECAUSE THE COMPLAINT STATES A CLAIM FOR SECURITIES FRAUD

### A.   Applicable Legal Standards

A complaint will defeat a motion to dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(6) if it alleges a facially "plausible" claim for relief, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), setting forth sufficient facts to support a "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts must "accept as true all well-pleaded facts in a complaint and construe them in the light most favorable to the plaintiff." *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017). A complaint should not be dismissed "unless it appears to a certainty that the plaintiff would be entitled to no relief under any set of facts which could be provided in support of the claims." *In re Human Genome Scis. Inc. Sec. Litig.*, 933 F. Supp. 2d 751, 757 (D. Md. 2013); *see also Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir.

---

[4] *See also Jiangchen v. Rentech, Inc.*, 2017 WL 10363990, at *2-4 (C.D. Cal. Nov. 20, 2017) (striking appendix that consolidated a company's allegedly false and misleading statements, concluding that the appendix constituted an over-the-page-limit extension of defendants' argument, despite defendants' couching the appendix as a tool for the court); *Vaitkuviene v. Syneos Health, Inc.*, 2020 WL 5742714, at *6-7 (E.D.N.C. Aug. 7, 2020) (*overruled on other grounds* by 2021 WL 385652 (E.D.N.C. Aug. 30, 2021) (granting motion to exclude charts created by defendants to summarize and explain).

9

1992) (cautioning that while "test[ing] the sufficiency of a complaint," a motion to dismiss "does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses").

"The purpose of the Exchange Act is to ensure that companies disclose the information necessary for investors to make informed investment decisions." *In re Emergent Biosolutions Inc. Sec. Litig.*, 2023 WL 5671608, at *10 (D. Md. Sept. 1, 2023). Section 10(b) claims must satisfy Rule 9(b) and the particularity requirements of the Private Securities Litigation Reform Act ("PSLRA"). *Singer v. Reali*, 883 F.3d 425, 439 (4th Cir. 2018). However, "neither Rule 9(b) nor the PSLRA requires plaintiff[s] to set forth facts which, because of the lack of discovery, are in the exclusive possession of the Defendants." *Direct Benefits, LLC, v. TAC Fin. Inc.*, 2014 WL 671616, at *8 (D. Md. Feb. 20, 2014). Here, Defendants only challenge the sufficiency of falsity and scienter, and as detailed herein the Complaint satisfies all requisite standards. The Motion should be denied in its entirety.

### B.    The Complaint Pleads Material Omissions

Falsity is adequately pled by "specify[ing] each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." *Singer*, 883 F.3d at 439 . Securities laws impose a duty "to be both accurate and complete" when speaking on an issue. *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002). While Section 10(b) does "not create an affirmative duty to disclose any and all information. . . . Nevertheless, disclosure of material information is required 'when necessary to make statements made, in the light of the circumstances under which they were made, not misleading.'" *Singer*, 883 F.3d at 440 (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011)).

Statements can be outright untruths or misleading by omission. "[T]he United States Court of Appeals for the Fourth Circuit has found that even in the absence of a specific false statement, when a company officer [makes] statements giving a positive impression of the company's

10

prospects, the failure to disclose related adverse information [can] constitute a material omission under the Exchange Act." *Novavax*, 645 F. Supp. 3d at 518. Once Defendants chose "to tout positive information" regarding LUPKYNIS sales and commercialization, they were prohibited from doing so misleadingly and required to disclose "adverse information that cuts against the positive information." *Khoja*, 899 F.3d at 1009. Further, Rule 9(b) is "less strictly applied with respect to claims of fraud by concealment or omission of material facts, as opposed to affirmative misrepresentations, because an omission cannot be described in terms of the time, place, and contents of the misrepresentation or the identity of the person making the misrepresentation." *Burt v. Maasberg*, 2013 WL 1314160, at *11 (D. Md. Mar. 31, 2013). "[U]nless the Court, drawing all reasonable inferences in favor of the plaintiff, determines that reasonable minds could not differ on the question of whether the statements . . . were misleading in light of the circumstances under which they were made", a motion to dismiss based on falsity should be denied. *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 609 (S.D.N.Y. 2017).

### 1.   Defendants' Misleading Representations that the Commercialization of LUPKYNIS Was a Success Are Actionable

Starting in May of 2021, with Aurinia's first quarter 2021 earnings release and call, and continuing through the beginning of 2022, Defendants touted the Company's positive LUPKYNIS commercialization results, stating, *inter alia*: that everything was trending according to plan and that the execution of the commercialization strategy was yielding positive results and "not slowing down"; that "encouraging" "feedback" had been received from physicians and patients; that progress and growth continued; that they understood the market; and, detailing patient start form numbers and lives covered by insurance, including the work done to make the "access process

11

seamless."[5] Defendants also began hyping 2022's net revenue as early as August of 2021, stating the Company was set up "for a very strong 2022 as we recognize *the benefit of patients continuing therapy*" (¶49) and culminating in a February 16, 2022 statement by Greenleaf promising "aggressive numbers" for 2022's year-over-year sales trajectory (¶63). Further, Defendants outright denied any slowing in sales (¶55) and denied that any market segments were reluctant to use LUPKYNIS without more data (¶56), instead blaming any "swing" in numbers on COVID and seasonality (*id.*). Adding to the false impression of a successful commercial launch and acceptance of the drug by physicians and patients, Greenleaf encouraged M&A rumors. ¶¶57, 61.

Plaintiff "need not . . . allege that a statement was literally false." *Emergent*, 2023 WL 5671608, at *13. As repeatedly recognized by courts in this District, the Fourth Circuit, and elsewhere, "[o]nce defendants chose to speak regarding" LUPKYNIS sales and commercialization successes, "they had an obligation to tell the whole truth," *Klein v. Altria Grp., Inc.*, 525 F. Supp. 3d 638, 663 (E.D. Va. 2021), including the "adverse information cut[ing] against the positive information." *Khoja*, 899 F.3d at 1009. *See also Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593, 604 (E.D. Va. 2015) ("[f]ailure to disclose negative information about the products at issue can create a 'misleading impression' to investors about the success of the company"). For example, in *Singer*, the Fourth Circuit found the plaintiff had adequately pled a material omission where it was alleged that a healthcare company chose to speak about its reimbursement practices, but at the same time failed to disclose that it relied on a fraudulent reimbursement scheme to generate revenue because defendants had a duty to "tell[] the whole, material truth." *Singer*, 883 F.3d at 439-40, 442. *See also Zak*, 780 F.3d at 609-10 (omission alleged where failed to disclose

---

[5] *See* ¶¶46-47 (May 2021 first quarter statements); ¶¶49-50 (August 2021 second quarter statements); ¶¶53-58 (November 2021 third quarter statements).

an adverse FDA recommendation "while releasing less damaging information" about approval).

Likewise, in *Novavax*, the court found that where defendants chose to speak about the timeline for regulatory approval of a vaccine and that there were no remaining obstacles, they were liable for false representations because they failed to disclose that there were contamination issues causing delays. 645 F. Supp. 3d at 520. And, in *In re 2U, Inc. Sec. Class Action*, 2021 WL 3418841, at *10-11 (D. Md. Aug. 5, 2021), the court found statements such as "[o]ur pipeline is simply stronger than it's ever been," the "[p]ipeline is excellent" and "still expecting enrollment growth" to be materially false and misleading, "convey[ing] that demand remained sufficiently strong" and leading "a reasonable investor [to] infer that, based on 2U's current data, projected enrollment remained strong and the company's new programs would experience adequate demand for enrollment to keep 2U on track to meet its stated goal of 250 programs and $3 billion in yearly revenue" while omitting "any reference to the negative enrollment projections." *Id.* at *9-11; *see also id.* at *14-17, *18-21 (additional similar statements found to be misleading).

Similar facts and allegations to those alleged here have been found to be false and misleading on motions to dismiss in many other cases as well. *See, e.g.*, *Emergent*, 2023 WL 5671608, at *7-14 (finding defendants misleadingly omitted problems at facility that jeopardized manufacturing making positive statements about facility false); *Klein*, 525 F. Supp. 3d at 663 ("Because Defendants chose to speak about their marketing practices, denying that they targeted youth, it had a duty to tell the entire truth about its marketing practices and the exposure to litigation and regulatory risks to which those practices exposed them."); *Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*, 496 F. Supp. 3d 952, 962 (E.D. Va. 2020) (finding material misrepresentation or omission adequately pled by alleging company failed to disclose anticompetitive behavior when touting "its legal pricing strategies to explain its success"); *Ollila*

13

*v. Babcock & Wilson Enters., Inc.*, 2018 WL 792069, at \*4 (W.D.N.C. Feb. 8, 2018) (falsity pled as "then-existing material facts that contradicted [Defendants'] statements" regarding "strong backlog" were undisclosed).[6]

Here, like those in the cases cited above, Defendants statements were false and misleading because those statements omitted material facts. Defendants repeatedly overstated Aurinia's commercial prospects and financial position and yet they omitted material adverse information then known to Defendants but not the public. Defendants knew, for example, but failed to disclose that LUPKYNIS' commercial launch was far from a success for many reasons having nothing to do with COVID (*e.g.*, ¶¶48, 52, 64), yet in public disclosures Defendants blamed the pandemic for its failings (*e.g.*, ¶¶50, 56). In reality, the relatively small LUPKYNIS population were underserved by the medical profession for various reasons, and even if treated, were often non-compliant with continuing treatment. ¶¶36-37. Furthermore, Defendants knew that the Company was targeting the wrong type of physician, that physicians were hesitant to prescribe the drug for a variety of reasons, including time-consuming paperwork, and that there was a lack of insurance coverage and extra requirements in order for coverage to be obtained, each issue severely affecting LUPKYNIS sales. ¶¶33-34, 38-40. Once Defendants chose to tout, for example, the purportedly "encouraging" "feedback" from physicians and patients (*e.g.*, ¶¶46, 50) they had a duty to reveal the adverse feedback and physician reticence (¶¶33-34, 38-40). Similarly, once Defendants chose

---

[6] *See also Setzer v. Omega Healthcare Inv'rs., Inc.*, 968 F.3d 204, 214 n.15 (2d Cir. 2020) ("by putting [customer's] rental payments 'in play,' Defendants were required to speak accurately and completely" and reveal that the customer had solvency issues); *Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 483 (9th Cir. 2019) ("companies mislead investors when they tout their products' capabilities but fail to disclose significant flaws that undercut those capabilities"); *In re Quality Sys.*, 865 F.3d 1130, 1144 (9th Cir. 2017) (statements false when "inconsistent with real-time financial information" showing market saturation and "sales pipeline had been declining"); *In re Finisar Corp. Sec. Litig.*, 646 F. App'x 506, 507 (9th Cir. 2016) (falsity where denied "inventory build-up and down-played concerns of a looming inventory bubble" while knowing levels rising); *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 970-71 (N.D. Cal. 2009) (falsity pled where stated "'strong demand,' despite the fact that bookings for PAS equipment continued to fall throughout each quarter"); *Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1181 (S.D. Cal. 2009) (finding "strong demand" statements false and misleading).

to state that they were purportedly "recogniz[ing] the benefit of patients continuing therapy" (¶49) they had a duty to reveal the high numbers of uncompliant patients (¶¶36-37). Had Defendants disclosed theses substantial issues, "that information would have significantly altered the total mix of information available to a reasonable investor because such an investor would have understood" that Aurinia's ability to successfully market LUPKYNIS and earn the much-needed revenue from LUPKYNIS sales was severely limited as a result of the issues. *Novavax,* 645 F. Supp. 3d at 520. As evidence of the import of these issues to investors, when one of the issues was disclosed the Company's stock price decreased by 5% (¶¶58, 60), and when the Company failed to give the promised "aggressive numbers" for 2022, the stock plunged 24.26% (¶¶65-67).

Defendant Greenleaf was forced to admit to the non-compliancy, ***for the first time***, when faced with Q3 "mixed financial performance" (¶¶58, 60), but continued to omit the additional issues substantially affecting sales. "The omission of [] fact, combined with the reassurance that everything was fine . . . meets the pleading standard for a material omission." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016). Where, as here, true facts "were being explained away or minimized" and "known causes of the [poor performance] were brushed off, minimized, or omitted altogether" the statements are false and misleading. *Turocy v. El Pollo Loco Holdings, Inc.*, 2017 WL 3328543, at *9-10 (C.D. Cal. Aug. 4, 2017); *see also Singer*, 883 F.3d at 439-40 ("downplay[ing] the immediate financial consequences" is materially misleading). Literally true statements can be misleadingly deceiving when they omit material information[7], significantly

---

[7] Defendants briefly argue many of the challenged paragraphs are historical data and figures not alleged to be misstated. Mem. 15-16. "Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors." *Brambaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 249 n. 10 (D. Mass. 2006); *In re StockerYale Sec.Litig.*, 453 F. Supp. 2d 345, 350 (D.N.H. 2006) ("the fact that a statement is literally accurate does not preclude liability under federal securities laws"). So, for example, while touting the number of start forms may have been a "facially true" statement, it would have misled a reasonable investor by painting a picture of drug acceptance and commercial launch success while omitting the fact that physicians did not want to prescribe it for various reasons and often abandoned start forms due to the tedious paperwork and/or insurance coverage issues and that the LN patients themselves often abandoned taking the drug even if they did fill the prescription.

15

when analysts "hail" the positive information, as here with an analyst noting that "read[ing] between the lines" it was apparent Aurinia was heading for a buyout and that the slowdown was only "seasonal" (¶61). *E.g.*, *Khoja*, 899 F.3d at 1015.

Additionally, the timing between Greenleaf's February 16, 2022 misstatement concerning "aggressive numbers" (¶63) and the disclosure of non-aggressive numbers just 12 days later (¶65) supports falsity. *Sloman v. Pressteck, Inc.*, 2007 WL 2740047, at *6 (D.N.H. Sept. 18, 2007) (temporal proximity between misleading statements and partial corrective risk disclosure supports falsity); *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 392 (S.D.N.Y. 2007) (same).

Defendants also made misleading and incomplete risk disclosures. ¶¶51, 59. Not only were the risk disclosures general and vague, but there was also "no indication that the risk[s] may already have come to fruition" making them actionable. *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181-82 (9th Cir. 2009) (misleading "risk factors" actionable because risk already occurring); *In re IronNet, Inc. Sec. Litig.*, 2023 WL 5110932, at *8 n.8 (E.D.V.A. Aug. 9, 2023) ("The Court agrees that the cautionary language is actionable as a misleading statement because, as explained *infra*, the language omits pertinent information about risks that were dangerously close to materializing."); *Turka v. S.C. Pub. Serv. Auth.*, 2020 WL 901965, at n.4 (D.S.C. Feb. 25, 2020) (generic risk factors insufficient because warned of issues "may" occur when more than likely were occurring); *Boston Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at *5-6 (N.D. Cal. Aug. 7, 2020) ("what was disclosed . . . was not enough to render what was *not* disclosed, not misleading" because it did "not suggest that any of those scenarios already exist").

Thus, Defendants' representations are actionable and adequately pled.

### 2. Defendants Fail to Discredit Plaintiff's Omission Theory

Defendants make much of the fact that Plaintiff pleads by omission. Mem. 20-26. But, it is neither novel nor a bar to overcoming a motion to dismiss to do so. It is also not surprising or

somehow incorrect to plead, as Defendants imply (Mem. 20), that all of the alleged misleading statements during the short ten-month Class Period were false and misleading for failure to disclose the same five adverse impediments to sales. *See* Section IV.B.1. In order to make the arguments, Defendants ignore the AC's well-pled facts and mispresent the law.

**a.      The CW Attacks Fail**

Defendants' criticisms and alleged deficiencies of the CWs relied upon in the AC lack merit, and at times improperly mischaracterize and outright ignore the AC allegations. Mem. 21-23. When a complaint relies on facts provided by confidential sources, it must describe the sources "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged[.]"*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 596 (7th Cir. 2006); *2U*, 2021 WL 3418841, at *9; *see also Emergent*, 2023 WL 5671608, at *12 (particularity satisfied where allege the "position, period of employment, responsibilities and supervisor"). Here, each of the CWs are described with the required particularity, including identifying their title, tenure, and reporting chain. *See* ¶¶33, 37, 39.

Defendants first criticize the positions of the CWs, offering no legal or factual basis to question their reliability. Mem. 21-22. The CWs are comprised of different levels of sales representatives and managers from across the country, and the Director of Commercial Effectiveness. ¶¶33, 37, 39. The fact that the CWs were on the frontline and each from different sales territories and corroborate each other ***strongly*** supports their reliability. *See Novavax*, 645 F. Supp. 3d at 524-25 (relying on multiple CWs "onsite" who "confirm and corroborate" each other); *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *13 (S.D.N.Y. Nov. 26, 2018) (crediting "store-level employees" with "first-hand knowledge" of policy and practices).

***It is not required*** that CWs know about "the Company's operations as a whole" as Defendants claim (Mem. 21), only that they know about the information alleged. It would be

17

absurd to assert that the CWs here would not know, for example, what physicians, the very people they were speaking with every single day, were saying or thinking about LUPKYNIS and the issues arising with drug sales. Improperly citing an extrinsic document for its truth, Defendants claim that Company-wide information is important due to differences in COVID restrictions (Mem. 22 n.10), ignoring that Plaintiff **does** support this fact with CWs from different locations throughout the U.S. Defendants' purported support, Mem. 21-22, does not require access to Company-wide information as they misleadingly claim.[8]

Second, merely labelling the CWs' testimony as "vague" and "conclusory" (Mem. 22-23) does not make it so. *See, e.g.*, *Kraft*, 2021 WL 3566602, at *6 (declining to accept similar argument, pointing out the "specific assertions" in the complaint). "Factual issues" concerning CW statements are "construed in favor of Plaintiff[]," *Lefkoe v. Jos. A. Bank Clothiers*, 2007 WL 6890353, at *5 (D. Md. Sept. 10, 2007), and as courts in this Circuit recognize, CW allegations can confirm issues "generally" and need not "provide 'smoking-gun' evidence." *Novavax*, 645 F. Supp. 3d at 525-26; *Quality Sys.*, 865 F.3d at 1138-39, 1144 (finding falsity in part based on CW statements which **did not** quantify sales declines or specific deals that fell through); *Robb v. Fitbit Inc.*, 2017 WL 219673, at *8 (N.D. Cal. Jan. 19, 2017) ("The specificity [] defendants seek, such as the frequency of alleged failures and the precise level of inaccuracy, crosses into territory better evaluated on a motion for summary judgment."). Furthermore, the allegations here are not the type conducive to specific metrics and there are no allegations of negative internal reports. And,

---

[8] *See, e.g.*, *In re Cree, Inc. Sec. Litig.* 333 F. Supp. 2d 461, 473 (M.D.N.C. 2004) (finding that witnesses job titles and descriptions "support the probability that the sources" would have knowledge about the issues they spoke to, not that they knew company-wide information); *KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F. 4th 601, 609 (4th Cir. 2021) (statements of former employees unreliable not because of their rank within the company, but because of lack of allegations that defendants were aware of the problems alleged); *Leacock v. IonQ, Inc.*, 2023 WL 6308045, at *13-14 (D. Md. Sept. 28, 2023) (statements from a CW in sales and marketing about the company's R&D progress were unreliable not because his position was "low level," but instead because his position in sales did not support the inference that he had insight into the R&D or technical facts he alleged).

Defendants once again misrepresent the allegations, parsing out clips without the surrounding background and support. Mem. 22-23. For example, CW1 and CW3's claims of slow uptake and low sales numbers are supported by CW2's statement that the Company was never able to meet quarterly goals in 2021 (¶34) and the explanation (which Defendants incorrectly state is missing) that goals were set by the top (¶¶44, 45). For these reasons, Defendants' arguments fail.

### b.    The Omitted Information Was Not Disclosed

Defendants once again mischaracterize Plaintiff's allegations" in arguing that the omitted information was disclosed. Mem. 23-26. As an initial matter, the Court should disregard Defendants' arguments throughout this section (Mem. 23-26) as they repeatedly invite the Court to inappropriately accept as true facts not alleged in the AC through the use of extrinsic materials. *See* Section III; *see also Iwa Forest Indus. Pension Plan v. Textron Inc.*, 14 F.4th 141, 146 (2d Cir. 2021) (declining to accept defendants' reasonable "contrary and competing 'explanation'" as it "is entitled to little weight at this stage of litigation"); *City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't Inc.*, 477 F. Supp. 3d 123, 132 (S.D.N.Y. 2020) ("the Court must accept as true the complaint's well-pleaded allegations, without regard to defendants' competing accounts" of what investors might have understood).

First, the fact that Aurinia was targeting both nephrologists and rheumatologists (Mem. 23-24) does not negate the allegation that targeting rheumatologists *over* nephrologists slowed sales because rheumatologists did not typically treat LN (¶35). In fact, targeting them *equally* (Mem. 24) still supports Plaintiff's allegation as it should have been *less*. Second, Defendants conflate two separate issues in claiming that the LN population's cultural distrust of medicine and loss of hope for treatment was disclosed. Mem. 24. Defendants do not point to a single cultural or medical failure disclosure, but instead COVID-19 issues (*id.*) which Plaintiff does not allege to be omitted, but actually alleges to be a scapegoat for any and all sales issues for the Company (*e.g.*, ¶¶56, 64).

Third, Defendants cited "disclosures" relating to "uncompliant patients" fail for several reasons. Mem. 24-25. Not only do none of the disclosures state, under any reasonable analysis, that LN patients were uncompliant, most of the purported "disclosures" say the exact opposite in claiming that, for example, prescription abandonment was low (Mem. 25). Further, reliance on the November 2021 statement that the LN population was "notoriously uncompliant" (Mem. 24 & 25) *is absurd as the Complaint plainly pleads that as a corrective disclosure*. *See* ¶58.

Fourth, as with the first three sales issues, Defendants purported "disclosures" relating to physician issues with prescribing and time-consuming paperwork and insurance coverage do not disclose what the AC alleges to be the issue and/or are merely generalized insufficient disclosures. Mem. 25-26 (*i.e.,* "ability to promptly obtain coverage . . . could have a material adverse effect on our operating results"; there can be "more paperwork and time to get the patient on to therapy").

Overall, Defendants' arguments fail to address that "[u]ltimately, [t]he inquiry is whether, read as a whole, the [statements or omissions] would have misled a reasonable investor about the nature of the securities." *Cambridge*, 496 F. Supp. 3d at 964. As explained in Section IV.B.1., read as a whole, Defendants' statements portrayed a successful commercial launch only hampered by COVID-19 and seasonality, omitting the truth regarding significant sales issues. "The most relevant warning would have been the precise one that [Defendants] omitted[.]" *2U*, 2021 WL 3418841, at *11; *see also Klein*, 525 F. Supp. 3d at 659-61 (rejecting similar assertions that "the public already had access to such information"); *Cambridge*, 496 F. Supp. 3d at 963-64 (similar). Additionally, most of the proffered "disclosures" are cautionary, failing to inform investors that the risks had already materialized. *See* Sections IV.B.1. and IV.B.3.

Last, this is an inappropriate truth-on-the-market-defense which "requires a factual determination not suitable for a Rule 12(b)(6) motion." *Klein*, 525 F. Supp. 3d at 663; *see also*

*IronNet*, 2023 WL 5110932, at \*10 (refusing to decide meaning of statements as a "motion to dismiss under Rule 12(b)(6) . . . does not resolve contests surrounding the facts.'") (quoting *Rep. Party of N.C.*, 980 F.2d at 952); *In re Massey Energy Co. Sec. Litig.*, 883 F. Supp. 2d 597, 616-17 (S.D. W. Va. 2012) (similar, rejecting defense). Due to its "intensely fact-specific" nature the truth on the market defense "is ***rarely*** an appropriate basis for dismissing a § 10(b) complaint." *Klein*, 525 F. Supp. 3d at 664.

### 3.    Defendants' Other Falsity Arguments Lack Merit

***The Complaint Is Properly Pled.*** Defendants spill much ink arguing that the Complaint is a "puzzle pleading." Mem. 13-15. It is not. Plaintiff specifies the statements that are misleading (¶¶46-47, 49-51, 53-59, 63), the reasons why each is misleading (¶¶48, 52, 64), and all facts on which the information and belief are formed (¶¶19-45, 61-62, 66, 68-72, 73-99), as well as identifying the who, when, and where of each one (*e.g.*, ¶54, "November 3, 2021 earnings conference call during which Greenleaf stated").[9] This is exactly what is required and the "approach used in other cases without criticism by this Court." *Emergent*, 2023 WL 5671608, at \*12 (rejecting similar argument and identifying multiple cases).

Defendants' complaints of inability to figure out which statements are misleading or the reasons why ring hollow. There are only 13 paragraphs containing the alleged misrepresentations made during the short Class Period here and 3 paragraphs describing the reasons why they are misleading. Courts have no trouble denying motions to dismiss where complaints quote much more extensively from public filings. *See, e.g.*, *Emergent*, 2023 WL 5671608, at \*12 (finding no issues discerning what is alleged to be false and misleading in "225-page pleading"). *See also*

---

[9] Defendants' Motion incorrectly states that Miller is not alleged to be a maker of statements (Mem. 13 n. 6) when the AC clearly alleges he was the "maker" of challenged statements in Company's 10-Qs (¶¶51, 59).

21

*McIntyre v. Pedder*, 2015 WL 5039431, at *8-9 (W.D.N.C. Aug. 26, 2015) (denying motion to dismiss where plaintiffs pled the falsity of over fifty challenged statements in long block quotes through "a generic paragraph listing the same omissions over and over"); *Uber*, 2020 WL 4569846, at *5 (rejecting puzzle pleading argument because while the complaint is "long, confusing, and meandering . . . it is not so deficient that [d]efendants are incapable of figuring out what statements are alleged to be false").[10]

Further, the cherry-picking of statements by Defendants to argue that the omissions are untethered to challenged statements should be disregarded. Mem. 14-15. For example, the statement that prescription abandonment has been low may have been true as of August 2021, but it omits the material adverse information that LN patients more often than not **do** end up abandoning treatment (¶37). The argument also ignores the multiple other statements in paragraphs 49 to 51 of the AC which portray a successful commercial launch when in reality it was far from successful with LUPKYNIS only "being used for the treatment needs **of [a mere] 1,500 patients**" after three years (¶70). In sum, the AC is properly pled and not a puzzle pleading.

***Defendants' Statements Were Neither "Puffery" Nor Inactionable Opinion.*** Defendants next attempt to downplay their fraudulent representations as mere puffery or inactionable opinions, again plucking language out of context to assert those arguments. Mem. 16, 19-20. "Although opinion or puffery will often not be actionable, in particular contexts when it is both factual and material, it may be actionable." *Cambridge*, 496 F. Supp. 3d at 964. *See also City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 672-73 (6th Cir. 2005) ("What might be innocuous

---

[10] In *In re Marriott Int'l, Inc. Customer Data Security Breach Litig.*, 543 F. Supp. 3d 96, 120 (D. Md. 2021) (Mem. 14), the case was "dismissed not due to 'puzzle pleading' but because the allegations did not actually indicate that the defendants' statements were false or misleading." *Emergent*, 2023 WL 5671608, at *12. Similarly, the court in *Abady v. Lipocine Inc*. (Mem. 13, 14), dismissed the complaint on its merits, 2023 WL 2938210, at *13 (D. Utah Apr. 13, 2023), and the Second Circuit affirmed dismissal of the complaint in *Nandkumar v. AstraZeneca PLC*, 2023 WL 3477164, at *2 (2d Cir. May 16, 2023), because it failed to "plausibly to allege falsity."

'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation."). "The Fourth Circuit has distinguished between allegedly false predictions [which] are not material, and expressions of belief or opinion concerning *current* facts which may be material. *In re James River Grp. Holdings, Ltd.*, 2023 WL 5538218, at *8 (E.D. Va. Aug. 28, 2023). Here, Defendants concealed the real difficulties the Company was then experiencing, while touting LUPKYNIS sales success. In doing so, Defendants intentionally misled the investing public regarding LUPKYNIS sales performance and prospects (the sole basis for Aurinia's revenues). As such, Defendants' statements cannot be deemed puffery or inactionable opinion.[11]

Further, where statements can be proven false and where they are "expressed certainty rather than an uncertain view of a fact" they are not considered inactionable opinions or puffery. *In re SCANA Corp. Sec. Litig.*, 2019 WL 1427443, at *9 (D.S.C. Mar. 29, 2019); *Dunn v. Borta*, 369 F.3d 421, 431 (4th Cir. 2004)  (statements that could "be proven true or false" not puffery); *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 185-86, 193 (2015) ("embedded statements of fact" are "perfectly capable of misleading investors").[12] Tellingly, there were no qualifiers in any of the statements such as "aims to" or "wants to." *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *8 (S.D.N.Y. May 24, 2018). Moreover, when assessing the statements in context instead of in a vacuum, many statements

---

[11] *See, e.g.*, *Ollila*, 2018 WL 792069, at *4-6 (representation of "strong backlog" actionable where alleged that defendants were aware of undisclosed problems and delay not puffery or inactionable opinion); *Quality Sys.*, 865 F.3d at 1143-44 (finding statement that sales pipeline not "drying up," "pipeline is deep," and "keeps growing" "went beyond 'feel good' optimis[im]"); *Signet*, 2018 WL 6167889, at *12 (responding to concern by claiming portfolio "strong" was "not puffery at all"); *Roberts v. Zuora*, 2020 WL 2042244, at *9-10 (N.D.C.A. Apr. 28, 2020) (similar).

[12] *See also Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*, 2020 WL 2559939, at *5 (N.D.C.A. May 20, 2020) ("the statements misrepresented *existing*, rather than future, overruns. The Supreme Court has explicitly placed statements about *existing* things in the realm of 'fact.,' rather than 'opinion.'") (emphasis in original); *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1019 n.12 (N.D. Cal. 2020) ("statement that a company 'anticipates a continuation of its accelerated expansion schedule,' while knowing that the expansion is already failing, is materially misleading.").

Defendants claim to be puffery (Mem. 16) were in response to analyst questions (¶¶55-58, 63), which is indictive of materiality, not puffery. *Kraft*, 2021 WL 3566602, at *10 (citing *Makor*, 437 F.3d at 597 ("In context," statement "went well beyond puffery" because "it was a direct response to an analyst's inquiry" about a decline in sales).

In addition, one of four statements Defendants explicitly assert as "opinions"[13] has absolutely no language indicating it is an opinion. Instead, it is a (false) statement of fact— "[A]ggressive numbers will come from us." *Abramson v. NewLink Genetics Corp.*, 965 F.3d 165, 176 (2d Cir. 2020) (to be considered an opinion, a statement generally is "couch[ed] . . . with prefatory language like 'I believe' or 'In my estimation'").[14] And notably, "opinions" are actionable where, as here, they omit material information. *Omnicare*, 575 U.S. at 189; *see also In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 778 (E.D. Va. 2015).

***There is No Safe Harbor Protection.*** Defendants' statements are also not shielded by the PSLRA's safe harbor. Mem. 17-19. The PSLRA safe harbor does not apply where, as here, the AC alleges that Defendants ***omitted*** material adverse facts (¶¶48, 52, 64). *Emergent*, 2023 WL 5671608, at *18; *In re Celera Corp. Sec. Litig.*, 2013 WL 4726097, at *2 (N.D. Cal. Sept. 3, 2013); *Amyris*, 492 F. Supp. 3d at 1021 n.15 (same) (collecting cases); *Roberti v. OSI Sys.*, 2015 WL 1985562, at *9 (C.D. Cal. Feb. 27, 2015) ("to the extent Plaintiffs [] challenge Defendants' *alleged omission of present facts* . . . the PSLRA's safe harbor does not apply").

Further, safe harbor protection is only given to forward-looking statements ***accompanied by meaningful cautionary language***. 15 U.S.C. § 78u-5(c)(1)(A)(i). With regards to the revenue

---

[13] If further statements are noted as opinions in the Appendix A, those arguments should be stricken as discussed in Section III, along with Defendants' inappropriate reliance on Exhibit 20 (Mem. 20).

[14] This distinguishes even the additional statements which are portrayed as a Company-wide belief with usage of "we" not "I". Mem. 19. *See also 2U*, 2021 WL 3418841, at *21 (noting "we" statements "effectively telling investors" opinion based on information available to company).

guidance and the "aggressive numbers" statement (Mem. 17), numerous courts have found the safe harbor inapplicable where "financial forecasts were intertwined with [the company's] misstatements of . . . revenue pipeline" and defendants "failed to disclose the material facts undermining those projections." *Amyris*, 492 F. Supp. 3d at 1021*; see also Direct Benefits*, 2014 WL 671616, at \*8 (projections actionable where alleged omissions "intimate Defendants' actual knowledge of the false or misleading nature of the projection").

Defendants' purported cautionary language also fails to protect them because it is not exact and clear enough that "'reasonable minds could not disagree that the challenged statements were not misleading." *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947 (9th Cir. 2005) (dismissal on purported disclosed risks "requires a stringent showing"); *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991) (cautionary statement must discredit misrepresentations to such extent that "the risk of real deception drops to nil"); *Singer*, 883 F.3d at 442.

Cautionary language has consistently been found inadequate where it fails to warn that the risks have already transpired. *See* Section IV.B.1.; *Genworth*, 103 F. Supp. 3d at 790 (cautionary language not "meaningful" where defendants "knew that the specific risks and uncertainties stated to be 'potential' in their cautionary language had already been realized"); *Singer*, 883 F.3d at 442 ("generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability"); *IronNet*, 2023 WL 5110932, at \*8. The language consistently spoke of issues that "*may*" occur (Mem. 17-18), when, as alleged, they were *already* occurring. Defendants also misleadingly argue that that the AC fails to identify which "risks" identified in the 10-K and 10-Qs were occurring (Mem. 18). The AC repeatedly states which risks were occurring (*i.e.*, sales were low because LN patients were uncompliant and stopped taking the drug), and furthermore such proves Plaintiff's next point—

25

the risks were not revealed because the cautionary language was generic and unmeaningful.[15]

"[C]ourts in the Fourth Circuit . . . [are hesitant] to rule on the adequacy of cautionary language at the motion to dismiss stage," *James River*, 2023 WL 5538218, at *16 (collecting cases), particularly where the cautionary language is boilerplate and unmeaningful. *See, e.g.*, Mem. 17-18 (ability to generate revenue depends on successful commercialization, including adequate insurance coverage); *Singer*, 883 F.3d at 442 ("generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability."); *Zaghian v. Farrell*, 675 F. App'x 718, 720 (9th Cir. 2017) (to be "meaningful" cautionary language must "sufficiently address the harm that resulted"). Here, like in *2U*, the Company's generic warnings (applicable to almost every drug company) fail because "[t]he most relevant warning would have been the precise one that [defendant] omitted: that despite stated confidence in [LUPKYNIS sales], the Company's internal [information showed significant issues preventing successful commercialization and positive sales numbers]." 2021 WL 3418841, at *11.

Last, Defendants are not protected by the safe harbor because as discussed *infra*, they had actual knowledge of the statements' falsity. *Genworth*, 103 F. Supp. 3d at 790.

**C.**      **The Complaint Adequately Alleges Scienter**

**1.**      **Plaintiff's Scienter Allegations Must Be Viewed Holistically**

"To demonstrate scienter, a plaintiff must show that the defendant acted with 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Zak*, 780 F.3d at 606. In this regard, "[a]llegations of reckless conduct can satisfy the level of scienter necessary to survive a motion to dismiss." *Id.*

In *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007), the Supreme Court

---

[15] Defendants once again reference disclosures relating to COVID-19 (Mem. 17-18). COVID-19 issues are never alleged to be hidden, and Defendants repeated mention of it in the Motion is a blatant red herring.

26

clarified that the proper scienter inquiry asks whether "*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegations, scrutinized in isolation, meets that standard." *Id*. at 323. In evaluating the AC's scienter allegations, the Court must consider whether, "[w]hen the allegations *are accepted as true and taken collectively*," a reasonable person would "deem the inference of scienter *at least* as strong as any opposing inference." *Id*. at 326; *Frank v. Dana Corp.*, 646 F.3d 954, 961 (6th Cir. 2011) (addressing scienter allegations "collectively," "quickly," and without "pars[ing] out the allegations for individual analysis," which is "the only appropriate approach following *Tellabs's* mandate to review scienter pleadings based on the collective view of the facts, *not the facts individually*").

The AC need only create an inference of scienter that is as compelling as any nonculpable explanation, with any "'tie [going to] the plaintiff.'" *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 254 (5th Cir. 2009). "When making the assessment whether scienter has been adequately pleaded, it is prudent to keep in mind that the PSLRA does not require a plaintiff to prove his case in his complaint" and that "a plaintiff generally must frame the facts [of the case] without the benefit of discovery." *Arnlund v. Deloitte & Touche LLP*, 199 F. Supp. 2d 461, 475 (E.D. Va. 2002).

Despite these well-settled principles, Defendants continue to "focus on particular types of allegations and argue for the insufficiency of each." *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 272 (3d Cir. 2009) (rejecting a similar strategy because it is "in tension with the prescriptions issued" in *Tellabs*). Defendants' strategy is improper under *Tellabs* and should be rejected. *Knurr v. Orbital ATK Inc.*, 294 F. Supp. 3d 498, 510 (E.D. Va. 2018) (noting that the court's holistic scienter analysis "does not require assigning a quantitative value to each of the allegations of scienter and then summing these values and comparing the sum to a quantitative value of opposing inferences"). Here, the collective allegations give rise to a strong inference of

27

scienter that is at least as likely as any opposing inference.

### 2. Considered Holistically, the Allegations in the Complaint Establish a Strong Inference of Defendants' Scienter

Here, circumstantial evidence of Defendants' fraud gives rise to a strong inference of scienter when considered holistically as *Tellabs* mandates, including that Defendants were the senior-most officers at the Company (¶74) who had access to information, including through meetings, regarding the obstacles to sales of LUPKYNIS (¶¶76-79), Aurinia's only product and undoubtedly *the* core operation of this Company (¶80) and the content and context of Defendants' statements about the success LUPKYNIS show that they had access to information showing the challenges frustrating Aurinia's sales efforts or else they were reckless in ignoring it. ¶¶81-87. In addition, the short time period between Greenleaf's statements regarding "aggressive" 2022 guidance and Aurinia's issuance of subpar guidance two weeks later shows that Greenleaf had access to the information at the time of his statements (¶88) and the abrupt resignation of Colao (¶69) supports scienter. The lucrative compensation packages that the Company bestowed upon Greenleaf and Miller provided them with the motive and opportunity to continue the ruse of LUPKYNIS's success throughout the Class Period particularly with regards to their annual performance-based bonus opportunities (¶¶89-92), as well as Aurinia's desperate need for cash and the potential to secure the same through a merger or the successful issuance of additional common shares further provided the motive to continue to perpetrate the fraud (¶¶93-95). Considered collectively, these allegations provide a strong inference of the Individual Defendants' scienter and, therefore, that of Aurinia.

### 3. The Law Does Not Require Direct Evidence of Scienter

Defendants erroneously argue that the Complaint should be dismissed because Plaintiff fails to allege direct evidence of an intent to deceive investors. Mem. 27. This argument misstates

the law and the allegations in the Complaint in multiple respects.

First, pleading Defendants' recklessness is enough to plead a strong inference of scienter. Second, the inference of scienter may be based on circumstantial evidence and inferable from the allegations in the Complaint. "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre." *Tellabs*, 551 U.S. at 324. Courts recognize that "it is seldom if ever possible to prove the state of a defendant's mind by direct evidence," and, "accordingly, finders of fact have almost always had to rely on circumstantial evidence." *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 630 (E.D. Va. 2000); *Herman & Maclean v. Huddleston*, 459 U.S. 375, 390 n.30 (1983) (noting that "circumstantial evidence can be more than sufficient" to prove scienter). For this reason, courts find that "[p]roof of scienter . . . may be inferred from circumstantial evidence." *Carlucci v. Han*, 907 F. Supp. 2d 709, 729 (E.D. Va. 2012).

### a.    The Defendants Knew Critical Facts and Had Access to Information Undermining the Truth of Their Statements

First, Greenleaf's and Miller's positions within the Company as CEO and CFO, respectively, are "relevant to the Court's holistic analysis of scienter." *Genworth*, 103 F. Supp. 3d at 785. Such fact "posited as part of the context to support the particulars of scienter set forth in the other allegations of the Amended Complaint." *Id.* (quoting *Arnlund*, 199 F. Supp. 2d at 477).

Second, the CWs further establish that the Individual Defendants knew facts showing that their statements were false and misleading. Specifically, CW1 reported that the Company knew that the "uptake" of LUPKYNIS was slower than expected, in part because LN patients were non-compliant with drug regimens. ¶¶33, 37. CW2, the Director, Commercial Effectiveness, who reported to the VP of Customer Operations who reported to Colao,[16] stated that the Company was

---

[16] All Area VPs of Sales reported to the Company's VP of Sales, Fran Lynch who reported to Max Colao who served as the Chief Commercial Officer from March 2020 to January 2023, reporting to Greenleaf and often speaking alongside Greenleaf on investor conference calls. ¶33 n.1.

never able to meet quarterly goals. ¶¶33-34. CW3 also echoed the reports of CW1 regarding sales issues with LUPKYNIS, specifically that the LN market was a typically "underserved" market that was difficult to reach. ¶36. He/she repeatedly discussed the sales issues with his/her Area VP of Sales and Lynch, the latter of which reported directly to Colao, who reported directly to Greenleaf. ¶77. According to CW3, these issues were also discussed during Business Review meetings that the Area VP of Sales held and that were attended by CW3 and other Regional Sales Managers. *Id.* On one such call, Greenleaf was on the line when Lynch addressed a lack of Start Form achievement. *Id.* ¶79. According to CW4, sales issues with LUPKYNIS were also discussed on "area calls" hosted by the Area VP of Sales that Lynch sometimes attended. Such sales issues were caused by practitioners' belief that LUPKYNIS was too expensive and, and best, only marginally better than existing generic drugs and the fact that obtaining a prescription was "tedious" and riddled with time-consuming issues with Start Forms. ¶¶38, 74. Obviously, as CEO, Greenleaf had access to these calls and meetings, and the same can be said for CFO Miller.

Accordingly, the Court must accept as true the alleged fact that across the country, Aurinia sales representatives were experiencing the same sales issues. The Individual Defendants had access to this information. In asserting that the CWs' accounts fail to establish a strong inference of scienter on their own accord, Defendants misstate applicable law, and accordingly, their argument misses the mark. *See also* Section IV.B.2.a. Defendants quote *KBC* for the proposition that the "CW allegations fail 'to establish a strong inference of scienter where [P]laintiffs d[o] not allege that [the CWs] spoke with the executives and the [CWs] were several levels removed from the company's executive team.'" Mem. 28(quoting *KBC*, 19 F.4th at 609). *KBC* in no way says that CW allegations are a zero-sum game. Rather, it stands for the proposition that a general lack of direct contact with the Individual Defendants merely "weakens" the inference of scienter

30

provided by the allegations. *KBC*, 19 F.4th at 609. There is no requirement that CWs have direct communication with the Defendants. *Novavax*, 645 F. Supp. 3d at 526 (discussing allegations showing flow of information upward sufficient and collecting cases).

At most, Defendants' authority stands for the proposition that the *strength* of the inference from the CW statements—viewed in isolation—may depend on the degree to which they can place information directly into the hands of the Defendants. However, *Tellabs* requires the CW allegations to be construed as true and viewed *holistically* with the full scienter pleading. Here, the Complaint's other scienter allegations corroborate all the CW statements. Similarly, as discussed *supra*, Defendants' other criticisms of missing details from the CWs' accounts do not warrant the outright rejection of these allegations. *See S. Ferry LP, #2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) ("Vague or ambiguous allegations are now properly considered as a part of a holistic review when considering whether the complaint raises a strong inference of scienter.").

### b.    Selling LUPKYNIS Was the Core Operation of Aurinia, and Defendants Admitted to Having Intimate Knowledge of Sales

Courts consistently hold that an inference of scienter is bolstered by allegations indicating that the subject of the alleged fraud was a core operation of the defendant company. *2U*, 2021 WL 3418841, at *12 (holding that aspects of business that provide a "key revenue stream for the most important part of the business supports . . . a strong inference that [the defendant] knew that omitting the declining enrollment projections from his statement was misleading"); *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *26 (S.D.N.Y. Dec. 2, 2013) (explaining that the core operations doctrine supported scienter where the product was "critical to the long term viability" of the company). "[C]ore-operations allegations are relevant to the court's holistic analysis of scienter." *See KBC*, 19 F. 4th at 612; *see also Genworth*, 103 F. Supp. 3d at 784. Aurinia is a relatively small company with only 300 employees (¶28) and entered the market *for the first*

31

*time* at the beginning of the Class Period with their ***sole revenue producing product***. Therefore, it would be both illogical and an extreme departure from their duties if Greenleaf and Miller did not keep informed and know all issues surrounding the commercialization and sales of LUPKYNIS.

Further, the core operations inference is sufficient to satisfy a plaintiff's pleading obligations when the substance and nature of a defendant's reassurances to investors show actual knowledge such that "[i]f [the defendant] did not in fact have such knowledge, it would be at least actionably reckless to reassure the public about these matters at all." *S. Ferry LP, #2 v. Killinger*, 687 F. Supp. 2d 1248, 1260, 1257-62 (W.D. Wash. 2009) (*S. Ferry II*).[17]

Here the frequent statements by Defendants about LUYPKNIS sales bolster a scienter inference. *See Massey Energy*, 883 F. Supp. 2d at 620-21. Detailed statements support a scienter inference because a defendant presumably educates himself before speaking. *See Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 711 (7th Cir. 2008) (stating that it is "exceedingly unlikely" that top executives did not know facts about a corporation's "most important products," particularly where they communicated with the market about those products).[18]

---

[17] *See also Singer*, 883 F.3d at 443-44 (finding defendants knew about, or recklessly disregarded, changes in medical reimbursement law when speaking in detail about the company's strategy for dealing with new law);*Genworth*, 103 F. Supp. 3d at 784-85 (explaining that misrepresentations concerning one of the company's "core sets of businesses" are "certainly relevant to the Court's holistic analysis" of scienter, and the fact that the Individual Defendants held senior executive positions "augments the other allegations of intimate involvement pleaded elsewhere in the Amended Complaint"); *KBC Asset Mgmt. NV v. 3D Sys. Corp.*, 2016 WL 3981236, at *9 (D.S.C. July 25, 2016) (explaining that "[i]n addition to the inferences drawn from Individual Defendants' positions, the allegedly misrepresented issues all related to core operations, which by nature can contribute to a strong inference of scienter" and that when a defendant is "specifically asked, directly and repeatedly about these core operations, denials of any issues can support a strong inference of scienter"); *Kiken*, 155 F. Supp. 3d at 606-07 (holding that core operations allegations supported scienter where company's "key product," which "drove the company's margins," was the subject of "repeated public discussion").

[18] *See also Zak*, 780 F.3d at 610 (finding a strong inference of scienter where "the plaintiffs' allegations, when considered in the context of the entire complaint, [demonstrated] that the defendants either knowingly or recklessly misled investors by failing to disclose critical information . . . while releasing less damaging information that they knew was incomplete"); *Kiken*, 155 F. Supp. 3d at 606 (finding that "repeated public discussion" of operations is "relevant to [defendants'] state of mind"); *Genworth*, 103 F. Supp. at 785 ("The fact that Defendants made repeated misrepresentations over the course of a year 'also suggests a substantial degree of scienter.'"); *KBC*, 2016 WL 3981236, at *9 (finding scienter adequately alleged with respect to "core operations" where "bolstered" by allegations that executives were "'specifically asked, directly and repeatedly' about these core operations"); *In re GE Sec. Litig.*,

Further, their responses to analysts' questions bolster a scienter inference. *See Avaya*, 564 F.3d at 269 (finding that responses to inquiries supports scienter).

The Defendants made statements such as "[t]otal revenue was $7.5 million and $59,000 for the six months ended June 30, 2021 in comparison to the prior-year period" (¶83) and "[w]e've had north of 1,265 PSFs here to date, that "if you just do the backwards math on that in the month of October alone, it's approximately 160 new patient start forms in the month of October alone" (¶55) that inform the scienter inquiry. *See also, e.g.*, ¶¶50, 54-58, 81-87

Also, the close proximity between Defendants' misstatement about "aggressive" guidance and the issuance of that guidance that revealed the truth about the impediments to sales of LUPKYNIS also contributes to a strong inference of scienter. *See Arnlund*, 199 F. Supp. 2d at 482 (explaining that the temporal proximity between Defendants' misleading statements and the revelation of the truth supports a strong inference of scienter support and inference of scienter); *Avaya, Inc.*, 564 F.3d at 271 ("temporal proximity" of defendants' denials to the revelation of the truth supports an inference of scienter).

### c.    Other Facts Support a Strong Inference of Scienter

Contrary to Defendants' suggestion, the "absence of a motive allegation is not fatal." *Tellabs*, 551 U.S. at 325; *see also Lefkoe v. Jos. A. Bank Clothiers*, 2008 WL 7275126, at *8 (D. Md. May 13, 2008) (explaining that "allegations of a pecuniary motive are not necessary to support a showing of scienter").[19] Nonetheless, Plaintiff adequately alleges the Defendants' motive to

---

857 F. Supp. 2d 367, 395, 397 (S.D.N.Y. 2012) (explaining that defendants would have had to educate themselves before speaking).

[19] A lack of stock sales by the Defendants is not dispositive of scienter either. *In re Twitter, Inc. Sec. Litig.*, 2020 WL 4187915, at *14 (N.D. Cal. Apr. 17, 2020) ("absence of stock sales by [defendants] is insufficient to show a lack of scienter as a matter of law") (citing *No. 84 Emp'r Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003)). Indeed, here it is not at all surprising even. As pointed out by a large investor, the Defendants owned "minimal" stock and what had was due to equity awards. ¶70. The sales by other insiders are significant not only in amount, selling over 1 million shares for over $28.5 million, with analysts taking note (¶97),

make false and misleading statements and omissions to provide Aurinia with desperately needed cash through the issuance of shares or a merger. ¶¶93-96. Courts have found that an urgent need for funding can also be probative of motive. *Tchatchou v. India Globalization Cap. Inc.*, 2021 WL 307415, at *9 (D. Md. Jan. 29, 2021); *Amyris*, 492 F. Supp. 3d at 1028-29 (motive to inflate stock "to provide needed financing to continue operations" support scienter and collecting cases). Here, in particular, the close temporal proximity between the November 3, 2021 misrepresentations and Aurinia's November 19, 2021 filing of a automatic shelf registration statement with the SEC for the sale of shares up to $250 million is probative of the Defendants' motive and, therefore, scienter.[20]

Defendants' exorbitant compensation also supports scienter, with Greenleaf r*eaping nearly $26 million* from 2019 through 2022. ¶¶89-92. Not only has the compensation been called out by large investors (¶¶70-72, 92), it was based in part on performance goals encouraging fraudulent bolstering of results and omissions of negative issues (¶¶90-91). While compensation is not always seen as supportive as noted by Defendants (Mem. 29-30), when tied to performance goals, as alleged here, it can be considered as motive. *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) ("When financial incentives to exaggerate earnings go far beyond the usual arrangements of compensation based on the company's earnings, they may be considered among other facts to show scienter."); *Brambaugh*, 416 F. Supp. 2d at 253 (company "nearly a quarter billion dollars in debt" and "executives' careers and the very survival of the company were on the line").

---

but also because it supports knowledge of issues by the Defendants. If other insiders were abandoning the sinking ship, surely Defendants knew of the issues.

[20] *See Oneida Sav. Bank v. Uni-Ter Underwriting Mgmt. Corp.*, 2014 WL 4678046, at *4-5 (N.D.N.Y. Sept. 18, 2014) (finding offering soon after alleged misstatements shows motive); *see also Van Dongen v. CNinsure, Inc.*, 951 F. Supp. 2d 457, 474 (S.D.N.Y. 2013); *In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 206 (E.D.N.Y. 2000); *In re Res. Am. Sec. Litig.*, 2000 WL 1053861, at *6-7 (E.D. Pa. July 26, 2000).

Last, Colao's departure following the fallout from the release of Aurinia's fourth-quarter and full-year earnings report is suspicious and contributes to an inference of scienter (¶69). *Cambridge*, 496 F. Supp. 3d at 967-68 (explaining that the CFO's resignation was part of the holistic pleading supporting strong scienter inference and that, while a resignation "***by itself*** could not support an inference of scienter," a court "can, however, consider this alleged fact in its 'holistic analysis.'" (emphasis in original)); *Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 655, 671-72 (D.S.C. 2016) (finding that scienter was supported by "the resignation of the Company's three most senior executive[s]").

### 4.    The Opposing Inference of Non-Fraudulent Intent is Not Compelling

Plaintiff's scienter inference is coherent, well-pled, and at least equally, if not more compelling, than that proffered by Defendants. The notion that Defendants were somehow ignorant of the pervasive issues preventing successful commercialization of Aurinia's sole source of revenue defies "common sense and logic." *MicroStrategy*, 115 F. Supp. 2d at 636-37, 639 (explaining that the significance of contracts to the company "certainly makes less credible the inference that the defendants were not aware of or did not recklessly disregard the accounting irregularities relating to these contracts"). Of significance, as noted herein and in the AC, Plaintiff is not the only one to have noticed Defendants fraudulent actions—large investor called for changes in management. ¶¶70-72.[21]

## V.    CONCLUSION

For these reasons, Defendants' Motion should be denied in its entirety.

---

[21] Because the AC alleges the Individual Defendants' scienter adequately, Aurinia's scienter is also alleged. *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 184 (4th Cir. 2007).

DATED: December 8, 2023                    Respectfully submitted,

                                           **BROWN GOLDSTEIN & LEVY**

                                           By: */s/ Andrew Radding*
                                           Andrew Radding (#00195)
                                           120 E. Baltimore Street, Suite 2500
                                           Baltimore, Maryland 21202
                                           Telephone: (410) 962-1030
                                           Facsimile: (410) 385-0869
                                           Email: radding@browngold.com

                                           *Liaison Counsel for Lead Plaintiff Skye Capital*
                                           *Partners*

                                           **BRAGAR EAGEL & SQUIRE, P.C.**
                                           Lawrence P. Eagel (admitted *pro hac vice*)
                                           Melissa A. Fortunato
                                           Marion C. Passmore
                                           810 Seventh Avenue, Suite 620
                                           New York, NY 10019
                                           Telephone: (212) 308-5858
                                           Facsimile:  (212) 214-0506
                                           Email:  eagel@bespc.com
                                                   fortunato@bespc.com
                                                   passmore@bespc.com

                                           *Counsel for Lead Plaintiff Skye Capital Partners*
                                           *and Lead Counsel for the Class*