**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

MICHAEL J. ORTMANN, Individually and
on Behalf of All Others Similarly Situated,

        Plaintiff,

    v.

AURINIA PHARMACEUTICALS INC.,
PETER GREENLEAF, and JOSEPH
MILLER,

        Defendants.

Civil Action No. 22-cv-1335-BAH

Hon. Brendan A. Hurson

**REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
<u>THE FEDERAL SECURITIES LAWS</u>**

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...................................................................................................... 1

II.    DEFENDANTS' APPENDIX AND EXHIBITS ARE PROPER ..................................... 2

III.   THE CW ALLEGATIONS CANNOT ESTABLISH FALSITY OR SCIENTER ........... 4

IV.   PLAINTIFF FAILS TO PLEAD THAT ANY STATEMENT WAS FALSE .................. 7

        A.     All the Allegedly Omitted Information Was Repeatedly Disclosed...................... 7

        B.     The Challenged Statements Are Inactionable as a Matter of Law......................... 9

V.    PLAINTIFF FAILS TO PLEAD A STRONG INFERENCE OF SCIENTER ............... 12

VI.   CONCLUSION...................................................................................................... 15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 2U, Inc. Sec. Class Action,*
  2021 WL 3418841 (D. Md. Aug. 5, 2021) ....................................................................11, 15

*In re Acterna Corp. Sec. Litig.,*
  378 F. Supp. 2d 561 (D. Md. 2005) ...................................................................................14

*Chang v. Accelerate Diagnostics, Inc.,*
  2016 WL 3640023 (D. Ariz. Jan. 28, 2016) ........................................................................7

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.,*
  2018 WL 2382600 (S.D.N.Y. May 24, 2018) ....................................................................10

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.,*
  399 F.3d 651 (6th Cir. 2005) ...............................................................................................9

*In re Conventry Healthcare, Inc. Sec. Litig.,*
  2011 WL 1230998 (D. Md. Mar. 30, 2011).........................................................................6

*Dunn v. Borta,*
  369 F.3d 421 (4th Cir. 2004) .............................................................................................10

*Edwards v. McDermott Int'l, Inc.,*
  2022 WL 3927828 (S.D. Tex. Aug. 30, 2022) ....................................................................3

*In re Emergent BioSolutions Inc. Sec. Litig.,*
  2023 WL 5671608 (D. Md. Sept. 1, 2023).......................................................................9, 12

*In re First Union Corp. Sec. Litig.,*
  128 F. Supp. 2d 871 (W.D.N.C. 2001) ...........................................................................4, 14

*Hecick v. Kraft Heinz Co.,*
  2021 WL 3566602 (N.D. Ill. Aug. 11, 2021) ....................................................................10

*In re Intel Corp. Sec. Litig.,*
  2019 WL 1427660 (N.D. Cal. Mar. 29, 2019).....................................................................7

*Izadjoo v. Helix Energy Sols. Grp.,*
  237 F. Supp. 3d 492 (S.D. Tex. 2017) .................................................................................5

*In re James River Grp. Holdings, Ltd. Sec. Litig.,*
  2023 WL 5538218 (E.D. Va. Aug. 28, 2023)....................................................................10

*Johnson v. Pozen Inc.,*
  2009 WL 426235 (M.D.N.C. Feb. 19, 2009)........................................................................3

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Katyle v. Penn Nat'l Gaming, Inc.*,
    637 F.3d 462 (4th Cir. 2011) ...................................................................................3

*KBC Asset Mgmt. NV v. DXC Tech. Co.*,
    19 F.4th 601 (4th Cir. 2021) ..................................................................... *passim*

*Leacock v. IonQ, Inc.*,
    2023 WL 6308045 (D. Md. Sept. 28, 2023) ............................................................4

*Lerner v. Nw. Biotherapeutics*,
    273 F. Supp. 3d 573 (D. Md. 2017) ...............................................................13, 14

*Maguire Fin., LP v. PowerSecure Int'l, Inc.*,
    876 F.3d 541 (4th Cir. 2017) ...................................................................................2

*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*,
    2021 WL 2401641 (D. Md. June 11, 2021)..............................................................4

*Miao v. Fanhua, Inc.*,
    442 F. Supp. 3d 774 (S.D.N.Y. 2020).....................................................................5

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015)...............................................................................................11

*In re Philip Morris Int'l Inc. Sec. Litig.*,
    2023 WL 8883457 (2d Cir. Dec. 26, 2023) ...........................................................10

*Phillips v. LCI Int'l, Inc.*,
    190 F.3d 609 (4th Cir. 1999) .................................................................................13

*Raab v. Gen. Physics Corp.*,
    4 F.3d 286 (4th Cir. 1993) ..................................................................................9, 10

*Ret. Sys. of the City of Baton Rouge & Par. of E. Baton Rouge v. MacroGenics, Inc.*,
    61 F.4th 369 (4th Cir. 2023) ...........................................................................9, 10, 12

*Ret. Sys. v. Anixter Int'l, Inc.*,
    2011 WL 1303387 (N.D. Ill. Mar. 31, 2011)..........................................................3

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001) ...................................................................................6

*In re SCANA Corp. Sec. Litig.*,
    2019 WL 1427443 (D.S.C. Mar. 29, 2019) ...........................................................10

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Sinnathurai v. Novavax, Inc.*,
  645 F. Supp. 3d 495 (D. Md. 2022) ....................................................................5, 6

*Slayton v. Am. Express Co.*,
  604 F.3d 758 (2d Cir. 2010)..................................................................................12

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007)...................................................................................2, 3, 12, 15

*In re Under Armour Sec. Litig.*,
  342 F. Supp. 3d 658 (D. Md. 2018) ......................................................................13

*Yates v. Mun. Mortg. & Equity, LLC*,
  744 F.3d 874 (4th Cir. 2014) ...........................................................................13, 14

**Statutes**

15 U.S.C. § 78u-4(b)(1)(B).......................................................................................7

**Rules**

Fed. R. Evid. 201 ......................................................................................................3

## I.    INTRODUCTION

Defendants' Opening Brief carefully detailed Aurinia's public disclosures about the commercialization progress of LUPKYNIS, its FDA-approved treatment for patients with active lupus nephritis ("LN"), during the class period. It further explained how *everything* Plaintiff alleges was omitted was in fact repeatedly disclosed to investors in real time. Plaintiff knows this, so it can only ask the Court to ignore these disclosures because some were not "incorporated by reference" into the Amended Complaint ("AC"). That is not the law. In securities class actions like this one, both the Supreme Court and the Fourth Circuit *require* courts to take judicial notice of extrinsic documents to determine what was disclosed to the public and to consider the challenged statements "in context." If that were not the clear rule, plaintiffs could do exactly what Plaintiff attempts here: purposefully plead around public disclosures and then claim they never happened.

Plaintiff's smoke and mirrors do not stop there. Recognizing the many defects with the AC's confidential witness ("CW") allegations, the Opposition tries to supplement them with a heavy dose of hyperbole. For example, the Opposition says there were "***high numbers*** of uncompliant patients," that "LUPKYNIS sales was [*sic*] ***severely*** limited as a result of the issues;" and that "LN patients ***more often than not*** . . . end up abandoning treatment." ***None*** of this quantifying language is alleged in the AC (or anywhere else), and even if it were, it is not supported by well-pled facts provided by the CWs or otherwise. The CW allegations are, at their core, a tiny collection of vague anecdotes about unquantified "issues" that are unmoored in time.

But there is a separate reason to dismiss the AC: all challenged disclosures are inactionable as a matter of law because they are puffery, opinions, or forward-looking statements protected by the PSLRA safe harbor. Plaintiff responds by misstating bedrock securities legal standards and by string-citing (but not applying) case law that is plainly distinguishable.

There are even further grounds for dismissal: the AC does not allege with any particularity

that any Individual Defendant knew their statements were false when made. In fact, Plaintiff candidly admits "***there are no allegations of negative internal reports***." Without a legally cognizable motive, the AC and Opposition are paved only with vague allegations common to all executives that cannot independently establish scienter. Viewing all the facts holistically, the much more compelling inference is that the Company warned investors of the many anticipated and contemporaneous challenges associated with launching a drug for a rare disease during a global pandemic, achieved its 2021 revenue projections, and projected 150–200% more revenue the next year. That is not fraud.

Congress enacted the PSLRA because private actions to enforce the federal securities laws, "if not adequately contained, can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007). The PSLRA was designed to "discourage fishing expeditions" and to "eliminate meritless suits brought only to extract a settlement." *Maguire Fin., LP v. PowerSecure Int'l, Inc.*, 876 F.3d 541, 546 (4th Cir. 2017). Thus, the pleading standards by which this Court must judge Plaintiff's claims in the AC are far more demanding than those imposed upon a standard complaint, or even a complaint asserting fraud. Plaintiff's approach in both the AC and Opposition has been to pay lip service to these heightened standards but to ignore them in practice. Where the PSLRA demands facts pled with ***particularity***, Plaintiff offers generalities. Where the PSLRA demands the pleading of ***contemporaneous*** facts demonstrating a strong inference of scienter, Plaintiff provides vague, undated innuendo. Accordingly, the AC should be dismissed.

## II.   DEFENDANTS' APPENDIX AND EXHIBITS ARE PROPER

The Opposition (Dkt. 72 ("Opp.")) begins with nitpicking, claiming that Appendix A (Dkt. 71-3) is an "end-run around the . . . page limit" because it makes arguments that are not in Defendants' Opening Brief. (Opp. at 8.) But Appendix A merely organizes the statements

2

Defendants believe Plaintiff is challenging and refers to the arguments in Defendants' Opening Brief (Dkt. 71-1 ("Defs.' Br.")). Nothing more. This "summary document [is] intended to assist the Court in evaluating the . . . statements . . . challenged in the complaint," *Garden City Emps.' Ret. Sys. v. Anixter Int'l, Inc.*, 2011 WL 1303387, at *9 (N.D. Ill. Mar. 31, 2011), not a "devious attempt to avoid page limitations," *Edwards v. McDermott Int'l, Inc.*, 2022 WL 3927828, at *5 n.3 (S.D. Tex. Aug. 30, 2022). Appendices like Appendix A are securities class action staples.[1]

Plaintiff also challenges Exhibits 1, 2, 3, 5, 6, 13, 17, and 20—transcripts of Aurinia conference calls and an Aurinia press release filed with the U.S. Securities and Exchange Commission—because they were not incorporated by reference into the AC. (Opp. at 8 & n.3.)[2] But the Court should still consider them because they are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011) (quoting Fed. R. Evid. 201); *Tellabs*, 551 U.S. at 322 (requiring courts to consider "matters of which a court may take judicial notice" when evaluating a securities class action motion to dismiss). Plaintiff concedes that the Court can use such documents "to determine what the documents stated, but not to prove truth." (Opp. at 8 n.2). And that is precisely why Defendants included these exhibits: to show that the allegedly "omitted information was disclosed." (Opp. at 19.) Courts routinely take judicial notice of documents for that ***exact reason***—*i.e.*, "to assess what the market knew at particular points in time" and because "a court must consider alleged false statements in the context of the entire record." *Johnson v. Pozen Inc.*, 2009 WL 426235, at *1–2 (M.D.N.C. Feb. 19, 2009); *see also*

---

[1] *See, e.g.*, *In re 2U, Inc. Sec. Class Action*, No. 19-cv-03455 (D. Md. Oct. 27, 2020), Dkt. 144-27; *Leacock v. IonQ, Inc.*, No. 22-cv-01306 (D. Md. Feb. 7, 2023), Dkt. 75-57; *Fagen v. Enviva Inc.*, No. 22-cv-02844 (D. Md. June 2, 2023), Dkt. 62-1.

[2] Plaintiff does not challenge the remaining exhibits and the Court should also consider them.

*Leacock v. IonQ, Inc.*, 2023 WL 6308045, at \*9 (D. Md. Sept. 28, 2023) (taking judicial notice of publicly available documents "as an indication of what information was available to the market").

## III.   THE CW ALLEGATIONS CANNOT ESTABLISH FALSITY OR SCIENTER

The Opposition does nothing to remedy two fatal shortcomings regarding the AC's CW allegations, which form the entire basis for Plaintiff's omissions-based theory of fraud (¶¶ 29–41, 48, 52, 64)[3] and upon which Plaintiff also relies to demonstrate scienter (¶¶77–79).

***First, the CWs—former low-level, regional Aurinia employees—cannot reliably speak about Company-wide sales or commercialization efforts.*** (Defs.' Br. at 21–22.) Plaintiff claims that "Aurinia sales representatives were experiencing the same sales issues" as the CWs "across the country." (Opp. at 30.) But Plaintiff "fails to make these allegations [in the AC] . . . and [it] cannot amend [the] complaint through [its] . . . opposition." *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 2021 WL 2401641, at \*16 (D. Md. June 11, 2021). Even if it had, Plaintiff neither cites any authority justifying such an unreasonable inference nor addresses the many cases explicitly rejecting it. (Defs.' Br. at 21–22.) Nor does Plaintiff account for the other unreasonable inferences necessarily underpinning this claim: that Defendants knew about these CW allegations ***and*** thought they applied across the Company nationwide.[4]

Retreating, Plaintiff argues that there is no requirement that CWs must know about Company-wide operations. (Opp. at 17–18.) But there ***is*** such a requirement here where Plaintiff is projecting the CWs' isolated experiences onto ***every*** Aurinia sales representative. *See KBC Asset*

---

[3] The first two alleged omissions—that Aurinia was targeting rheumatologists over nephrologists and that LN patients have a cultural distrust of medicine—are supported only by Plaintiff's say-so, and by no CW (or any other factual) allegations at all. (Defs.' Br. at 23–24.)

[4] Plaintiff argues that Defendants "offer[] no legal or factual basis to question [the CWs'] reliability" because Plaintiff has pleaded the CWs' "position, period of employment, responsibilities and supervisor." (Opp. at 17.) Plaintiff misses the point. Job descriptions aside, the CW allegations are far too vague and anecdotal to infer that ***everyone else*** in the Company had the same experiences or that Defendants knew about them. ***That*** is the type of reliability the CWs lack.

4

*Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601, 609 (4th Cir. 2021) (explaining that CW "allegations will only be afforded the weight they are due given their indicia of reliability").

Plaintiff also asks the Court to excuse the CWs' lack of knowledge about Company-wide operations because the AC's allegations "are not . . . conducive to specific metrics." (Opp. at 18.) Plaintiff offers no support for this eyebrow-raising claim—the PSLRA's heightened pleading standards apply to ***all*** securities class actions regardless of the types of allegations. And while Plaintiff prefers to focus on vague (and undefined) references to Company goals (¶ 34), it ignores the many unchallenged specific metrics pleaded in the AC and repeatedly disclosed to investors (*e.g.*, PSFs, amount of insurance coverage, and price per patient). (*See, e.g.*, ¶¶ 22, 50, 53.)

***Second***, ***the CW allegations are hopelessly vague and anecdotal.*** (Defs.' Br. at 22–23.) These are not "mere[] label[s]," as Plaintiff suggests. (Opp. at 18.)

**When:** None of the CW allegations are tied to any time period (*e.g.*, month, quarter, year), making Plaintiff's task of showing that the "statements were knowingly false ***when made***" impossible. *Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 799 (S.D.N.Y. 2020).

**What:** The CW allegations are full of ambiguous catch phrases ("uptake," "sales numbers," "slower than they wanted," "sales issues," "lack of Start Form achievement," "some doctors did not appreciate," "patients . . . would skip a few days"). Because none of these allegations even attempt to quantify the supposed "issues," Plaintiff cannot show, as it must, that any of them necessarily contradicted any challenged statement. *Izadjoo v. Helix Energy Sols. Grp.*, 237 F. Supp. 3d 492, 513 (S.D. Tex. 2017) (alleging "some issues" "falls short of the PSLRA's particularity requirement" because "it is unclear whether [those] 'issues' were . . . severe enough").

Relying on *Sinnathurai v. Novavax, Inc.*, 645 F. Supp. 3d 495 (D. Md. 2022), Plaintiff argues that CWs can "confirm issues 'generally.'" (Opp. at 18.) But there was nothing "general"

about the issues alleged in *Novavax*—the FDA issued a scathing and ***specific*** 52-page report about "contamination and purity" issues at the defendant's vaccine manufacturing facility, which was forced to "shut down." *Novavax,* 645 F. Supp. 3d at 519. General "issues" are not the stuff of securities fraud, but "the daily work of business people," and that they "exist does not make a lie out of any of the alleged false statements." *Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001).

Plaintiff cannot win on the law, so it attempts to change the facts. The Opposition retroactively tries to inject specificity into the AC by claiming, for example, that there were "***high numbers*** of uncompliant patients," that "LUPKYNIS sales was [*sic*] ***severely*** limited as a result of the issues;" and that "LN patients ***more often than not*** do end up abandoning treatment." (Opp. at 5, 12, 14–15, 22.) ***None*** of this quantifying language is alleged anywhere in the AC, nor is it supported by any well-pled facts alleged by the CWs or anyone else.

**Who:** None of the CWs are alleged to have interacted (significantly or otherwise) with the Individual Defendants, and therefore cannot (and do not purport to) speak reliably about their state of mind. (Defs.' Br. at 28–29.) Quizzically relying on *KBC*, Plaintiff argues that the CWs' lack of interaction with the Individual Defendants weakens, but does not eliminate, the inference of scienter. (Opp. at 30–31.) But in *KBC*, which ***affirmed*** dismissal on scienter grounds, the CWs had at least minimal interaction with the individual defendants. 19 F.4th at 609 ("***for the most part*** [the CWs] do not allege that they passed their concerns on to . . . the individual Defendants."). Here, however, there is no specific ***contact of any kind*** alleged, so even a weak inference of scienter would "def[y] logic." *In re Conventry Healthcare, Inc. Sec. Litig.*, 2011 WL 1230998, at *6 (D. Md. Mar. 30, 2011).[5]

---

[5] Plaintiff cites *Novavax* for the proposition that "there is no requirement that CWs have direct communication with the Defendants." (Opp. at 31.) But that was only true there because the CWs showed how information flowed from low-level employees directly to the individual defendants.

The only allegation even remotely connecting a CW to an Individual Defendant is a conference call attended by both Mr. Greenleaf and CW 3. (¶ 79.) But CW 3 does not specify what Mr. Greenleaf or CW 3 said during this call (if anything at all). These gaps foreclose any inference of scienter. *See KBC*, 19 F.4th at 609 (rejecting "vague and conclusory" CW allegations).

## IV.    PLAINTIFF FAILS TO PLEAD THAT ANY STATEMENT WAS FALSE

The Opposition glosses over the PSLRA, which requires Plaintiff to "specify each statement alleged to have been misleading [and] the . . . reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B). (Defs.' Br. at 12.) The AC falls short of these heightened standards.[6]

### A.    All the Allegedly Omitted Information Was Repeatedly Disclosed

The alleged omissions cannot render any statements false because they were repeatedly disclosed by Defendants.[7] (Defs.' Br. at 23–26.) Plaintiff *cannot* fix this pleading defect.

*"[T]argeting the wrong types of physicians."* Defendants repeatedly disclosed that Aurinia's sales teams were targeting both nephrologists and rheumatologists. (*Id.* at 23–24.) Plaintiff argues such disclosures fail because Defendants did not disclose that the Company was "targeting rheumatologists over nephrologists." (Opp. at 19.) This claim is puzzling—Aurinia disclosed it was targeting "5,000 rheums and . . . 7,500 nephrologists," *i.e.*, *more nephrologists than rheumatologists*. (Ex. 3 at J.R. 59.)

---

645 F. Supp. 3d at 524–26. The AC alleges nothing of the sort here.

[6] The Opposition confirms that the AC is a puzzle pleading. (Defs.' Br. at 13–15; Opp. at 21 (explaining that the "alleged misrepresentations" are "contain[ed]" somewhere in "13 paragraphs," which are mostly lengthy walls of text).) And Plaintiff ignores that many of the omissions could not have rendered any statement false as a matter of logic. (Defs.' Br. at 14–15.)

[7] Plaintiff argues that Defendants cannot assert a "truth-on-the-market defense" at the pleading stage. (Opp. at 20–21.) But Defendants are doing no such thing—the "'truth-on-the-market' defense attempts to prove that the truth made its way to the market through sources *other than defendants*." *Chang v. Accelerate Diagnostics, Inc.*, 2016 WL 3640023, at *5 (D. Ariz. Jan. 28, 2016). Here, conversely, Defendants "argue that *they* disclosed all required information" *In re Intel Corp. Sec. Litig.*, 2019 WL 1427660, at *13 n.13 (N.D. Cal. Mar. 29, 2019).

*LN Patients' "social and economic backgrounds."*[8] Defendants repeatedly disclosed that LN's "non-white" patient population was "notoriously uncompliant" and harder to reach during the pandemic because they experienced "significant hurdles in seeing their physicians and in access to medical testing." (Defs.' Br. at 24.) Plaintiff argues these disclosures fail because they were about COVID, not "cultural or medical" issues. (Opp. at 19.) Not so—these disclosures were about how COVID disproportionately affected LN patients' access to medical care *because they were minorities.* (Defs.' Br. at 24; Ex. 6 at J.R. 736 (disclosing that the "unique and different" LN patient population was hard to reach "[e]specially" during COVID")).)

*"Uncompliant patients."* Defendants repeatedly disclosed that some LUPKYNIS patients were not and would not be drug-compliant and that some would stop treatment altogether. (Defs.' Br. at 24–25.) Plaintiff argues these disclosures fail because they do not address noncompliance or indicate that noncompliance was high. (Opp. at 20.) But Defendants addressed precisely that. (*See e.g.*, Ex. 12 at J.R. 848, 853-54 (August 2021: "[T]he rate of prescription abandonment . . . has been low" and the "persistency rate" is "less than 10% [of patients] are going off of drug.")). And the AC never alleges that noncompliance was high (or even low or medium). Thus, that high noncompliance was not disclosed is irrelevant.[9]

*"Cost and time-consuming paperwork . . . lack of insurance coverage and/or extra [coverage] requirements."* Defendants repeatedly disclosed that some physicians would be and in

---

[8] The AC makes no well-pled allegations whatsoever supporting Plaintiff's claim that LN patients have a "cultural distrust of medicine" and a "loss of hope for treatment." (¶ 48; Opp. at 19.)

[9] The "notoriously uncompliant" statement was not a corrective disclosure, as Plaintiff argues. (Opp. at 20.) The only corrective disclosure pled in the AC came three months later. (¶ 103.) Plus, it was not a "disclosure" at all—Mr. Greenleaf explicitly stated it was too early to report compliance trends. (¶ 58.) The Opposition also infers that Mr. Greenleaf reported "mixed financial performance" in Q3. (Opp. at 15.) But this quote comes from a third-party investing website, *not* from Mr. Greenleaf. https://seekingalpha.com/news/3763823-aurinia-pharma-slips-as-uptake-of-lupus-nephritis-therapy-slows (last visited January 11, 2024).

fact were hesitant to prescribe LUPKYNIS because of "cost," "paperwork," and the Company's "inability to promptly obtain coverage." (Defs.' Br. at 25–26.) Plaintiff says these disclosures are "generalized." (Opp. at 20.) But they are just as specific, if not more so, as the alleged omissions. *Compare* ¶ 39 ("paperwork . . . tied up the staff"), *with* Ex. 13 at J.R. 865–66 ("[If] the drug is being approved as a medical exception . . . that can require more paperwork."); *compare* ¶ 40 ("if [LUPKYNIS] was not covered . . . it was very difficult to get a prescription."), *with* Defs.' Br. at 26 ("[o]f course, we've had payer denials;" "reimbursement may be limited or unavailable;").[10]

### B.  The Challenged Statements Are Inactionable as a Matter of Law

***Puffery.*** Many of the challenged statements are puffery, *i.e.*, corporate cheerleading that the Fourth Circuit has consistently held cannot be false. *Emps.' Ret. Sys. of the City of Baton Rouge & Par. of E. Baton Rouge v. MacroGenics, Inc.*, 61 F.4th 369, 386 (4th Cir. 2023). Indeed, courts have repeatedly held that **the exact language Plaintiff is challenging** here is inactionable puffery.[11] (*See* Defs.' Br. at 16; Appendix A.)

Without citing a single example, Plaintiff argues that none of the challenged statements can be puffery because of "the real difficulties the Company was then experiencing." (Opp. at 23.) But the alleged "difficulties" are so vague that they cannot transform plainly puffing statements into actionable ones. For example, alleging that the "uptake" of LUPKYNIS was "slower" does not mean Mr. Greenleaf did not "believe [the Company was] pointing in the right direction."

---

[10] The AC's allegations are galaxies away from those in *In re Emergent BioSolutions Inc. Sec. Litig.*, 2023 WL 5671608 (D. Md. Sept. 1, 2023), where the defendants touted their manufacturing facility when they knew about an FDA report detailing nine egregious facility deficiencies and a congressional report detailing how the defendants hid evidence from investigators. *Id.* at *5.

[11] *Compare* ¶ 47 ("we are right on trends"), *with MacroGenics*, 61 F.4th at 386 ("trending for OS has been positive"); *compare* ¶ 49 ("well-poised for growth"), *with Raab v. Gen. Physics Corp.*, 4 F.3d 286, 289 (4th Cir. 1993) ("poised to carry the growth" inactionable); *compare* ¶ 63 ("aggressive numbers"), *with City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 670-71 (6th Cir. 2005) ("aggressive product development" and "aggressive marketing" inactionable).

(¶¶ 34, 47). And because none of the "difficulties" are tied to any time period, Plaintiff cannot show that the Company was "*then* experiencing" any of them.[12]

Plaintiff also argues that puffing statements are actionable when they "express[] certainty" but again does not point to any examples. (Opp. at 23.) None of the puffing statements are "objectively verifiable statements of fact," *In re SCANA Corp. Sec. Litig.*, 2019 WL 1427443, at *9 (D.S.C. Mar. 29, 2019), that "can be proven true or false," *Dunn v. Borta*, 369 F.3d 421, 431 (4th Cir. 2004).[13] (*See, e.g.,* ¶ 58 ("So far things have looked good.").)

Plaintiff argues that responses to analysts' questions cannot be puffery. (Opp. at 23–24.) But that cannot be true—just last year, the Fourth Circuit affirmed dismissal of a puffing statement made "*after being asked*" by an analyst. *MacroGenics*, 61 F.4th at 369, 377. And because Plaintiff's cases involve "factual" and "specific" statements, they are distinguishable. *Compare, e.g.*, *Hecick v. Kraft Heinz Co.*, 2021 WL 3566602, at *10 (N.D. Ill. Aug. 11, 2021) ("significantly improved our case fill . . . *to over 97%*"), *with* ¶ 49 ("Aurinia *continues to make progress*").

*Opinions.* The AC challenges many opinions (Defs.' Br. at 19; Appendix A), but the Opposition barely addresses them. Plaintiff argues that only one of them—*i.e.*, "aggressive numbers will come from us"—is not an opinion because Mr. Greenleaf did not use the prefatory "I believe." (Opp. at 24.) While such language is "sufficient," it is "not *necessary*" to render a statement an opinion—"inherently subjective . . . assessments" like Mr. Greenleaf's count too. *In*

---

[12] Plaintiff's cases are readily distinguishable. *See, e.g.*, *In re James River Grp. Holdings, Ltd. Sec. Litig.*, 2023 WL 5538218, at *8-9 (E.D. Va. Aug. 28, 2023) (puffing statement "historically well-informed judgment" was actionable because defendant "in fact had no reserve methodology"); *Raab*, 4 F.3d at 290 (puffing statements can be actionable when at odds with "current facts").

[13] Plaintiff argues that statements must have "qualifiers" to be puffery. (Opp. at 23.) That is not the law. Plaintiff's case for that proposition merely distinguishes another case finding statements with such qualifiers were puffery. *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *8 (S.D.N.Y. May 24, 2018) ("Unlike in *UBS AG*, where the statements at issue contained qualifiers . . . "). But no case says such qualifiers are required.

*re Philip Morris Int'l Inc. Sec. Litig.*, 2023 WL 8883457, at *5 (2d Cir. Dec. 26, 2023). In any case, Mr. Greenleaf explicitly said that ***he thought*** that "150 to 200-plus percent growth year-on-year [was] aggressive in light of the challenges everyone [wa]s facing." (Ex. 20 at J.R. 979.)[14]

***Forward-Looking Statements.*** Defendants identified many forward-looking statements that the PSLRA safe harbor shields from liability. (Defs.' Br. at 17.) Plaintiff argues the safe harbor does not apply because Defendants' cautionary language—which accompanied every challenged forward-looking statement (Defs.' Br. at 17–18)—is not meaningful because it is "not exact and clear enough." (Opp. at 25; *see also id.* at 16, 26.) Not so—Defendants included "specific warnings, tailored to address [Plaintiff's] exact complaints." *Syneos*, 75 F.4th at 245 (cleaned up). For example, Plaintiff alleges that Defendants failed to disclose that some physicians would not prescribe LUPKYNIS because of "cost." (¶ 52.) Defendants warned investors of the same thing. (Ex. 4 at J.R. 87 ("[M]arket acceptance for LUPKYNIS could be impacted by . . . ***cost-effectiveness***"); *see also* Defs.' Br. at 5, 25–26.)

Plaintiff attempts to analogize this case to *In re 2U, Inc. Securities Class Action*, 2021 WL 3418841 (D. Md. Aug. 5, 2021), but the defendants there touted increasing enrollment while omitting that their internal projections showed decreasing enrollment. *In re 2U* concluded that the defendants' risk factors were ineffective because "they did not specifically . . . disclose that 2U itself was specifically projecting declining enrollment." *Id*. But unlike in *In re 2U*, Plaintiff here admits "there are no allegations of negative internal reports." (Opp. at 18.) [15]

---

[14] Plaintiff argues that the opinions are actionable because "they omit material information." (Opp. at 24 (citing *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 189 (2015)).) But that is the extent of Plaintiff's analysis. Plaintiff does not identify what omitted information rendered which opinions actionable or explain why.

[15] Plaintiff argues that the safe harbor categorically does not apply to complaints alleging omissions. (Opp. at 24–25.) But even Plaintiff's cases recognize that is not the law. "Risk

Plaintiff also argues that Aurinia's cautionary language failed to warn that "the risks ha[d] already transpired." (Opp. at 16, 25.) This argument fails because the AC does not allege **when** any of the so-called risks occurred. (*See supra* at Section III.) The Opposition has no answer to this devastating deficiency.[16]

## V.    PLAINTIFF FAILS TO PLEAD A STRONG INFERENCE OF SCIENTER

Plaintiff's failure to plead particularized facts supporting a strong inference of scienter is an independent reason to dismiss the AC. The Opposition's "throw-it-all-against-the-wall-to-see-what-sticks" approach to scienter cannot change that.

At the outset, Plaintiff once again misstates elementary securities law: **mere** recklessness is **not** enough to plead a strong inference of scienter. (Defs' Br. at 29.) Instead, Plaintiff must allege **contemporaneous** facts demonstrating "either intentional or **severely** reckless conduct," where "[r]ecklessness" is defined as "an act so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff." *KBC*, 19 F.4th at 607–08. The PSLRA requires a **strong** inference, based on facts pled **with particularity**, that Defendants acted with "intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319, 321. Plaintiff's allegations come nowhere close to satisfying these demanding pleading standards.

*No "actual exposure."* Plaintiff alleges that Individual Defendants had "access to certain

_____

disclosures are considered part of the 'total mix of information made available' to investors. *Emergent*, 2023 WL 5671608, at *18 (quoting *Syneos*, 75 F.4th at 245).

[16] Plaintiff is incorrect that "safe harbor protection is **only** given to forward-looking statements accompanied by meaningful cautionary language." (Opp. at 24.) The safe harbor also applies, even without cautionary language, if Plaintiff "fail[s] to plead that the speaker had actual knowledge of the statements' falsity at the time the statements were made." *MacroGenics*, 61 F.4th at 389. To address this, Plaintiff merely references the Opposition's scienter section. (Opp. at 26.) But there is a difference between scienter and actual knowledge—circumstantial evidence is sometimes enough for the former, but the latter requires showing that the Individual Defendants **actually knew** their statements were false. *See Slayton v. Am. Express Co.*, 604 F.3d 758, 773 (2d Cir. 2010). Plaintiff falls well short of this high standard. (*See infra* at Section V. ("No 'actual exposure'").)

reports." (¶ 76.) But the AC fails to allege even the most basic details about these reports, or that any Individual Defendant read them. *See Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 890 (4th Cir. 2014) (requiring "actual exposure" to fraud in reports).[17] But we need not speculate about what the alleged reports said because, according to Plaintiff, "***there are no allegations of negative internal reports***." (Opp. at 18.) This concession cripples Plaintiff's theory.

Plaintiff next argues that Individual Defendants must have known their statements were false when made because they reported historical financial data. (Opp. at 33.) Nonsense—just because Individual Defendants reported "[t]otal revenue" (*id.*) does not mean they knew, for example, that a ***single*** sales representative thought physicians "didn't appreciate" paperwork. (¶ 39.) *See In re Under Armour Sec. Litig.*, 342 F. Supp. 3d 658, 691 (D. Md. 2018) ("knowledge of the Company's sales growth" did not create an inference that the speaker knew related representations were false). Critically, Plaintiff does not allege any of this data was false or identify a known, contemporaneous fact that contradicted any statement. (Defs.' Br. at 32–33.)

***No motive.*** The AC's motive allegations fail to establish scienter because they are common to all executives and did not result in any "concrete benefits." *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 621 (4th Cir. 1999). The Opposition largely ignores these defects. For example, Plaintiff claims that Individual Defendants' "exorbitant compensation" supports scienter because it was "tied to performance goals." (¶¶ 89–92; Opp. at 34.) But Plaintiff has neither identified ***any*** performance goals nor articulated ***how*** they incentivized Individual Defendants to commit fraud. Plaintiff also ignores that most of the AC's compensation allegations are tied to compensation that

---

[17] For the same reason, Plaintiff's argument that Individual Defendants "[o]bviously . . . had access to . . . calls and meetings" simply because of their positions at the Company is unavailing. (Opp. at 30.) *Lerner v. Nw. Biotherapeutics*, 273 F. Supp. 3d 573, 593 (D. Md. 2017) (collecting cases and stating that "[c]ourts have routinely held that corporate executives' access to information and internal affairs is not enough to demonstrate scienter under the PSLRA").

was paid to Individual Defendants *before* any challenged statement was made. (Defs.' Br. at 29.)

The AC also alleges that Individual Defendants committed fraud to raise money for Aurinia's operations. (¶¶ 93, 95.) Recognizing that this generic motive is not probative of scienter, *Lerner*, 273 F. Supp. 3d at 595, Plaintiff now says that the need for funding was "urgent." (Opp. at 34.) Even if this were a valid motive, the AC contains no facts to support it.[18]

***Plaintiff's supplemental scienter allegations do not amount to even the slightest inference of scienter.*** All that is left is Plaintiff's hodgepodge of allegations of scienter that, even if well-pled, cannot establish scienter on their own. (Defs.' Br. at 31–33.)[19]

First, Plaintiff argues that non-defendant Mr. Colao's departure from Aurinia was "abrupt." (Opp. at 28.) This claim is absent from the AC, as are facts to support it. And Plaintiff fails to explain how this was "suspicious." (Defs.' Br. at 34.) Plaintiff also ignores that Mr. Colao's departure has ***zero*** "probative value" because it occurred five months ***after*** the class period. *In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 896 (W.D.N.C. 2001). (*See* Defs.' Br. at 34.)

Second, Plaintiff argues Mr. Greenleaf must have known his "aggressive guidance" statement was false when made because, two weeks later, he issued guidance ***others*** did not think was aggressive. (Opp. at 16, 33.) But to demonstrate scienter, Plaintiff must plead facts indicating ***Mr. Greenleaf*** thought this guidance would not be aggressive. And there are none. In fact, Mr. Greenleaf disclosed that he thought "150 to 200-plus percent growth year-on-year [***was***] aggressive

---

[18] Plaintiff's failure to plead a cognizable motive or any Defendant's stock sales "weighs heavily against [it] in the scienter analysis." *Syneos*, 75 F.4th at 242; *In re Acterna Corp. Sec. Litig.*, 378 F. Supp. 2d 561, 576–77 (D. Md. 2005) (holding that a lack of stock sales by defendants creates a "negative inference" regarding scienter).

[19] *Syneos*, 75 F.4th at 244 (declining to "read anything nefarious" into executive departures where "Plaintiffs have failed to raise an inference of scienter through any other means"); *KBC*, 19 F.4th at 612 (same but for temporal proximity); *Yates*, 744 F.3d at 890 (same but for core operations and the individual defendants' positions at the company).

in light of the challenges everyone [wa]s facing." (Ex. 20 at J.R. 979.)

Third, Plaintiff asks the Court to infer that Individual Defendants knew about "**all issues** surrounding the commercialization and sales of LUPKYNIS" because of their roles at the Company and because LUPKYNIS was Aurinia's main product. (Opp. at 31–32.) But it would be wholly illogical to infer that based on, for example, a single salesperson in Dallas who thought LN patients would "skip a few days" of treatment. (¶ 37.)[20]

*The non-culpable inference is far more compelling than the inference of scienter.* Viewed holistically, and considering "plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff," *Tellabs*, 551 U.S. at 324, the far more compelling inference is that Defendants were cautiously optimistic about LUPKYNIS' prospects. And there was good reason to be—the Company squarely hit its 2021 revenue guidance during a global pandemic and projected 150–200% more revenue growth the next year. Defendants were completely transparent about both the ordinary risks associated with commercializing a brand-new drug for a rare disease and the unique risks and impacts COVID-19 had on their sales teams' effectiveness. Plaintiff fails to plead facts showing that Individual Defendants had anything to gain by making false statements. And Plaintiff admits that "there are no allegations of negative internal reports" that would have contradicted any challenged statement. (Opp. at 18.)[21]

## VI.    CONCLUSION

For these reasons, the AC should be dismissed with prejudice.

---

[20] *In re 2U* again is distinguishable. There, the court inferred that the company's CEO "knew that omitting the declining enrollment projections from his statement was misleading" because "enrollment provided the key revenue stream for the most important part of the business." 2021 WL 3418841 at *12. Here, "there are no allegations of negative internal reports." (Opp. at 18.)

[21] Plaintiff claims Defendants ignored the requisite holistic approach to scienter allegations and instead "focus[ed] on particular types of allegations and argue[d] for the insufficiency of each." (Opp. at 27.) Not so. Defendants showed that each of Plaintiff's scienter allegations fail to show a strong inference of scienter on their own, *and when viewed holistically*. (Defs.' Br. at 26–35.)

15

Dated: January 12, 2024                    **COOLEY LLP**


By:  */s/ David E. Mills*
David E. Mills
1299 Pennsylvania Avenue, NW,
Suite 700
Washington, DC 20004-2400
Tel: (202) 842-7800
dmills@cooley.com

Koji Fukumura (admitted *pro hac vice*)
Ryan Blair (admitted *pro hac vice*)
Heather Speers (admitted *pro hac vice*)
10265 Science Center Drive
San Diego, CA 92121-1117
Tel: (858) 550-6000
kfukumura@cooley.com
rblair@cooley.com
hspeers@cooley.com

Zach Williams (admitted *pro hac vice*)
1144 15th Street, Suite 2300
Denver, CO 80202-2686
Tel: (720) 566-4000
zwilliams@cooley.com

*Counsel for Defendants Aurinia Pharmaceuticals
Inc., Peter Greenleaf, and Joseph Miller*

16